1  Robert C. Holtzapple (State Bar No. 145954)
   FARELLA BRAUN & MARTEL LLP
2  235 Montgomery Street, 30th Floor
   San Francisco, CA  94104
3  Telephone:  (415) 954-4400

4

5  Andrew Wagener (*to be admitted pro hac vice*)
   BOLLENBECK, WAGENER, SPAUDE & FYFE, S.C.
6  W6260 Communication Court
   Appleton, WI 54914
7  Telephone: (920) 735-1711
   Facsimile: (920) 735-1710

8

9  Attorneys for Defendants
   J. MARK EBBEN
10 EBBEN ENTERPRISES, INC.

11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14 CALIFORNIA CLOSET COMPANY, INC., a  )   Civil Case No.  C 08-0625 SI
   California corporation,             )
15              Plaintiff,             )
                                       )
16     vs.                             )
                                       )
17 J. MARK EBBEN,                      )
18 an individual and                   )   **DECLARATION OF J. MARK EBBEN**
                                       )
19 EBBEN ENTERPRISES, INC.             )
   a Wisconsin corporation,            )
20              Defendant.             )
                                       )
21 ─────────────────────────────────── )

22 STATE OF WISCONSIN         )
                             ) SS
23 OUTAGAMIE COUNTY           )

24        J. Mark Ebben, being first duly sworn on oath deposes and says:

25        1.      I am an adult resident of the State of Wisconsin, one of the defendants in the above

26                referenced matter and President of defendant, Ebben Enterprises, Inc.

Farella Braun & Martel LLP
Russ Building, 30th Floor
235 Montgomery Street
San Francisco, CA  94104
(415) 954-4400

DECLARATION OF J. MARK EBBEN
Case No. C08-00625 SI

Page 1

2. The Franchise Agreement that is the subject of this action was negotiated assigned and executed in Wisconsin on April 20, 1990 with the transaction finalized on April 26, 1990. A copy of the Assignment of Franchise contracts are attached hereto as Exhibit "A" and incorporated herein by reference.

3. Ebben Enterprises, Inc. was organized in the State of Wisconsin on December 11, 1992, maintains its principal business offices in Wisconsin and does not conduct business in California. Further, all business conducted by myself and/or Ebben Enterprises, Inc. occurs in Wisconsin and Upper Michigan

4. Closet Works conducts business in Wisconsin only.

5. I have not physically visited California, for personal or business matters, individually or through Ebben Enterprises, Inc., in approximately ten years.

6. Neither I nor Ebben Enterprises, Inc. own or lease real or personal property in California.

7. Neither I nor Ebben Enterprises, Inc. have any agents, representatives or employees that reside in California.

8. Neither I nor Ebben Enterprises, Inc. have a mailing address or telephone listing in California.

9. Neither I nor Ebben Enterprises, Inc. have any business or personal bank accounts in California.

10. Neither I nor Ebben Enterprises, Inc. generate any revenue from business in California.

11. All evidence that I am aware of at this point in time that will be utilized in defending myself and Ebben Enterprises, Inc. is located in the State of Wisconsin.

12. All witnesses that I will be called to defend myself and Ebben Enterprises, Inc.

DECLARATION OF J. MARK EBBEN
Case No. C08-00625 SI

reside in the State of Wisconsin.

13.  I am a partial owner in The Closet Works, LLC.  None of my business associates

related to The Closet Works, LLC have any contacts with California.

14.  Defendants are amenable to litigating this action in the Eastern District of Wisconsin

Dated this __29__ day of February, 2008.

_J. Mark Ebben_

Subscribed and sworn to before me
this _29_ day of February, 2008.

Andrew Wagener, Notary Public
Outagamie County, Wisconsin
My Commission is permanent.

Farella Braun & Martel
Russ Building, 30th Floor
235 Montgomery Street
San Francisco, CA 94104

DECLARATION OF J. MARK EBBEN
Case No. C08-00625 SI

Page 3

# EXHIBIT A

**DECLARATION OF J. MARK EBBEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DIMSISS FOR IMPROPER VENUE UNDER §1391 or in the alternative TRANSFER VENUE FOR FORUM NON-CONVENIENS UNDER §1404(a)**



**EXHIBIT A**

ASSIGNMENT OF FRANCHISE

Damrau/Ebben

April 26, 1990

1.   Agreement of Purchase and Sale with Exhibits

2.   California Closet Approvals (May 29, 1990)

3.   Subordination Agreement (May 24, 1990)

4.   Assignment Agreement (April 20, 1990)

5.   Original Damrau/California Closet Franchise Agreement

---

SIGMAN, JANSSEN, STACK, WENNING & SUTTER          Attorneys at Law

303 S. Memorial Drive

Appleton, Wisconsin 54911

(414) 731-5201

## AGREEMENT OF PURCHASE AND SALE

This is an agreement between Chain O Lakes Express, Inc., of Waupaca, Wisconsin, James W. Damrau and Sally Damrau, (collectively referred to as "Seller") and J. Mark Ebben of Appleton, Wisconsin, ("Buyer"), for the purchase of franchise rights owned by Seller in the operation of its California Closets franchise pursuant to Franchise Agreement between Seller and California Closet Company, Inc., a California corporation, ("Franchisor") by Franchise Agreement dated 13th day of May, 1987.

### RECITAL

Seller is a duly authorized and operating California Closets franchisee in an exclusive territory defined in the Franchise Agreement. Seller desires to sell all of its right, title and interest in said franchise and assign the same to the Buyer, and the Buyer is willing to buy and assume the same on the terms and conditions herein provided, and as permitted by said Franchise Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, it is agreed as follows:

1.1 <u>Sale Of Franchise</u>. Seller conveys and assigns to the Buyer the franchise rights to the California Closets franchise for $20,000.00. The franchise rights are described in Franchise Agreement dated May 13, 1987, (Page 1 and Page 44 and exclusive territory exhibit only are attached as Exhibit 1) between Seller and Franchisor which entire Franchise Agreement is incorporated by reference. Buyer shall pay Franchisor training fee of $2,500.00 directly to Franchisor. Seller shall execute an appropriate assignment and

deliver the same to the Buyer after closing when all escrow conditions set out below are met.

1.2 <u>Sales Tax</u>. Any sales tax due on this transaction is the obligation of the Seller. The Seller indemnifies the Buyer for the same.

1.3 <u>Seller's Representations And Warranties</u>. Seller has good and marketable title to all franchise rights transferred herein. There are no liens or encumbrances on said franchise rights. There are no claims by Franchisor against Seller and Seller has paid all obligations to creditors relating to the operation of the California Closets franchise business so that Buyer will not have claims made against it by third party creditors for Seller's previous operations. Seller represents that all sales tax liabilities are paid and shall hold Buyer harmless regarding the same.

1.4 <u>Liabilities of the Seller</u>. Buyer assumes none of the liabilities of the Seller, and Buyer shall have no liability to pay or discharge any of Seller's obligations or liabilities as a result of the purchase of the franchise rights, except as otherwise specifically set out in said Franchise Agreement. The parties intend for Buyer to acquire ownership of Seller's franchise rights free and clear of all claims, encumbrances and liabilities. Seller agrees to indemnify and hold Buyer harmless for any claims or expenses resulting from claims asserted by creditors of Seller against Buyer.

1.5 <u>Closing In Escrow</u>. The Buyer and Seller shall execute this document prior to the closing date and provide Franchisor with a signed copy. On or before April 26, 1990, the Buyer shall deliver

$20,000.00 (less $500.00 already in realtor trust account) to the trust account of the Buyer's attorney, John C. Wenning, to be held in said trust account in escrow pending satisfactory completion of the following:

1.5.1    Written approval from the Franchisor that:

a.    The Franchise Agreement with the Seller is in full force and affect and expires April 13, 1997;

b.    Franchisor approves the assignment of franchise rights to the Buyer;

c.    Seller's obligations to the Franchisor under the Franchise Agreement are current and the Seller is in good standing with no setoffs or unpaid claims to the Franchisor;

d.    Franchisor waives rights of first refusal to Seller's Franchise Agreement.

1.5.2    Written confirmation from the Franchisor that the Buyer has completed all required Franchisor training requirements and that said training shall start on or about May 1, 1990.

1.5.3    Written commitment by Franchisor to offer Buyer a new Franchise Agreement for a "mini" franchise on the same terms and conditions as the assigned "Franchise Agreement" for the first seven years and on terms and conditions currently offered to other qualifying franchisees for a mini franchise

- 3 -

for the last three years at no extra franchise cost to Buyer.

1.5.4   Payment by the Seller to the Franchisor of all required transfer fees ($1,000.00) and payment to the Seller's realtor of applicable realty fees (total $2,000.00).

1.6 <u>Closing</u>.  Closing shall occur by mail on or before April 26, 1990. Seller's attorney shall hold all required documents pending fulfillment of all escrow requirements.

1.7 In the event all escrow requirements are not accomplished within thirty (30) days of the closing date, unless otherwise extended in writing by the Buyer and Seller, all funds paid under this agreement shall be returned to the Buyer and all documents signed by the Seller shall be returned to the Seller, and this contract will be at an end.

SELLER:

Chain O Lakes Express, Inc.

Dated: _____4 - 23 -90_____     By _James W. Damrau, Pres_
                                   James W. Damrau, President

Dated: _____4 - 23 -90_____     _James W. Damrau_
                                   James W. Damrau, Individually

Dated: ___4 -25 -90___          _Sally Damrau_
                                   Sally Damrau, Individually and as Secretary
                                   of Chain O Lakes Express, Inc.

                                BUYER:

Dated: __4 · 26 90___           _J. Mark Ebben_
                                   J. Mark Ebben

- 4 -

## COUNTERPARTS

Section 10.12.   This Agreement may be executed in any number of identical counterparts, and each such counterpart shall be deemed a duplicate original hereof.

## ACKNOWLEDGEMENT OF UNDERSTANDING

The parties hereto have fully read and understand this Franchise Agreement, its terms, conditions and significance. The parties hereto understand and agree that they either have had legal counsel review this Franchise Agreement or hereby expressly, knowingly and intelligently waive their right to have legal counsel review this Franchise Agreement. Further, the parties hereto while acknowledging their right to have legal counsel review and interpret this Franchise Agreement, voluntarily execute this Franchise Agreement mindful and understanding of its legal significance.

Executed at Encino, California, on the date and year first above written.

FRANCHISOR

CALIFORNIA CLOSET COMPANY, INC.

BY: _____

NEIL BALTER, President

FRANCHISEE

BY _____

44

## ASSIGNMENT AGREEMENT
## SALE OF FRANCHISE

This Assignment Agreement ("Agreement") is entered into as of April 20,          19 90     , ("Effective Date"), by and between California Closet Company, a California corporation ("Franchisor"), and    Chain O Lakes Express, Inc. ,  a                     doing
James and Sally Damrau/
business in the state of   Wisconsin          , as  California Closets (Original Franchisee") and  J. Mark Ebben        , an individual proposing to do business in the state of    Wisconsin            as
J. Mark Ebben, d/b/a
California Closets              ("New Franchisee").

### RECITALS

A.   Franchisor entered into a Franchise Agreement ("Franchise Agreement") dated as of    May 13      , 19 87 , with the Original Franchisee, under the terms of which the Original Franchisee was licensed to use a certain "System", including proprietary marks of Franchisor, for marketing, constructing, designing and installing commercial and residential storage space.  The right to use the Franchisor's "System" is hereafter referred to as the "Franchise".

B.   The Original Franchisee is contemplating the transfer of its business to the New Franchisee and wishes to transfer its rights under the Franchise Agreement to the New Franchisee.  In accordance with Section 7.03 of the Franchise Agreement, the Original Franchisee has delivered to Franchisor a written notice setting forth all of the terms and conditions of the proposed transfer.

C.   Franchisor has completed a review of the qualifications, including required financial statements and related information, of the New Franchisee.  Franchisor has determined that the new Franchisee's qualifications are acceptable and, therefore, Franchisor is willing to consent to an assignment of the Franchise Agreement from the Original Franchisee to the New Franchisee.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and such other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.   <u>CONSENT TO ASSIGNMENT</u>.   The Franchisor hereby consents to the assignment and transfer of the Franchise Agreement by the Original Franchisee to the New Franchisee, on the terms and conditions set forth herein.

2.   <u>FRANCHISE DISCLOSURE DOCUMENT</u>.    For a period of not less than ten (10) business days prior to its executing this Agreement, the New Franchisee has received and reviewed Franchisor's current Uniform Franchise Offering Circular and the current Franchise Agreement.   The New Franchisee acknowledges that the Franchise Agreement which is being assigned hereunder may differ in certain respects from the Franchise Agreement described in the current Uniform Franchise Offering Circular.   The New Franchisee further acknowledges that the Franchisor has not participated in the offer or sale of the Original Franchisee's business, including the assignment or the Franchise Agreement, except to approve the assignment of the Franchise Agreement to the New Franchisee.

3.   <u>TRAINING AND OPERATIONS</u>:

(a)   The New Franchisee, at its sole expense, shall comply with all training or orientation program requirements set forth in the Franchise Agreement commencing with the first available program offered by Franchisor.

(b)   The New Franchisee has reviewed the Franchisor's Franchise Manual ("Manual") and agrees to abide by all its terms and provisions in the operation of the Franchise.   In addition, the New Franchisee agrees to abide by all other manuals and guidelines of Franchisor, including, without limitation, those pertaining to inventory maintenance and advertising.

(c)  Unless otherwise indicated by addendum to this Agreement, the New Franchisee shall conduct its operations in compliance with the Franchise Agreement and from the same location(s) as that used by the Original Franchisee.  The Original Franchisee shall cause all of its rights and interest in and to the lease(s) for any and all locations from which the Franchise operations are conducted to be assigned to the New Franchisee.

4.   <u>ASSUMPTION OF LIABILITIES</u>.   The   New   Franchisee   hereby assumes and agrees to discharge or pay , when and as due, all the obligations of the Original Franchisee evidenced by and contained in the Franchise Agreement arising or accruing on or after the Effective Date of this Agreement.  In connection therewith, the New Franchisee shall execute such documents and take such further steps as may be reasonably necessary to reflect this assumption of obligations and liabilities.

5.   <u>RIGHT OF FIRST REFUSAL</u>.  In granting its consent  to  this Agreement, Franchisor has elected not to exercise its rights of first refusal as provided in Section 7.03 of the Franchise Agreement.   Notwithstanding the foregoing, however, Original Franchisee shall have a period of 90 days after the Effective Date hereof to complete the assignment and transfer consented to hereunder and , if the terms of the assignment materially change between the Effective Date and the date of transfer or if such 90 day period expires prior to such transfer, Franchisor shall again have a right of first refusal with respect to the proposed assignment of the Franchise Agreement, and the Original Franchisee shall again comply with Article 7 of the Franchise Agreement before the assignment can be effected.  The foregoing waiver shall not constitute a waiver as to any future proposed transfers or assignments.

6.   <u>CESSATION OF OPERATIONS</u>.    Immediately upon the assignment consented to hereunder, the Original Franchisee shall cease operating its Franchise business under the Franchise Agreement.

trans.ltr/assn.agr 1/90      Page 3

7.    <u>NO ASSIGNEES</u>.  This Agreement (and the consent to transfer incorporated herein) are effective solely with respect to the New Franchisee and may not be assigned or transferred, voluntarily or involuntarily, to any other person, firm or entity.

8.    <u>RELEASE BY ORIGINAL FRANCHISEE</u>.   In consideration of the foregoing, the Original Franchisee hereby releases and forever discharges Franchisor, and its officers, directors, shareholders, agents, employees, successors, subsidiaries, assigns, affiliates, and parent and subsidiary corporations, (collectively, "Releasees") and each of them, of and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including but not limited to attorneys' fees), damages, actions and causes of law or in equity (collectively, "Claims"), which the Original Franchisee now has or may hereafter have against any of the Releasees with respect to any matter, cause or thing as of the Claims which are in any way connected with or arising out of the operation of the Franchise or the actions of the Franchisor under the Franchise Agreement.   In executing this Release the Original Franchisee relinquishes any and all rights under California Civil Code Section 1542, which provides:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor",

and expressly releases the Releasees from Claims that are not known or suspected on the date of this Agreement.

9.      <u>MISCELLANEOUS</u>.

(a)  Any controversy or claim arising out of this Agreement shall be settled by arbitration conducted in Los Angeles, California in accordance with the Commercial Rules of Arbitration of the American Arbitration Association and judgment upon any award rendered in such arbitration may be entered in any court having jurisdiction thereof.

The foregoing shall not preclude an action for injunctive or other provisional relief in any court of competent jurisdiction.

(b)  In the event of any litigation to enforce any of the provisions of the Agreement, the prevailing party shall be entitled to reimbursement of costs of suit, including without limitation, reasonable attorneys' fees.

(c)  This Agreement constitutes the entire agreement between the parties hereto with respect to consent for the assignment of the Franchise Agreement, all other understandings or representations whether oral or written, having been incorporated herein, are otherwise superseded.

(d)  This Agreement may be executed in any number of copies each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

ORIGINAL FRANCHISEE

By: *Sally Damrau*
Sally Damrau - Secy
Chain O Lakes Express, Inc.

BY: *James W. Damrau*
James W. Damrau, Individually and as President of Chain O Lakes Express, Inc.

ITS: _____

NEW FRANCHISEE

BY: *J. Mark Ebben*
J. Mark Ebben

ITS: _____

CALIFORNIA CLOSET COMPANY, INCORPORATED

BY: _____

ITS: *VICE PRESIDENT*

damrau/ebben
trans.ltr/assn.agr 1/90       Page 5

FRANCHISE AGREEMENT

AGREEMENT made this 13 day of _____May_____, 1986, by and between CALIFORNIA CLOSET COMPANY, INC., a California corporation, with its principal place of business located at 6409 Independence Avenue, Woodland Hills, California, hereinafter referred to as "Franchisor" and _Jim and Sally Damrau/Chain o' Lakes Express, Inc._ of _Appleton, Wisconsin_ hereinafter referred to as "Franchisee."

R E C I T A L S

Franchisor and Franchisee mutually acknowledge the following:

THE FRANCHISE SYSTEM

Franchisor has developed a unique and successful system and procedure for the designing, marketing, constructing and installing of customized residential and commercial storage space including closets, garages, and other storage areas for consumers and the selling of related retail accessories (including "do-it-yourself kits") in retail showrooms, all of which is hereinafter referred to as the "Franchise System." Franchisor is a licensed California contractor, California license number B-457949 and is engaged in the business of designing, marketing, constructing and installing customized residential and commercial storage space including closets, garages and other storage areas for consumers and the selling of related retail goods and accessories including "do-it-yourself closet kits" in retail showrooms. Franchisor is also in the business of licensing the operation by others of the "customization of closets" and the sale of related retail accessories as part of the Franchise System.

As part of the Franchise System, Franchisor provides certain services to its Franchisees including use of Franchisor's contractor's license (California only) and/or assistance in obtaining a contractor's or specialty license, site selection, equipment and inventory purchase and selection, merchandising, advertising, sales and promotional, techniques, personnel training, use of Franchisor's name and logo and other services related to the efficient and successful operation of the custom closet business and the maintenance of high standards of quality, if such services are desired and requested by Franchisee.

In order to assist California Closet Company, Inc. Franchisees to get started in business and to achieve maximum results, Franchisor makes available to all Franchisees both initial and continuing information, experience, advice,

1

supervision, guidance and know-how with respect to the management, operation and promotion of the Franchise as part of the Franchise System.

## PROPRIETARY MARKS AND INDICIA

Franchisor, all California Closet Company retail showrooms, and the Franchise System, are operated in connection with and through the use of the following trade names, service marks and trademarks registered with the California Secretary of State and various other states:

1. California Closet Company Logo
   (See attached Exhibit "A")

2. Creative Closet Company Logo
   (See attached Exhibit "A")

A Service Mark application has been filed with the United States Office of Patents and Trademarks for the following:

1. Creative Closet Company Logo
   (See attached Exhibit "A")

2. California Closet Company Logo
   (See attached Exhibit "A")

The California Closet Company Service Mark will be used by all Franchisees to designate the Franchise System in all areas where Franchisor and its Franchisees do business.

## GOODWILL

Franchisor has expended large sums of money as well as effort over a period of years in developing and improving the Franchise system and in advertising, promoting, and publicizing the Franchise System's Proprietary Marks and Indicia, all of which have become well and favorably known to the public throughout the United States and Canada, and Franchisor has acquired valuable goodwill therein. The public has come to associate said Proprietary Marks and Indicia exclusively with the Franchise System and the services and products offered, sold, installed, and rendered by Franchisor.

## FRANCHISEE'S ACKNOWLEDGEMENTS

Franchisee has had the opportunity to investigate the Franchise System and the competitive market in which it operates and, based on the conclusions drawn therefrom, desires to establish a California Closet Company, Inc. business (hereinafter sometimes referred to as the "business") at the location hereinafter designated, use the Franchise System and its Proprietary Marks and Indicia, have the right to engage in

2

the business of offering to the public said products and services, and to derive benefit from Franchisor's information, experience, advice, guidance, know-how, and customer goodwill.

Franchisee acknowledges that each California Closet Company operation is dependent upon each of the other Franchisees in the Franchise System to establish and maintain the goodwill necessary for a successful operation of the Franchise System. Franchisee further acknowledges that it is essential to the maintenance of the high standards which the public has come to expect of the business, to the preservation of the integrity of the Franchisor's Proprietary Marks, Indicia, and goodwill, that each franchise adhere to the uniform standards, procedures, and policies hereafter described.

In consideration of the foregoing recitals, of the mutual covenants hereinafter set forth, and of other good and valuable consideration, Franchisor and Franchisee hereby agree as follows:

ARTICLE 1.   GRANT AND USE OF FRANCHISE
GRANT OF FRANCHISE

Section 1.01.    Subject to the terms and conditions contained herein, Franchisor hereby grants to Franchisee, and Franchisee hereby accepts from Franchisor, the right, franchise and license:

(a)   To establish and operate a California Closet Company business only at the location designated in Article 2 hereof;

(b)   To use, in connection with the operation of said business the Franchise System and its Proprietary Marks and Indicia;

(c)   To purchase those products listed in schedule A attached hereto which carry Franchisor's identifying marks for sale in Franchisor's showroom;

(d)   To perform, at Franchisee's business and in the field, those services listed in Exhibit A attached hereto, according to the standards and procedures established by Franchisor;

(e)   To utilize Franchisor's Contractors License with regard to services requiring same (within the State of California only).

TERM OF FRANCHISE

Section 1.02.   The term of this Agreement and of the right, franchise, and license granted herein shall commence as of the date of final execution hereof by all parties hereto and shall

3

continue in effect until its expiration pursuant to Article 9 hereof, unless sooner terminated in accordance with Article 8 hereof.

## INITIAL FRANCHISE FEE

Section 1.03. Franchisee will pay, concurrently with the execution of this Agreement, to Franchisor the sum of $20,000 as an initial fee for the right, franchise, and license hereby granted. Said initial franchise fee is in addition to the periodic royalty pursuant to Article 6 hereof.

## REFUND OF FEES

Section 1.04. The initial franchise fee referred to in Section 1.03, above, shall be deemed fully earned by Franchisor after due execution and delivery of this Agreement by Franchisor. Except as herein expressly provided, said initial franchise fee shall not be refunded, in whole or in part, upon any termination of this Agreement nor at any other or under any other circumstances whatsoever.

## DELIVERY OF OPENING INVENTORY & RELATED MATERIALS

Section 1.05. All training required of franchisee shall be complete within forty (45) days of execution of this agreement. All opening inventory, design layouts and supplies shall be provided by Franchisor to Franchisee within forty (45) days of execution of this Agreement.

## ARTICLE 2.   LOCATION  AND TERRITORY
### ADDRESS

Section 2.01. The exact address of Franchisee's business is 2323 W. Everett St. Appleton, Wisconsin 54914

## PROTECTED AREA

Section 2.02. Except as otherwise provided herein, Franchisor will not operate or allow any other party to operate a California Closet Company business within the protected area designated in Section 2.03 hereof.

## AREA PROTECTED

Section 2.03. The "protected area" referred to in Section 2.02, above, is described in Exhibit "B" attached hereto which by this reference is incorporated herein as though set forth in full hereat.

## USE OF FRANCHISE NAME

Section 2.05. Franchisee agrees not to interfere in any manner with or attempt to prohibit the use of the name California Closet Company by any of the Franchisees of Franchisor in any area other than the protected area described in or pursuant to

4

this Article 2. Franchisee further agrees to execute any and all other necessary papers, documents, and assurances to effectuate this purpose and agrees to cooperate fully with Franchisor or any Franchisee of Franchisor in securing all necessary and required authority from any Secretary of State, licensing authority, or any other state or federal authority for the use of the name California Closet Company wherever needed.

The Franchisee agree to take appropriate steps to incorporate under a name other than California Closet Company, Inc. and/or file and publish a fictitious name statement or its equivalent in the county or counties in which it does business.

The Franchisee agrees to use all names and marks in the conduct of the business as required by Franchisor and will not use any name and/or mark in connection with the sale of any unauthorized product or service or in any manner not explicitly authorized in writing by Franchisor.

Franchisee agrees that if it becomes necessary, in the sole discretion of Franchisor, to modify or discontinue use of any name or mark and/or use one or more additional or substitute names or marks it will do so. Franchisor agrees that if alternate, additional or substitute names or marks are required to be used by Franchisee, Franchisor will reimburse the Franchisee for its actual tangible costs (such as changing signs, etc.,) necessarily and actually incurred.

## EXCLUSIVITY OF TERRITORY OR CLIENTELE

Section 2.06. In order to facilitate the successful development of the franchise business and to protect Franchisee's investment therein, Franchisor grants to Franchisee the exclusive right, except as otherwise provided herein and except to the extent inconsistent with Federal or State Law, to operate a California Closet Company business within the protected area described in Exhibit "B." Except as otherwise provided herein, neither Franchisor nor any other of its Franchisees shall be authorized to establish a California Closet Company business within said exclusive area nor shall Franchisor establish other custom closet establishments selling products or offering similar services under the same or any other Proprietary Mark or Indicia. Franchisee may not open any other franchise locations within the protected area without the express written consent of the Franchisor first obtained. Except for purposes of relocation described infra, Franchisor may in its discretion impose the following conditions on the opening of a new location by Franchisee:

1.  Require that the Franchisee execute an amendment to the Franchise Agreement in a form prescribed by Franchisor;

2.  Payment of a new franchise fee in an amount being charged to new Franchises at the time of the proposed

opening.

## RELOCATION OF PREMISES

Section 2.07. If Franchisee's right to possession of the premises designated In Section 2.01, above, Is terminated, prior to expiration of the term of this Agreement without fault or affirmative action on the part of Franchisee, Including without limitation, expiration of the term of Franchisee's lease or sublease by lapse of time, destruction by casualty, or taking by eminent domain of all or a material part of the premises if such premises are owned by Franchisee, then within one hundred twenty (120) days after Franchisee notifies Franchisor In writing that such event has occurred or will occur on a date certain not more than six (6) months after the date of such notice, Franchisor shall, subject to the provisions of Sections 2.08 through 2.10, below, propose to Franchisee a new location at which Franchisee's business may be operated for the remainder of the term of this Agreement.

## SELECTION OF NEW LOCATION

Section 2.08. The location to be proposed by Franchisor shall be within the trading area of the business theretofore operated by Franchisee, provided however, that if Franchisor determines that no appropriate location is available within said trading area, then Franchisor shall propose the next nearest location determined by it to be appropriate and available. The definition of the trading area of Franchisee's business, the selection of a particular location within such trading area, the determination that an appropriate location is not available within such trading area, and the determination, if necessary, of the next nearest appropriate and available location outside Franchisee's trading area, shall all be within the sole and absolute discretion of Franchisor and its decisions thereon shall be final.

## RELOCATION PROPOSAL

Section 2.09. The proposal by Franchisor of a new location at which Franchisee's business may be operated shall be given to Franchisee In writing. If such location is to be leased, subleased, or sold by Franchisor or any affiliated corporation to Franchisee, such proposal shall be accompanied by a statement of such requirements as may be prescribed by Franchisor relating to the construction or alteration of improvements on the premises; but Franchisor shall not require that Franchisee sell, assign, grant, or transfer to Franchisor or any affiliated entity, upon termination of this Agreement, ownership of or a leasehold Interest In such premises. Franchisor shall not submit to Franchisee any lease or sublease with Franchisor or any affiliated entity the term of which extends beyond the term of this Agreement.

## ACCEPTANCE OF RELOCATION

Section 2.10.    If, within thirty (30) days after receipt of Franchisor's proposal of such location, Franchisee gives to Franchisor written notice of acceptance of such proposal, and either enters into such tendered lease, sublease, or sale contract, or if none is tendered, agrees in writing to comply with any and all requirements prescribed by Franchisor relating to construction or alteration of improvements on the premises, then notwithstanding the automatic termination provisions of Section 8.06(a), below, this Agreement shall be reinstated for the remainder of the term specified in Section 1.02, above, and shall be deemed amended to refer to such new location. If Franchisee fails to comply with the provisions of this Section 2.10 within said thirty (30) days period, then the termination of this Agreement pursuant to Section 8.06(a), below, shall be and remain effective and Franchisee shall have no further rights under or by virtue of Sections 2.07 through 2.10 of this Article.

## ARTICLE 3.  USE OF SYSTEM, MARKS, INDICIA AND LICENSE
## VALIDITY AND USE OF PROPRIETARY MARKS

Section 3.01.    Franchisee hereby acknowledges the validity of the Proprietary Marks identified above and acknowledges that they are the sole property of Franchisor.    Franchisee shall use such proprietary Marks only for so long as the right, franchise, and license granted herein remains in force, and only in connection with the conduct of the franchise business in the manner and for the purposes specified in this Agreement. Franchisee shall not, either during or after the term of this Agreement, do anything, or aid or assist any other party to do anything, which would infringe upon, harm, or contest the rights of Franchisor in any of its Proprietary Marks or in any other mark or name which incorporates the words "California Closet Company." Franchisee shall not use any mark or name other than as herein licensed in connection with the conduct of the franchise business, and shall not place any name or mark other than the names or marks originally appearing thereon, on any products, packages, or other materials which Franchisee obtains from Franchisor or any manufacturer designated by Franchisor as qualified to supply products conforming to Franchisor's specifications. Further, all goods sold by Franchisee must bear marks or logos currently being used by Franchisor to designate Franchisor's goods.

## VALIDITY AND USE OF INDICIA

Section 3.02.    Franchisee acknowledges that Franchisor's indicia is the exclusive property of Franchisor.    Franchisee shall not, either during or after the term of this Agreement, utilize any of Franchisor's indicia, or any indicia confusingly similar thereto, except in accordance with the terms of this Agreement.

## FUTURE MARKS OR INDICIA

Section 3.03. Franchisee agrees that any further rights that may develop in any of Franchisor's Proprietary Marks or in any of Franchisor's Indicia in the future, whether as trade names, trademarks, service marks, or copyrighted materials, shall inure and accrue to the benefit of Franchisor.

## USE OF FRANCHISE BUSINESS NAME

Section 3.04. Franchisee shall operate, advertise, and promote its business under the designation "California Closet Company" without the addition of any prefix, suffix, or any other name or names, or under any other name or names as Franchisor may from time to time designate, and under no other name or designation whatsoever. Franchisee shall not use the name California Closet Company or any word included therein, or any other of Franchisor's Proprietary Marks in or as part of Franchisee's firm or corporate name, except as otherwise provided herein.

## CONFIDENTIALITY OF FRANCHISE SYSTEM

Section 3.05. Franchisee hereby acknowledges that Franchisor is the sole owner of all proprietary rights in and to the Franchise System and all material and information relating to the System now or hereafter revealed to Franchisee under this Agreement. Franchisee further acknowledges that the System, in its entirety, constitutes trade secrets of Franchisor and that they are revealed to Franchisee in confidence, solely for the purpose of enabling Franchisee to establish and operate the California Closet Company business licensed herein in accordance with the terms of this Agreement. Such trade secrets include, but are not limited to, training manuals, operating manuals, policy manuals, sales promotion aids, business forms, accounting procedures, marketing reports, informational bulletins, and inventory systems. Franchisee hereby agrees that both during and after the term of this Agreement, Franchisee will not reveal any of such trade secrets to any other person or entity and that Franchisee will not use any of such trade secrets in connection with any business or venture in which Franchisee has a direct or indirect interest, whether as a proprietor, partner, joint venturer, shareholder, officer, director, or in any other capacity whatsoever, other than in connection with the operation of the California Closet Company business licensed herein. Nothing contained in this Section shall be deemed to prohibit Franchisee from engaging or participating in any lawful trade or business, either during or after the term of this Agreement, not competitive with Franchisor or its franchisees, provided that Franchisee does not reveal, use, or appropriate in connection therewith any of the proprietary rights, confidential information, or trade secrets referred to in this Section and does not violate any other provision of this Agreement.

## RIGHTS TO GOODWILL

Section 3.06. Franchisee acknowledges that all goodwill which may arise from Franchisee's use of Franchisor's Proprietary Marks, the Indicia, or System, is and shall at all times remain the sole and exclusive property of Franchisor and shall Inure to the sole benefit of Franchisor. Nothing contained In the preceding sentence shall be construed to prohibit Franchisee from receiving, for a sale of Franchisee's business made In compliance with the provisions of this Agreement, a price which Includes payment for any goodwill belonging to Franchisee.

## UNAUTHORIZED USE

Section 3.07. Franchisee shall promptly report to Franchisor any unauthorized use of Franchisor's Proprietary Marks or Indicia that comes to Its attention In any manner whatsoever. If requested by Franchisor, Franchisee will cooperate with Franchisor In precluding unauthorized use of Franchisor's Proprietary Marks and Indicia, or any confusingly similar mark or Indicia, but at the sole expense of Franchisor.

## USE OF FRANCHISOR'S CONTRACTOR'S LICENSE

Section 3.08. Franchisee understands and agrees that Franchisee will render services to customers with regard to customizing and Installing closets that does or may require a contractors license pursuant to local state law (e.g. the California business and Professional Code Sections 7025 et. seq). Franchisee further understands and agrees that Franchisor possesses a valid California Contractors License, license number B-457949, and that If Franchisee does such customization and Installation of closets under the name California Closet Company, In the State of California, said Franchisee need not obtain Its own separate contractor's license.

However, If Franchisee does business under Its own name or any other name other than California Closet company, or outside the State of California, Franchisee agrees, represents and warrants that before Franchisee does such business, Franchisee will obtain a contractors license, If required by local law. Franchisor will aid and assist Franchisee In the obtaining of such contractors license, If desired by Franchisee.

ARTICLE 4. FRANCHISOR'S CONTINUING OBLIGATIONS
SERVICES TO BE RENDERED

Section 4.01. In addition to any assistance which Franchisor may have heretofore rendered to Franchisee relating to site selection, showroom construction and layout, and equipment selection and Installation, Franchisor agrees that It will perform the following continuing services for the benefit of Franchisee:

9

(a) Provide Franchisee with a Training and Operations Manual;

(b) If Franchisee's showroom has not yet opened, Franchisor will instruct Franchisee, prior to the opening of Franchisee's showroom, in all aspects of the system by providing a training program which shall be attended by Franchisee and such of Franchisee's management and supervisory personnel as Franchisor may reasonably designate. From time to time after the opening of Franchisee's business, Franchisor may reasonably designate, and Franchisee agrees to attend, and to cause all such designated employees to attend, such training program or programs. All expenses of travel, lodging, meals, and other living expenses, incurred by Franchisee and/or such employees in attending such initial or subsequent program or programs shall be borne and paid by Franchisee;

(c) Franchisor agrees to make available to Franchisee from time to time all improvements and additions to the System, to the same extent and in the same manner as they are made available to Franchisor's Franchisees generally;

(d) Franchisor agrees to counsel and assist Franchisee on a continuing basis with respect to the management and operation of Franchisee's California Closet company business and will make available to Franchisee the benefits of Franchisor's information, experience, advice, guidance, and know-how in connection therewith;

(e) Franchisor agrees that it will purchase and place from time to time advertising promoting Franchisor's Franchisees and the products and services sold by them. Subject to the provisions hereinafter set forth, all decisions from time to time regarding whether to utilize national, regional, or local advertising or some combination thereof, and regarding selection of the particular medium and advertising content, shall be within the sole discretion of Franchisor and such agencies or others as it may appoint. Franchisor agrees that it will expend for media costs, commissions and fees, production costs, and other costs of such advertising, with respect to all of Franchisor's franchises, an amount in Franchisor's discretion, including advertising credits extended to Franchisees, which will give California Closet Company market exposure. Such amounts shall be expended for advertising which is published, broadcast, displayed or otherwise disseminate either during the calendar year within which such royalties and advertising fees are received by Franchisor or during the immediately succeeding calendar year. Nothing herein shall be deemed to prohibit Franchisee from engaging in any advertising or promotion of Franchisee's business, in addition to the advertising paid for by Franchisor, provided such advertising or promotion shall be at the sole cost of Franchisee, except as otherwise provided herein. Moreover, such advertising or promotion shall be subject to the provisions of Section 5.08 hereinbelow.

In connection with assisting Franchisee in acquiring a location either initially or upon renewal or relocation, Franchisor may purchase or otherwise acquire real property for lease to Franchisee. Franchisor may also, be affiliated with directly or indirectly another entity owning premises offered to Franchisee for lease. Franchisee shall have no obligation to purchase or lease any such premises from Franchisor or any entity affiliated in any way with Franchisor and may acquire any other premises or leasehold interest consistent with this Agreement.

## SALE OF PRODUCTS

Section 4.02. Franchisee agrees to acquire and sell to the general public during the term of this agreement and subject to the terms hereinafter set forth, such quantities of those products referred to in Exhibit A attached hereto as Franchisee may reasonably require to maintain Franchisor's required minimum quantities. Franchisee shall order such goods from Franchisor or any manufacturer or supplier recommended by or approved by Franchisor in writing. Franchisor shall not unreasonably withhold approval of alternate sources of goods and supplies, if such goods and supplies are of at least of the same quality as are the goods offered or recommended by Franchisor. Franchisor may at any time and from time to time, in its sole discretion, discontinue the sale to all of its Franchisees of any product or products, if, in the opinion of Franchisor, the continued sale of such product or products becomes unfeasible, unprofitable or otherwise undesireable, and upon such discontinuance the license herein granted with respect to such product or products shall terminate unless Franchisor has provided for alternative sources of supply meeting its standards and specifications and expressly elects to continue such license subject to such standards and specifications. Such discontinuance or termination of a product or product line by Franchisor is not "cause" for the termination of the Franchise by Franchisor or Franchisee.

## PRICE AND TERMS OF SALE

Section 4.03. The prices, delivery terms, terms of payment, and other terms relating to the sale of such products by Franchisor shall be as prescribed by Franchisor from time to time, and shall be subject to change by Franchisor without prior notice at any time.

## SALES FOLLOWING TERMINATION

Section 4.04. Upon the giving by Franchisor of notice of termination, or upon the termination of this Agreement, Franchisor shall not be obligated to fill or ship any orders for merchandise theretofore or at any time thereafter received from Franchisee.

## UNAVAILABILITY OR DELAY

Section 4.05. Franchisor shall in no event be liable to

Franchisee for unavailability of or delay in shipment or receipt of merchandise due to temporary product shortages or unavailabilities, order backlogs, production difficulties, delays in or unavailability of transportation, fire, strikes, work stoppages, or other causes beyond the reasonable control of Franchisor.

ARTICLE 5.    OPERATION OF FRANCHISEE'S BUSINESS

### OPERATION OF RETAIL BUSINESS AND SHOWROOM

Section 5.01.    Franchisee hereby agrees to keep Franchisee's California Closet Company business open to the public during all normal business days and hours throughout the year (at least 9:00 a.m. to 5:00 p.m.) except normal holidays during the term of this Agreement, and will at all times operate said business diligently so as to maximize the revenues and profits therefrom.

### PROMOTION OF SALES

Section 5.02.    Franchisee hereby agrees that Franchisee will at all times actively promote the sale of Franchisor's products and services and will use Franchisee's best efforts to cultivate, develop, and expand the market therefor.

### MAINTENANCE OF INVENTORY

Section 5.03.    Franchisee acknowledges that a public demand has been created and exists for genuine products carrying Franchisor's indicia, and that members of the public have come to expect that they will be able to obtain such products at an authorized California Closet Company business. Accordingly, Franchisee agrees that Franchisee will at all times during the term of this Agreement maintain an inventory of such products, listed in Exhibit A attached hereto, which is adequate, both in terms of range of items covered and in terms of the quantities of the respective items, to fulfill the public demand in Franchisee's market for such products and to promptly satisfy customers seeking such products at Franchisee's business.

### MANAGERIAL RESPONSIBILITY

Section 5.04.    Subject to the provisions of subsections (a) and(b) of this Section, it is agreed that at all times during the term of this Agreement, Franchisee or Franchisee's duly authorized general manager or agent named herein in Exhibit "C" (i) shall devote his full time and effort to the active management and operation of Franchisee's business, (ii) shall, irrespective of any delegation of authority not inconsistent with clause (i), reserve and exercise ultimate authority and responsibility with respect to the management and operation of Franchisee's business, and (iii) shall represent and act on behalf of Franchisee in all dealings with Franchisor. If two or

more individuals are named herein, each of them shall fulfill the requirements of clause (I), and both or all of them shall jointly fulfill the requirements of clauses (II) and (III).

(a)    If Franchisee operates or hereafter commences to operate under license from Franchisor, one or more additional California Closet Company businesses, and if the individual or individuals named herein is or are also named in the corresponding provision of such other agreement or agreements, then such provisions shall be deemed to apply to all such shops in the aggregate.

(b)    In the event of the resignation, disability, or death of such individual or individuals, the provisions of Article 7 hereof shall govern, provided however, that if two or more individuals are named herein then upon the resignation, disability, or death of one or more but less than all of such individuals, the provisions of Article 7 shall not govern and the provisions of this Section shall apply to the remaining or surviving individual or individuals.

## DESIGN AND APPEARANCE OF PREMISES

Section 5.05.    Franchisee acknowledges that the design and appearance of both the exterior and interior of the shop building are part of the Franchisor's indicia, subject to modification of such indicia from time to time by Franchisor, and that it is essential to the integrity of said indicia that as great a degree of uniformity as possible be maintained among the various shop premises of Franchisor's Franchisees. Accordingly, Franchisee agrees that:

(a)    Franchisee will make no change, addition, or alteration of any kind to the structural elements of the shop building or to the adjacent areas, without the prior written consent of Franchisor;

(b)    Franchisee will at Franchisee's sole expense maintain interior and exterior painting and decor in such manner and form as may be reasonably prescribed from time to time by Franchisor;

(c)    Franchisee will follow the reasonable instructions of Franchisor with respect to floor layout and character of interior furnishings;

(d)    Fanchisee will purchase and display, on and about the interior and exterior and the shop building, such and only such signs, emblems, logos, lettering, and pictorial materials as may be reasonably prescribed by Franchisor from time to time.

## MAINTENANCE OF PREMISES

Section 5.06.    Franchisee hereby agrees that Franchisee will

13

at all times maintain the business premises in a clean, wholesome, attractive and safe condition, and will keep the same in good maintenance and repair.

## STANDARDS OF OPERATION

Section 5.07.   Franchisee hereby agrees that Franchisee will at all times give prompt, courteous, and efficient service to the public; will perform work competently and in a workmanlike manner; and in all business dealings with members of the public will be governed by the highest standards of honesty, integrity, fair dealing, and ethical conduct. Franchisee will do nothing which would tend to discredit, dishonor, reflect adversely upon, or in any manner injure the reputation of Franchisor, Franchisee, or any other Franchisee of Franchisor.

## ADVERTISING BY FRANCHISEE

Section 5.08.   Franchisee will not use, display, publish, broadcast, or in any manner disseminate any advertising or promotional material unless the same has first been approved in writing by Franchisor.   In the event that Franchisor from time to time furnishes to Franchisee any advertising, promotional, or informational materials to be used, displayed, or distributed in or about Franchisee's shop, Franchisee agrees to follow the instructions of Franchisor in connection therewith, and need not obtain Franchisor's written approval therefor.

As an inducement for Franchisee to advertise for potential clients and customers, Franchisee shall be entitled to deduct from the royalty payment payable to Franchisor a sum equal to one-half of the actual advertising expenses paid monthly up to an amount equal to five (5%) percent of the gross sales for the month.  For example, if for one month total sales are $10,000.00, Franchisor shall be entitled to a sum equal to $1,000.00 less one-half of the actual advertising costs incurred up to $500.00. Therefore, if the Franchisee expended $800.00 in advertising expenses for the month, Franchisor would be to the sum of $600.00 for the month.

In order for Franchisee to obtain the setoff against monies owing to Franchisor as hereinabove provided, for actual advertising expenses paid, Franchisee must do the following:

(a)  Provide Franchisor with a copy of all layouts (not prepared by Franchisor) that will run, within a reasonable time prior to their anticipated publication dates;

(b)  Obtain Franchisor's written consent for advertising layouts provided in (a) above;

(c)  Provide Franchisor, prior to the end of the month, with actual tearsheets and copies of invoices of advertising expenses actually incurred and paid.

14

These sums credited to Franchisee's account with Franchisor will be used to satisfy Franchisor's advertising and promotional obligations as set forth in Article 4, subsection 4.01 hereinabove.

## FRANCHISEE'S LIABILITY AND INSURANCE

Section 5.09.    Franchisee alone shall be responsible for all loss or damage arising out of or relating to the operation of Franchisee's California Closet Company business or arising out of the acts or omissions of Franchisee or any of Franchisee's agents, servants, employees or contractors in connection with the sale of products or rendering of services by Franchisee, and for all claims for damage or injury or death of any persons directly or indirectly resulting therefrom, and Franchisee agrees to indemnify and hold Franchisor harmless against and from any and all such claims, losses and damages, including costs and reasonable attorney's fees.    Franchisee shall obtain and at all times during the term of this agreement maintain in force and pay the premiums for public liability insurance, in either case with complete operations coverage, in companies acceptable to Franchisor, with limits of liability for bodily injury of not less than $1,000,000.00 for each injury and $1,000,000.00 for property damage in each occurrence.

Franchisee shall also maintain "all risk coverage" insurance for fire, business interruptions, etc. up to the replacement value of Franchisee's inventory.

Such limits of liability shall be increased, and modified or additional types of coverage shall be obtained at the direction of Franchisor, as and when changed circumstances reasonably so require.    Said policies of insurance shall expressly protect both Franchisee and Franchisor and shall require the insurer to defend Franchisee and Franchisor in such action. Franchisee shall furnish to Franchisor a certified copy or certificate with respect to each such policy, evidencing coverage as set forth above, naming Franchisor as as additional insured, and providing that such policy shall not be cancelled, amended, or modified except upon ten (10) days prior written notice to Franchisor.    Maintenance of the insurance required under this section shall not relieve Franchisee of the obligations of indemnification contained in the first sentence of this Section.    If Franchisee fails to procure or maintain in force any insurance as required by this Section or to furnish the certified copies or certificates thereof required hereunder, Franchisor may, in addition to all other remedies it may have, procure such insurance and/or certified copies or certificates, and Franchisee shall promptly reimburse Franchisor for all premiums and other costs incurred in connection therewith.

## SUBMISSION OF FINANCIAL DATA

Section 5.10.    In addition to the reports required of

Franchisee pursuant to Section 6.03 and 6.04 below, Franchisee shall submit to Franchisor, within ninety (90) days after the end of each fiscal year of Franchisee, complete financial statements in a form prescribed by Franchisor, including balance sheets, profit and loss statements, and statements of source and disposition of funds.   In addition, Franchisee shall submit to Franchisor such other reports and financial information as Franchisor may from time to time require, including by way of example and not limitation, sales and cost data and analysis, and personal financial statements of any persons having a material financial interest in Franchisee's business.

## PAYMENT OF BILLS

*End of year Dec 31*

Section 5.11.  Franchisee will pay all invoices rendered by Franchisor for merchandise or other items sold to Franchisee in strict accordance with the payment and credit terms applicable thereto from time to time.    Any such amount not so paid when due, as well as any amount due from Franchisee pursuant to Section 5.09 above, shall bear interest at the rate of ten (10%) percent per annum from thirty (30) days after the date due until paid, but the payment of such interest shall not be deemed to authorize any delay in payment of such invoices or other amounts.    Franchisee will further pay when due all bills and other amounts owed to third parties under any purchasing arrangement in which Franchisor may be involved, but Franchisor shall not by virtue thereof become liable to any such third party.

## COMPLIANCE WITH LAWS

Section 5.12.    Franchisee shall comply with all Federal, State, County, Municipal, or other statutes, laws, ordinances, regulations, rules, or orders of any other governmental or quasi-governmental entity, body, agency, commission, board, or official applicable to Franchisee's business.    Nothing herein shall prevent Franchisee from engaging in a bona fide contest of the validity or applicability thereof in any manner permitted by law.

Franchisee has been advised and is aware that certain state and local laws, rules and ordinances require or may require the registration of "Home Improvement Salespersons" (e.g.    The California Home Improvement Act as contained in California Business and Professions Code, Section 7150 et. seq.); and if required by state or local law, Franchisee agrees to register such salespersons, pay any and all required fees, submit all necessary documentation and otherwise comply with such state or local requirements and hold Franchisor harmless therefrom.

If applicable, Franchisee further agrees to register as a "Home Solicitation Salesperson" with the Registrar of the local State Contractors License Board, or other regulating authority, any salesperson Franchisee employs, if necessary.    Franchisee further agrees that Franchisee shall require all salespersons

and other agents and employees to agree to comply with all applicable laws, rules, ordinances and statutes applicable to "Home Solicitation Salespersons," Contractors, etc.

## EMPLOYMENT PRACTICES

Section 5.13. During the term of this Agreement, and for a period of six (6) months thereafter, Franchisee shall not, without the written consent of such person's employer, employ or attempt to employ any person who is at the time employed by Franchisor or by any other Franchisee of Franchisor, and Franchisor shall not, without the written consent of Franchisee, employ or attempt to employ any person who is at the time employed by Franchisee, nor shall Franchisee or Franchisor otherwise directly or indirectly induce or attempt to induce any such person to leave his employment as aforesaid.

## FRANCHISEE NOT FRANCHISOR'S AGENT

Section 5.14. This Agreement does not in any way create the relationship of principal and agent between Franchisor and Franchisee, and in no circumstances shall Franchisee be considered an agent of Franchisor. Franchisee shall not act or attempt to act, or represent himself, directly, or by implication, as an agent of Franchisor or in any manner assume or create or attempt to assume or create any obligation on behalf of or in the name of Franchisor nor shall Franchisee act or represent himself as an affiliate of any other authorized Franchisee of Franchisor.

## COMPLIANCE WITH FRANCHISOR'S POLICIES

Section 5.15. Franchisee shall at all times comply with all lawful and reasonable policies, regulations, and procedures promulgated or prescribed from time to time by Franchisor in connection with Franchisee's shop or business, including but not limited to standards, techniques, and procedures in installation or servicing of products or the rendering of other services, selection, supervision, and training of personnel, sales, advertising, and promotional techniques, programs, and procedures, maintenance and appearance of retail showroom and business premises, payment, credit, and accounting, and financial reporting policies and procedures.

## FRANCHISOR'S RIGHT TO INSPECT

Section 5.16. Franchisor, through its authorized representatives, shall have the right at all reasonable times, to visit Franchisee's business for the purpose of inspecting the merchandise and equipment on hand, inspecting the nature and quality of goods sold and services rendered, examining and auditing Franchisee's books and records, and observing the manner and method of operating the shop. If any of Franchisee's books, records, or inventory are located outside the shop premises, Franchisor shall have similar rights with regard to

the same.

*will be changed*

## WEEKLY REPORTS

Section 5.17. Franchisee agrees to provide Franchisor with weekly reports on forms provided from time to time by Franchisor. Such weekly reports shall include the following:

A. Copies of all signed contracts;

B. Date such job was started;

C. Date such job was completed;

D. Description of work;

E. Amount of job;

F. How customer was obtained;

G. Any difficulties or problems encountered.

H. Length of time spent on job;

### ARTICLE 6.    ROYALTIES

### ROYALTY BASED ON GROSS REVENUE

Section 6.01    Franchisee agrees to pay to Franchisor, within fifteen (15) days after the close of each calendar month during the term of this Agreement, a royalty in an amount equal to ten (10%) percent of Franchisee's gross receipts for said preceding month. If the term of this Agreement commences or ends on the day other than the first or last day of a calendar month, respectively, the royalty for such month shall be based on gross receipts for the portion of the month commencing or ending with the date of commencement or termination of the term of this Agreement, as the case may be.

### "GROSS RECEIPTS" DEFINED

Section 6.02. For the purpose of Section 6.01, above, the term "gross receipts" is defined as the total gross revenue derived by Franchisee from the operation of Franchisee's business whether from sales for cash or credit, including sales of both merchandise and services, and including installation charges, exclusive of all sales taxes, use taxes, gross receipts taxes and other similar taxes added to the sales price and collected from the customer, and less any bona fide refunds, rebates, and discounts. Royalties received by Franchisor pursuant to this Section shall not be deemed trust funds nor shall Franchisor be required to segregate such funds in any way, but they shall be deemed general funds of Franchisor for all purposes.

*Dec. 31*

## GROSS REVENUE REPORT

Section 6.03.    Franchisee shall submit to Franchisor, with and at the time each monthly payment of royalty is required pursuant to Section 6.01, above, a true, correct, and complete statement of gross revenue on forms provided by Franchisor, containing all information called for by such forms and certified to by Franchisee.

## ANNUAL REVENUE REPORT

Section 6.04.    Within sixty (60) days after the close of Franchisee's fiscal year, Franchisee shall furnish a statement, on forms provided by Franchisor containing all the information requested on such forms, certified to by Franchisee and signed by Franchisee's accountant, showing the total net revenue for said preceding fiscal year, as finally adjusted and reconciled after the closing and review of Franchisee's books and records for such fiscal year.    If such statement discloses any underpayment of royalties for such fiscal year, Franchisee shall pay to Franchisor, at the time of submitting such statement, the amount of any such underpayment.    Any overpayment shall be credited to Franchisee's account.

## MAINTENANCE AND AUDIT OF RECORDS

Section 6.05.    Franchisee shall maintain Franchisee's books and records in such manner as to clearly and accurately reflect gross revenue.    All such books and records shall be preserved for a period of not less than five (5) years after the close of the fiscal year to which they relate and shall be open at all reasonable times to inspection and verification by Franchisor or any of its representatives.    Franchisor shall be entitled at any time to have Franchisee's books and records examined or audited at Franchisor's expense, and Franchisee shall cooperate fully with the party or parties making such examination or audit on behalf of Franchisor.    Franchisee shall promptly pay to Franchisor or Franchisor shall credit to Franchisee's account, as the case may be, any underpayment or overpayment of royalties disclosed by such examination or audit.    If any examination or audit is necessitated by Franchisee's failure to submit statements of gross revenue or to maintain books and records as required by this Article 6 or in the event that the gross revenues reported by Franchisee for any period or periods are more than five (5%) percent below the actual gross revenues of Franchisee for such period as determined by any such examination or audit, then Franchisee shall immediately pay to Franchisor the cost of such examination or audit (including reasonable compensation for any time necessarily expended by Franchisor's own employees and reimbursement for expenses necessarily incurred by them), as well as any additional amount of royalties shown to be due, plus interest thereon from the date due at the rate of ten (10%) percent per annum.    Such payments shall be without prejudice to any right of Franchisor to terminate this Agreement on account of such defaults by Franchisee, in accordance with the

terms of Section 8.02, below.

## INTEREST

Section 6.06.  Any amount properly owing from Franchisee to Franchisor for royalties, if not paid when due, (whether such amount has been shown on any report required to be submitted by Franchisee or has subsequently been determined by verification, examination, or audit to have been due for any month), shall bear interest at the rate of ten (10%) percent per annum from thirty (30) days after the date such amount was or would have been due until paid.

## ARTICLE 7. TRANSFER OR ASSIGNMENT

## GENERAL PROHIBITION

Section 7.01.  Except as set forth in Sections 7.02 through 7.10, below, and subject to all of the terms and provisions thereof and of Section 7.11, below, Franchisee shall not make or suffer any assignment of this Agreement or of any rights or interest herein.  Notwithstanding anything contained herein to the contrary, Franchisee may not start a new location within the protected area, subfranchise or sub-license without the express written consent of the Franchisor first obtained.  Franchisor may withhold such consent for any reason and impose any condition for such permission as the Franchisor deems in its sole discretion to be appropriate.  For all purposes of this Agreement, each of the following shall be deemed to be an assignment of this Agreement:

(a)  Any sale, assignment, transfer, subfranchise, or sublicense by Franchisee of or with respect to this Agreement or any rights or interest herein;

(b)  Any pledge, encumbrances, or grant of any security interest by Franchisee.

(c)  Sale at judicial sale or under power of sale, conveyance or retention of collateral in satisfaction of debt, or other procedure to enforce the terms of any pledge, encumbrance, or security interest in this Agreement which results in disposition of Franchisee's interest herein;

(d)  The passing by operation of law to any other party or parties of Franchisee's interest in this Agreement or any part hereof;

(e)  In the event Franchisee is a corporation, partnership, or other form of business association, any act, transaction or event of a nature described in either of subsections (a) through (d), above, which, instead of operating upon this Agreement as such, operates upon or affects any interest in such corporation, partnership, or association and results in any change in the present controlling interest in such corporation, partnership, or association, whether by means

20

of one or a sequence of more than one transaction or event.   If Franchisee herein is two or more individuals, Franchisee shall be deemed to be a partnership for all purposes of this Article 7, irrespective of whether or not such individuals are designated herein as a partnership;

(f)    In the event the person or persons designated in Section 5.04 of this Agreement cease to comply with any one or more of the provisions of that Section, whether by reason of voluntary action or inaction, disability, death, or other cause, subject however, to the provisions of subsection (b) of Section 5.04.

Any assignment of this Agreement, other than in accordance with and subject to all of the terms and provisions of Sections 7.02 through 7.11, below, shall constitute a breach of this Agreement, shall be subject to the provisions of Section 8.02(d)III), below, and shall confer no rights or interest whatsoever under this Agreement upon any other party.

<u>TRANSFER TO CONTROLLED CORPORATION</u>

Section 7.02.    If Franchisee is an individual or a partnership, he or they may at any time assign and transfer this Agreement to a corporation organized and operated for the sole purpose of conducting the business for which Franchisee is franchised and licensed hereunder, subject to the following conditions:

(a)    Franchisee shall be and remain the owner of one hundred (100%) percent of the issued and outstanding capital stock of said corporation, provided that he or they may cause stock possessing not more than forty-nine (49%) percent of the total voting power in said corporation to be issued to his or her spouse or their spouses;

(b)    The person or persons designated in Section 5.04, above, shall continue to comply with all of the requirements of that Section;

(c)    Such assignment and transfer shall be evidenced by a written instrument, in form reasonably satisfactory to Franchisor, in which said corporation expressly assumes all obligations of Franchisee hereunder, whether accrued at the time of such assignment or arising thereafter, and agrees to be bound by all of the terms and provisions of this Agreement to the same extent and in the same manner as Franchisee.   A copy of said instrument, executed by both Franchisee and said corporation, shall be promptly delivered to Franchisor;

(d)    Franchisee shall execute and deliver to Franchisor, Franchisor's standard form personal guaranty and subordination agreement.   Such personal guaranty and subordination agreement shall continue in effect during the term of the herein Agreement and any Renewal period.   Further, Franchisee shall not be

21

released from, but shall remain personally bound and liable to Franchisor notwithstanding said assignment and transfer, with respect to all monetary and nonmonetary obligations of Franchisee under this Agreement then accrued or thereafter arising, and to evidence such obligations shall execute the personal undertaking set forth at the end of this Agreement, following the signatures of Franchisor and Franchisee.

## SALE OF BUSINESS

Section 7.03.    In the event Franchisee proposes to sell the business operated pursuant to this Agreement, whether by sale of the assets thereof, by sale of a controlling interest in Franchisee if Franchisee is a corporation, partnership, or other form of business association, or by any other means which directly or indirectly transfers said business or control thereof, there shall first be submitted to Franchisor a copy of any bona fide written offer made or received, or if none, a statement in writing of all the terms of the proposed sale and the identity of any proposed purchaser.    Franchisor shall have the irrevocable first right and option to purchase the business on the same terms as stated therein, exercisable by notifying Franchisee in writing of its election to do so within fourteen (14) days after its receipt of such written offer or statement. If Franchisor does not so notify Franchisee within said fourteen (14) day period, then a sale of the business to a third party may be consummated, but only on all the same terms as are set forth in said written offer or statement and to the same party, if any, identified therein, and subject to all the provisions, conditions, and limitations of Sections 7.01 and 7.04.    If such a sale is not consummated with the third party within one hundred twenty (120) days after receipt by Franchisor of such written offer or statement, then the proposed sale shall be deemed withdrawn, and all the provisions of this Section shall again become fully applicable, as if such sale had not been proposed.    Nothing contained in this Section shall abrogate, impair, or limit the application of any of the provisions of Section 7.01 or 7.04, or any other provision of this Agreement. In any event, if Franchisee sells, transfers, assigns or otherwise disposes of its franchise business except by termination as provided herein, Franchisee shall pay to Franchisor a transfer fee equal to five (5%) percent of the total purchase price received by Franchisee on or before the consummation of the sale or the close of escrow.    In the event of an escrow, such transfer fee is to be in the form of an irrevocable assignment from Seller and Buyer to Franchisor. Furthermore, any approval for transfer given by Franchisor, as provided herein, is conditional pending receipt by Franchisor of such transfer fee.    Such transfer fee is to defray costs and expenses of Franchisor incurred or to be incurred, including but not limited to attorneys fees, in the review, investigation and approval of Franchisee's sale, transfer and/or assignment and the qualifications of the transferee.

FRANCHISOR'S CONSENT TO VOLUNTARY ASSIGNMENT

Section 7.04.    In the event Franchisee desires or proposes to voluntarily sell, assign, or transfer this Agreement to any party other than a corporation described in Section 7.02, above, or, if Franchisee is a corporation, partnership, or other form of business association, then in the event Franchisee and/or the holder or holders of any interest in such corporation, partnership, or association desire or propose to take any action which would constitute or create an assignment of this Agreement within the meaning of Section 7.01, above, Franchisee or the holders of such interest, as the case may be, shall first notify Franchisor in writing of such proposed sale, assignment, transfer, or other action, setting forth in detail the nature of the item or interest to be sold, assigned, transferred, or otherwise acted upon the name and address of the proposed purchaser, assignee, or transferee, or party acquiring any interest, and the consideration, if any, therefor.  Subject to prior compliance with the provisions of Section 7.03, above, Franchisor shall consent to the proposed transaction provided that each of the following conditions is fulfilled:

(a)    It shall be demonstrated to the reasonable satisfaction of Franchisor that the proposed purchaser, assignee, transferee, or person otherwise to acquire an interest, is of good moral character, and possesses the business experience and capability, credit standing, health, and financial resources necessary to successfully operate Franchisee's shop in accordance with the terms of this Agreement.  If the proposed purchaser, assignee, or transferee is a corporation, partnership, or other business association, the provisions of the preceding sentence shall apply to the individuals who are to own such corporation, partnership, or association.  Franchisee shall cooperate with Franchisor in making available such information as Franchisor may require to make the above described determinations;

(b)    The person (or persons) who are to be substituted in Section 5.04 of this Agreement shall have been approved by Franchisor and shall have successfully completed the training course then in effect for Franchisor's Franchisees at Transferee's sole cost and expense.  Upon consummation of the transaction, this Agreement shall be deemed amended to insert the name of such person in Section 5.04 hereof;

(c)    Franchisee shall not be in default under any provision of this Agreement, and shall pay in full all amounts owed to Franchisor at or prior to the closing of the transaction;

(d)    Any sale, assignment, or transfer of this Agreement as such to be made by Franchisee shall be evidenced by a written instrument, in form reasonably satisfactory to Franchisor, in which the purchaser, assignee, or transferee expressly assumes

all obligations of Franchisee hereunder, whether accrued at the time of such assignment or arising thereafter, and agrees to be bound by all the terms and provisions of this Agreement to the same extent and in the same manner as Franchisee. A copy of said instrument executed by both Franchisee and such purchaser, assignee, or transferee, shall be promptly delivered to Franchisor. If the purchaser, assignee, or transferee is a corporation, limited partnership, or other entity, any of the owners of which enjoy limited liability by law, the individual or individuals who own the controlling interest therein shall execute and deliver to Franchisor its then standard forms of personal guaranty and subordination agreement, and shall further execute the personal undertaking set forth at the end of this Agreement following the signatures of Franchisor and Franchisee;

(e)    In the case of a party or parties who are to acquire an interest in Franchisee, the individual or individuals who are to acquire, directly or indirectly, the controlling interest in Franchisee shall have executed and delivered to Franchisor its then standard forms of personal guaranty and subordination agreement, and shall further execute the personal undertaking set forth at the end of this Agreement, following the signatures of Franchisor and Franchisee; and

(f)    Franchisee and each of its stockholders, directors, and officers shall have executed and delivered to Franchisor a general release of any and all claims and causes of action against Franchisor, its affiliated corporations, and their respective officers, agents, and employees.

### FRANCHISOR'S CONSENT TO ENCUMBRANCES

Section 7.05    In the event Franchisee desires or proposes to pledge, encumber, or grant any security interest in this Agreement, or, if Franchisee is a corporation, partnership, or other form of business association, then in the event the holder of any interest in such corporation, partnership, or association desires or proposes to pledge, encumber, or grant any security interest therein under circumstances which would constitute or create an assignment of this Agreement within the meaning of Section 7.01, above, Franchisee or the holder of such interest, as the case may be, shall first notify Franchisor in writing of such proposed transaction. Franchisor shall not unreasonably withhold its consent to such transaction, subject, however, to the following conditions:

(a)    Any consent so granted shall not be deemed a consent to such pledgee, encumbrancer, or secured party exercising any rights or prerogatives of Franchisee under this Agreement, nor to its exercise of any rights or prerogatives of a holder of an ownership interest in Franchisee;

(b)    Any consent so granted shall not be deemed a consent to any subsequent disposition described in Section 7.01(c), above, or so much of Section 7.01(e) as refers to Section

24

7.01(c). Any such subsequent disposition shall be deemed an assignment of this Agreement within the meaning of Section 7.01, above, and shall be subject to the provisions of Section 7.06, below;

(c)    The pledgee, encumbrancer, or secured party shall have executed and delivered to Franchisor an instrument in writing agreeing to be bound by the provisions of this Article.

## APPROVAL OF TRANSFEREE

Section 7.06.    In the event any party proposes to acquire the interest of Franchisee in this Agreement, if Franchisee is an individual, in a transaction described in Section 7.01(c), above, or any such party proposes to acquire the interest of any party or parties having an interest in Franchisee, if of a type described in Section 7.01(e), the party proposing to acquire such interest shall notify Franchisor thereof in writing. Subject to prior compliance with the provisions of Section 7.03, above, Franchisor shall consent to the proposed transaction, provided that each of the following conditions is fulfilled:

(a)    It shall be demonstrated to the reasonable satisfaction of Franchisor that such party is of good moral character, and possesses the business experience and capability, credit standing, health, and financial resources necessary to successfully operate Franchisee's shop in accordance with the terms of this Agreement. If such party is a corporation, partnership, or other business association other than a corporation whose stock is publicly traded, the provisions of the preceding sentence shall apply to the individuals who own the same;

(b)    The person who is to be substituted in Section 5.04 of this Agreement shall have been approved by Franchisor and shall have successfully completed the training course then in effect for Franchisor's Franchisees. Upon consummation of the transaction, this Agreement shall be deemed amended to insert the name of such person in Section 5.04 thereof;

(c)    There shall be no existing default in any of the obligations of Franchisee under this Agreement, and all amounts owed to Franchisor shall be paid in full at or prior to the consummation of such transaction;

(d)    Such party shall have submitted to Franchisor satisfactory evidence that he has acquired and has become entitled to all rights of Franchisee hereunder, or to all rights in Franchisee belonging to the party or parties whose interests have been acquired, as the case may be. If the interest of Franchisee hereunder is to be acquired and delivered to Franchisor a written instrument, in form reasonably satisfactory to Franchisor, by which he expressly assumes all obligations of Franchisee hereunder, whether then accrued or thereafter arising, and agrees to be bound by all the terms and provisions

25

of this Agreement to the same extent and in the same manner as Franchisee. In addition, if such acquiring party is a corporation other than a corporation whose stock is publicly traded or is a limited partnership or other entity, any of whose owners enjoy limited liability by law, the individual or individuals who own the controlling interest therein shall execute and deliver to Franchisor its then standard forms of personal guaranty and subordination agreement, and shall further execute the personal undertaking set forth at the end of this Agreement, following the signatures of Franchisee and Franchisor. If an interest in Franchisee is to be acquired, the individual or individuals who are to acquire, directly or indirectly, the controlling interest in Franchisee shall have executed and delivered to Franchisor said forms of guaranty and subordination agreement and shall have executed the said personal undertaking set forth at the end of this Agreement.

## DEATH OF FRANCHISEE

Section 7.07. In the event of the death of Franchisee, if Franchisee is an individual or if Franchisee is a corporation, partnership, or other form of business association, then in the event of the death of any party or parties owning an interest in Franchisee, which death results in an assignment of this Agreement within the meaning of Section 7.01, above, Franchisor shall consent to an assignment and transfer of this Agreement to the executor, administrator, or other personal representative of the deceased, and subsequently to the person or persons entitled to distribution from the deceased's estate (or directly to the latter persons if no probate proceedings are instituted with respect to the estate), provided that each of the following conditions is fulfilled with respect to each such assignment and transfer:

(a)    It shall be demonstrated to the reasonable satisfaction of Franchisor that such executor, administrator, personal representative, or distributee is of good moral character, and possesses the business experience and capability, credit standing, health, and financial resources necessary to successfully operate Franchisee's shop in accordance with the terms of this Agreement. Such executor, administrator, personal representative, or distributee shall cooperate with Franchisor in making available such information as Franchisor may require to make the above-described determinations;

(b)    The person who is to be substituted in Section 5.04 of this Agreement shall have been approved by Franchisor and shall have successfully completed the training course then in effect for Franchisor's franchisees. Upon such approval and completion, this Agreement shall be deemed amended to insert the name of such person in Section 5.04 hereof;

(c)    There shall not be an existing default in any of the obligations of Franchisee hereunder, and all amounts owed to Franchisor as of the date of death shall be paid in full;

26

(d)    Such    executor,    administrator,    personal
representative,    or    distributee    shall    have    submitted    to
Franchisor    satisfactory    evidence    that    he    has    succeeded    or
otherwise become entitled to all rights of Franchisee hereunder,
or to all rights of the deceased in Franchisee,    as the case may
be.    If    the    deceased    was    the    Franchisee,    such    executor,
administrator,    personal    representative,    or    distributee    shall
have executed and delivered to Franchisor a written instrument,
in    form    satisfactory    to    Franchisor,    by    which    he    expressly
assumes all obligations of Franchisee hereunder, whether accrued
at    the    date    of    Franchisee's    death    or    arising    thereafter,    and
agrees    to    be    bound    by    all    the    terms    and    provisions    of    this
Agreement    to    the    same    extent    and    in    the    same    manner    as
Franchisee.    If    the    deceased    was    the    owner    of    an    interest    in
Franchisee,    such    executor,    administrator,    personal
representative,    or    distributee    shall    execute    and    deliver    to
Franchisor    its    then    standard form of    personal    guaranty    and
subordination    agreement    (limited,    in the case of    an    executor,
administrator,    or personal representative to his representative
capacity), and shall execute the personal undertaking (similarly
limited to such representative capacity) set forth at the end of
this    Agreement,    following    the    signatures    of    Franchisor    and
Franchisee.

Any    consent    by    Franchisor    to    an    assignment    and
transfer    of this Agreement or of any interest in Franchisee    to
the executor,    administrator,    or personal representative of the
deceased    shall    not    constitute a    consent    to    any    subsequent
assignment    or    transfer    thereof    from    such    executor,
administrator,    or personal representative of any distributee of
the    estate.    Any consent by Franchisor to such    subsequent
assignment    or    transfer shall be subject to    fulfillment,    with
respect to said subsequent assignment or transfer separately and
specifically, of all of the conditions stated in this Section.

## CONSENT TO TRANSFER OF MANAGERIAL RESPONSIBLITY

Section 7.08.    In the event the person designated    in
Section 5.04 of this Agreement ceases to comply with any one or
more of the provisions thereof,    whether by reason of    voluntary
action or inaction,    disability,    death,    or other cause (or, if
two or more persons are designated in Section 5.04,    then in the
event    of them cease to comply as aforesaid),    other than in the
connection with a transaction described in Section 7.04,    7.06,
or 7.07,    above,    Franchisor shall consent to the designation by
Franchisee    of another person or persons to be substituted
therein,    and Section 5.04 hereof shall be amended accordingly,
but    only if Franchisor in its reasonable discretion finds    such
person    or    persons acceptable and he or they    shall    thereafter
successfully    complete    the training course then    in    effect    for
Franchisor's Franchisees.

## TIME LIMITATION

Section 7.09. In the case of any transaction described in either Section 7.02, or 7.04 through 7.07, above, Franchisor shall not be required to give its consent to such transaction unless each conditions precedent to such consent requiring action by Franchisee or any third party has been fulfilled within ninety (90) days from the date of the event giving rise to the requirement of such consent, provided however, if in any case the person who is to be substituted in Section 5.04 of this Agreement has been unable, within said ninety (90) day period, to complete the required training course solely by reason of such course not having been offered by Franchisor at an earlier date, and if all other conditions to Franchisor's consent have been fulfilled with said ninety (90) day period, then Franchisor shall consent to such transaction conditioned upon successful completion of such training course by such person at the earliest practicable date.

## EXCLUSION

Section 7.10. Nothing contained in this Article shall be deemed to refer to any event referred to in subsection (b), (c), or (d) of Section 8.06, below, as causing automatic termination of this Agreement.

## ARBITRATION

Section 7.11. In the event that Franchisor is required, pursuant to Section 7.04, 7.05, 7.06, 7.07, or 7.08, to grant any consent, subject to the conditions set forth in said Sections and in Section 7.09, and if Franchisor fails or refuses to grant such consent, then upon written demand made by Franchisee upon Franchisor at any time within ten (10) days after Franchisee's receipt of written refusal by Franchisor to grant such consent, or if no such written refusal is sent by Franchisor, then at any time within ten (10) days after expiration of the period defined in Section 7.09, above, within which the conditions to Franchisor's consent are to be fulfilled or within ten (10) days after earlier written notice of Franchisee's binding election to waive the balance of such period and to stand upon the circumstances then existing, such dispute shall be submitted to arbitration before the American Arbitration Association or any successor organization in accordance with and subject to all the same terms, provisions, and conditions as are set forth in Section 8.03, below, (including all subsections thereof except subsections (e) and (f), and except that the time within which such arbitration is to be requested shall be as provided in this Section, and except further that the issues of fact and law referred to in subsection (b) of Section 8.03, below, shall be those the determination of which is necessary to determine whether Franchisor is required, pursuant to and subject to all the conditions of Sections 7.04, 7.05, 7.06, 7.07, or 7.08, and of Section 7.09, above, to grant such consent. If Franchisee fails to serve proper written demand

for arbitration as set forth in this Section within the time specified herein, Franchisee shall be barred from seeking any relief, whether by way of arbitration or by way of action or defense in any court, with respect to any matter or issue which was subject to arbitration pursuant to this Section. If Franchisee makes proper and timely written demand for arbitration pursuant to this Section, then Franchisor shall grant the required consent promptly upon termination of the proceedings in favor of Franchisee, either by rendition of final decision or award by the arbitration or by entry of a final and nonappealable order of any court of competent jurisdiction in which lawful review of such decision or award may be sought by Franchisor or Franchisee. Franchisor shall not be liable to Franchisee for any damage alleged to have accrued to Franchisee by reason of the fact that such consent shall have been delayed until termination of the proceedings as aforesaid.

### ASSIGNABILITY BY FRANCHISOR

Section 7.12. This Agreement may be assigned by Franchisor or by any hereafter referred to successor, to any corporation, person or entity which may succeed to the business of Franchisor or of such successor by sale of assets, merger, or consolidation, and may also be assigned by Franchisor or by such successor to the shareholder or shareholders thereof in connection with any distribution of the assets of said cororation.

### ARTICLE 8. DEFAULT AND TERMINATION

### TERMINATION BY FRANCHISEE

Section 8.01. Franchisee shall not terminate this Agreement without cause during the term of this Agreement or any Renewal period. For purposes of this section and Agreement, "cause" is defined as a material breach of the herein Agreement by Franchisor, and Franchisor's inability or refusal to cure such material breach within sixty (60) days of written notice by Franchisee to Franchisor of such breach. However, Franchisee may otherwise sell or assign his rights herein under the terms and conditions provided for in Article 7, paragraphs 7.01 through 7.10.

### TERMINATION BY FRANCHISOR

Section 8.02. (a) In the event Franchisee fails to make any payment of money owed to Franchisor when due, or fails to submit to Franchisor when due any report required by this Agreement and such default is not totally cured within thirty (30) days after Franchisor gives written notice of such default to Franchisee, then Franchisor may terminate this Agreement at any time thereafter by giving written notice of such termination to Franchisee;

(b) In the event Franchisee fails to perform any

29

obligation imposed upon Franchisee by this Agreement, other than those referred to in subsection (a) or (d) of this Section, and such default is not totally cured within sixty (60) days after Franchisor has given written notice of such default to Franchisee, then Franchisor may terminate this Agreement at any time thereafter by giving written notice of such termination to Franchisee, provided however, that if the default is of such nature that it is not capable of being totally cured with reasonable diligence by Franchisee within said sixty (60) day period, then this Agreement shall not be terminated by Franchisor if Franchisee has commenced, immediately upon receipt of such notice, to exercise reasonable diligence to cure such default, Franchisee continues to be diligently engaged in curing same upon the expiration of said sixty (60) days period, and the curing thereof is completed as soon thereafter as is reasonably practicable;

(c)    In the event Franchisee has been given written notice of default by Franchisor three (3) times within any period of twelve (12) consecutive months pursuant to subsections (a) and/or (b) above, and in each of such prior instances Franchisee has cured the default within the time permitted, then in the event Franchisee again fails, within said twelve month period, to perform any obligation referred to in subsection (a) or (b), Franchisor may at any time thereafter terminate this Agreement forthwith, without giving prior notice in which to cure such default, by giving written notice of such termination to Franchisee;.

(d)    Franchisor may terminate this Agreement immediately after giving fifteen (15) days written notice to Franchisee, on account of any of the following matters:

(i)    Any willful and material falsification by Franchisee of any report, statement, or other written data furnished to Franchisor. Any report submitted pursuant to Article 6 shall be conclusively deemed to be materially false if it understates gross revenue by more than five (5%) percent;

(ii)    Any willful and repeated deception of customers by Franchisee, relating to the source, nature or quality of goods sold, or relating to the terms of applicability of any of Franchisor's guaranties;

(iii)    Any attempted or purported assignment of this Agreement not in compliance with Section 7.02 through 711, provided that if Franchisor does not elect to exercise its right to terminate this Agreement pursuant to this subsection, such inaction shall

30

not be deemed to constitute a consent
to such assignment nor to confer any
rights or interest whatever upon the
purported assignee, but this Agreement
shall remain binding and in full force
and effect as between Franchisor
and Franchisee herein unless and until
Franchisor elects to terminate the same;

(iv)  Any willful and repeated refusal to
honor any of the Franchisor's guaranties
or any willful and repeated issuance of
guaranties other than those permitted
and authorized by this Agreement;

(v)  Voluntary abandonment of the franchise
relationship by the Franchisee;

(vi)  The conviction of the Franchisee of
an offence directly related to the business
conducted pursuant to the Franchise; or

(viii)  Failure to cure a default under this
Agreement which materially impairs the
goodwill associated with the Franchisor's
trademark, service mark, logotype, or other
commercial symbol after the Franchisee has
received written notice to cure of at least
twenty-four (24) hours in advance thereof.

(e)  Any act or omission described in subsection  (d),
above,  shall  be conclusively deemed to be willful and repeated
if  it occurs after written notice from Franchisor to cease  and
desist  therefrom,  but  nothing  in  this  sentence  shall  be
construed to mean that acts or omissions described in either  of
said subsections may not  be considered  to  be  willful  and
repeated  in  the absence of such notice from Franchisor.   Any
notice  of  termination  given by Franchisor  pursuant  to  this
subsection  shall  be fully effective,  and this agreement shall
thereby be terminated,  notwithstanding the fact that  Franchisee
may not at the time of such notice be engaged in, any of the acts
which  give  rise  to  such  notice,   and  notwithstanding  that
Franchisee  may have taken steps to counteract the effects of any
such acts.

The  termination by Franchisor of the sale of products
or  product  line to Franchisee as provided in Section  4.02  of
this Agreement (Page 19), is not "cause" for the  termination of
the franchise by Franchisor or Franchisee.

## ARBITRATION

Section 8.03.   In the event that Franchisor gives  to
Franchisee  any  notice of default and/or notice of  termination
pursuant to Section 8.02,  and Franchisee disputes the right of

31

Franchisor to terminate this Agreement pursuant to said notice or notices, then upon written demand made by Franchisee upon Franchisor at any time prior to or within ten (10) days after notice of termination, such dispute shall be submitted to arbitration in accordance with the rules and procedures for commercial arbitration of the American Arbitration or any successor organization, and in compliance with subject to all the provisions of the Uniform Arbitration Act as in force in the State of California. The place of arbitration shall be Los Angeles, California or if not permitted by local law such other location as may be mutually agreed upon by the parties.

(a) The procedure for selection of the arbitrator shall be as may then be prescribed by said Association or its successor, provided however, that if said Association or a successor is not in existence or does not provide such a procedure, then Franchisor and Franchisee shall each select one arbitrator and said arbitrators shall select a third, and in the event of the death, resignation, or disability of any such arbitrator, his successor shall be chosen in the same manner as the arbitrator so succeeded;

(b) The arbitrator or arbitrators shall have full power to determine all issues of fact and of law necessary to determine whether Franchisor has the right to terminate this Agreement pursuant to the notice or notices given, and the determination of the arbitrators thereon shall be final and conclusive upon the parties, subject only to the provisions of said Uniform Arbitration Act. Any such determination of an issue of fact or law made by the arbitrators, however, shall be binding upon the parties only with respect to and in connection with the particular arbitration proceeding and the specific final decision or award of the arbitrators made therein, and shall not be binding upon the parties nor shall it be admissible in any other proceeding or for any other purpose, provided that nothing herein shall prevent any party from enforcing the specific decision or award of the arbitrators by any appropriate and lawful means;

(c) The costs of the arbitration (not including attorney's fees) shall be taxed and borne as provided in said Uniform Arbitration Act;

(d) The arbitrators shall not have the power to determine or decide any issue or matter other than those hereinabove expressly set forth, and shall in no event have any right or power to award or assess damages to or against any party;

(e) The serving of the proper and timely demand for arbitration shall suspend the running of any period for curing a default or shall suspend the effectiveness of any termination of this Agreement, as the case may be, until the decision or award of the arbitrator is made. If such decision or award is in favor of Franchisor, such curative period shall immediately

resume running or such termination shall immediately take effect, as the case may be, notwithstanding the pendency of any proceedings to modify, set aside, or vacate said decision or award, whether taken or brought before the arbitrators or in any court;

(f) If Franchisee fails to serve proper written demand for arbitration within the time specified, Franchisee shall be barred from seeking any relief, whether by way of arbitration or by way of action or defense in any court, with respect to any matter or issue which was subject to arbitration in accordance with this Section.

## NOTICE OF DEFAULT OR TERMINATION

Section 8.04. No notice of default or notice of termination purporting to be given pursuant to this Article 8 shall be of any force or effect unless signed by a corporate officer of Franchisor. Regional directors, district managers, and other agents of Franchisor having authority with respect to a specific geographic area shall in no event be deemed corporate officers for purposes of this Section.

## NONEXCLUSIVE REMEDY

Section 8.05. The right of Franchisor to terminate this Agreement pursuant to this Section, whether or not exercised, shall not be exclusive of any other remedies given Franchisor by this Agreement or by law on account of any default of Franchisee hereunder.

## AUTOMATIC TERMINATION

Section 8.06. This Agreement shall terminate immediately upon the occurrence of any of the following events, without the necessity of notice of any kind by Franchisor or Franchisee:

(a) Any termination of Franchisee's right to possession of the premises designated in Section 2.01, subject however, to the provisions of Sections 2.07 through 2.10, above;

(b) The adjudication of Franchisee a bankrupt, or the filing of any petition by or against Franchisee, under the federal bankruptcy laws or the laws of any state or territory relating to relief of debtors, for reorganization, arrangement, or other similar relief provided therein, unless such petition filed against Franchisee is dismissed within thirty (30) days, or the making by Franchisee of a general assignment for the benefit of creditors;

(c) The appointment of any receiver, trustee, sequestrator, or similar officer to take charge of Franchisee's business, or any attachment, execution, levy, seizure, or appropriation by any legal process of Franchisee's interest in

33

this Agreement, unless the appointment of such officer is vacated or discharged or the effect of such legal process is otherwise released within thirty (30) days;

(d) If Franchisee is a corporation, partnership, or other business association, the occurrence of any act of a type described in subsection (b) or (c), above, which relates to, involves, or affects the interest of any person owing a controlling interest in Franchisee. The parties hereto understand and agree that termination of the Franchise on the ground of bankruptcy may be unenforceable under the Federal Bankruptcy Law;

Notwithstanding the above, this Agreement shall be cancelled or terminated only for "Good Cause." For purposes of this Agreement, "Good Cause" shall mean a failure by the Franchisee substantially to comply with reasonable requirements imposed upon Franchisee by the Franchise including, but not limited to:

(1) The bankruptcy or insolvency of the Franchisee;

(2) Assignment for the benefit of creditors or disposition of the assets of the Franchise business;

(3) Voluntary abandonment of the Franchise business;

(4) Conviction or a plea of guilty or no contest to a charge of violating any law relating to the Franchise business;

(5) Any act by or conduct of the Franchisee which materially impairs the goodwill associated with the Franchisor's tradmark, trade name, service mark, logotype or other commerical symbol.

Franchisor shall not fail to renew this Franchise unless the Franchisee has been given written notice of the intention not to renew at least ninety (90) days in advance of the renewal date and has been given a sufficient opportunity to recover Franchisee's investment unless the failure to renew is for "Good Cause" as defined in subsection (1) through (5), above.

## RELIEF IN EQUITY

Section 8.07. Franchisee agrees that neither termination of this Agreement, nor an action at law, nor both, would be an adequate remedy for a breach or default by Franchisee, or by any other persons bound by this Agreement, in the performance of any obligation relating to Franchisor's Proprietary Marks or Indicia, the trade secrets revealed to Franchisee in confidence pursuant to this Agreement, Franchisor's guaranties, or the obligations of Franchisee and such other persons, upon and after termination of this Agreement. It is agreed that in the event of such breach or default, in addition to all other remedies provided elsewhere in

this Agreement or by law, Franchisor shall be entitled to relief in equity (including a temporary restraining order, temporary or preliminary injunction, and permanent mandatory or prohibitory injunction) to restrain the continuation of any such breach or default or to compel compliance with such provisions of this Agreement.

OBLIGATIONS FOLLOWING TERMINATION

Section 8.08. Upon termination of this Agreement, whether by lapse of time, by termination pursuant to any provision of this Article, by mutual consent of the parties, by operation of law, or in any other manner whatsoever, and in the absence of renewal of this Agreement pursuant to Article 9, Franchisee shall cease to be authorized California Closet Company Franchisee as to any products or services whatsoever, and Franchisee and all persons directly or indirectly owning any interest in Franchisee or in any way associated with or related to Franchisee shall:

(a) Promptly cause Franchisee to pay Franchisor all liquidated or ascertainable sums owing from Franchisee to Franchisor, without set-off or other diminution on account of unliquidated claims;

(b) Immediately and permanently discontinue the use of any of Franchisor's Proprietary Marks or Indicia or the System, or any marks, names, or indicia which in the opinion of Franchisor are confusingly similar thereto, or any other materials which may in any way indicate or tend to indicate that Franchisee is or was an authorized Franchisee of Franchisor or is or was in any way associated with Franchisor;

(c) Immediately and permanently remove, destroy, or obliterate, at Franchisee's expense, all signs containing any of the marks, names, indicia, or other things the use of which is prohibited by subsection (b), above, and shall also sell to Franchisor, f.o.b., Franchisee's shop, such of the aforesaid signs as Franchisor may request, at a price equal to the original installed cost thereof to Franchisee minus a reasonable allowance for depreciation, wear, and obsolescence;

(d) Promptly destroy or surrender to Franchisor all stationery, letterheads, forms, printed matter, promotional displays, and advertising containing any of the marks, names, indicia, or other things the use of which is prohibited by subsection (b), above;

(e) Immediately and permanently discontinue all advertising placed by Franchisee as an authorized Franchisee of Franchisor or which contains or makes reference to any of the marks, names, indicia, or other things the use of which is prohibited by subsection (b), above, and will cancel all such advertising already placed or contracted for which would otherwise be published, broadcast, displayed, or disseminated

after the date of termination hereof;

(f)   Immediately cease using or claiming any right to use any telephone number which Franchisor, as the subscriber therefor, has allowed Franchisee to use during the term of this Agreement, and pay all bills incurred for the period during which Franchisee used such number or numbers. As to each telephone number for which Franchisee may be the subscriber and which shall have been listed or advertised by Franchisee at any time within the twenty-four (24) month period prior to termination in any telephone directory or other medium in connection with any of the Proprietary Marks or any similar designation, Franchisee shall immediately transfer and assign any such number to Franchisor or to such person or firm as Franchisor may designate, and shall immediately execute such instruments and take such steps as in the opinion of Franchisor may be necessary or appropriate to transfer and assign each such telephone number, and Franchisee further irrevocably appoints the then acting President of California Closet Company or its successor as Franchisee's duly authorized agent and attorney-in-fact to execute all such instruments and take all such steps to transfer and assign each such telephone number;

(g)   Immediately and permanently discontinue any use of the name "California Closet Company" or any word confusingly similar thereto in Franchisee's firm name, corporate name, or trade name, and take such steps as may be necessary or appropriate in the opinion of Franchisor to change such names to eliminate therefrom the name "California Closet Company" or any word confusingly similar thereto;

(h)   Sell to Franchisor, f.o.b., Franchisee's business, all or such part of inventories of genuine products bearing Franchisor's Proprietary Marks or indicia on hand as of the date of termination as Franchisor may request in writing prior to or within thirty (30) days after the date of termination, at the current published prices then being charged by Franchisor to authorized Franchisees operating under agreements in form similar to this Agreement, not including any costs of storage or transportation paid by Franchisee to bring the goods initially to the shop, minus all costs incurred or to be incurred by Franchisor to restore such goods or packaging thereof to a salable condition, and minus a reasonable allowance of physical deterioration, obsolescence, or damage to the extent not restored under the preceding clause. Franchisor shall have the right to set off and apply any amounts due to Franchisee pursuant to this subsection against any and all other amounts which may be due from Franchisee to Franchisor; and

(i)   Thereafter refrain from doing anything tending to indicate that Franchisee is or was an authorized Franchisee of Franchisor, or is or was in any way associated with Franchisor.

36

GENERAL PROVISIONS REGARDING TERMINATION

Section 8.09. (a) Termination of this Agreement under any circumstances shall not abrogate, impair, release, or extinguish any debt, obligation, or liability of Franchisee to Franchisor which may have accrued hereunder, including without limitation, any such debt, obligation, or liability which was the cause of termination or arose out of such cause;

(b) All covenants and agreements of Franchisee which by their terms or by reasonable implication are to be performed, in whole or in part, after the termination of this Agreement, shall survive such termination;

(c) In the event this Agreement is assigned by Franchisee and such assignment is consented to by Franchisor, as provided herein, except as otherwise provided herein this Agreement shall be deemed to have terminated as to the assignor or assignors as of the date of such consent, and such assignor or assignors shall thereupon be bound by all provisions of Section 8.09, above (except subsection (h) thereof) and this Section to the same extent and in the same manner as if this Agreement has been terminated in its entirety as of said date;

(d) Nothing contained in Section 8.09 shall be deemed to apply to or affect the operation by Franchisee or by any other party bound thereby of a California Closet Company shop at any other location pursuant to and in accordance with the provisions of any other valid and outstanding agreement with Franchisor.

ARTICLE 9. EXPIRATION AND RENEWAL

EXPIRATION

Section 9.01. Unless sooner terminated or modified in accordance with the provisions hereof, the expiration date of this Agreement and the right, franchise, and license granted herein shall end ten (10) years from the date of the execution of this Agreement.

RENEWAL OPTION

Section 9.02. Subject to the provisions of Section 9.07, above, and pursuant to Section 20025 of the California Business and Professions Code, Franchisee is hereby granted an option to extend this Agreement for a successive ten (10) year period. This option may be exercised by Franchisee at its sole election by sending to Franchisor written notice of its intention to do so, by mail, at least ninety (90) days prior to the expiration date specified in Section 9.01, above. Upon payment of the renewal fee at least (5) days prior to said expiration date, and compliance with all other conditions for Renewal provided for herein, the franchise shall be renewed for an additional ten (10) years.

37

## RENEWAL FEE

Section 9.03.   The renewal fee shall be the  initial franchise fee specified in franchise agreements being  used  by Franchisor as of the date of Renewal.

## ROYALTIES AFTER RENEWAL

Section 9.04.  At the beginning of the renewal period, the royalties  payable to Franchisor shall be the same  as  the royalties  provided  in the franchise agreements being  used  by Franchisor as of the date of Renewal,  and shall include present advertising credits as per Section 5.08.

## CONDITIONS FOR RENEWAL OPTION

Section 9.05.   Franchisee shall not have the right to exercise the renewal option referred to in Section 9.02,  above, unless all  amounts to be paid by Franchisee to Franchisor are currently  paid,  and no default under this Agreement exists uncured  five (5) days after the Franchisee has received written notice of any overdue amounts.   Even if no such default exists, Franchisor may revoke said option and refuse  to  allow  said renewal if,  during the franchise period,  Franchisee has repeatedly and  unreasonably been in material default of this Agreement.   Franchisor and Franchisee agree that,  for the purposes of this Section,  such repeated, unreasonable, material default includes, but is not limited to,  failure to make  at least  one hundred (100%) percent of all  payments and  reports within  fifteen (15) days of the date they are actually due.    It is  further agreed that such default also includes Franchisee's consistently  demonstrated unwillingness to take remedial actions as  recommended by Franchisor to improve Franchisee's  sales and marketing methods,  in accordance with Franchisee's  obligations under Article 5 of this Agreement.

## ADDITIONAL FRANCHISE LOCATIONS

Section 9.07.   If Franchisee elects and is  qualified to exercise  the  Renewal Option referred to in  Section  9.02 above,  or if prior to Renewal Franchisor determines that one or more  additional  California Closet Company businesses  are necessary within the said protected area for market coverage therein,  Franchisee may renew  such option on the terms and conditions provided and Franchisee,  Franchisor or a  new Franchisee licensed  by Franchisor may operate such additional businesses so long as the following conditions are met:

(a)    Reasonable projections based upon  pertinent marketing data demonstrate that the protected area can  support one  or more additional California Closet Company businesses and Franchisor concludes  that the opening of such  businesses  are desirable in order to avoid loss of market position and business to competitors;

(b) Franchisor communicates in writing to Franchisee its intention to open said additional businesses, based on the reasonable market projections and determinations set forth in section (a), above;

(c) Franchisee herein shall have the first right to open any additional businesses after receiving notification; the election to open such additional businesses may be made in the manner provided in Section 9.08 herein;

(d) In the event that Franchisee elects not to open additional businesses pursuant to subsection (c), above, or fails to proceed with the election procedures set forth in Section 9.08, the option price paid, if any, shall be retained by Franchisor as consideration for the delay, and Franchisor shall have the right to accept offers from other parties to become Franchisees in the areas or area designated for the additional businesses, or to operate Franchisor-owned businesses therein;

(e) Franchises granted under the right of first refusal set forth in subsection (c), above, shall not be governed by the terms and conditions of this Agreement, but by the terms and conditions of the Franchise Agreement employed by Franchisor at the time Franchisee exercises said right to open such additional businesses.

## EXERCISE OF RIGHT TO ADDITIONAL FRANCHISES
## WITHIN PROTECTED AREA AT ANY TIME

Section 9.08. In this event that Franchisor communicates to Franchisee its intent to open additional businesses in Franchisee's protected area, at any time during the existence of this agreement or the renewal hereof, Franchisee shall have the right of first refusal under the conditions set forth below, to operate any such additional business. If Franchisee decides to elect to open such business therein, Franchisor will grant Franchisee a franchise under which Franchisee may operate such additional business pursuant to the following terms and conditions:

(a) Franchisee shall with thirty (30) days after receiving notice under all of the terms and conditions of the Franchise Agreement then currently employed by Franchisor, elect to either open or not the additional business under said notice. If Franchisee cannot so determine to open such additional Franchise, Franchisee may notify franchisor in writing within said thirty (30) days period of its election to take an option on said additional franchise or franchises. The option price shall be $1,000 per additional franchise, and shall not be refundable. Payment of said option price shall reserve that portion of the entire protected area applicable to the additional franchise location or locations for three (3) months from the date of receipt of said notice for Franchisee only;

39

(b)     Within six (6) months after receipt of said notice, Franchisee shall pay to Franchisor the franchise fee for the additional business to be opened under this Section.     The franchise fee and royalty rate for said additional business shall .be the same amount and rate as the franchise fee and royalty rate stipulated in this Franchise Agreement, unless notified to the contrary by Franchisor at or before the expiration of said six (6) month period.     The option price, if paid, shall be credited against said franchise fee;

(c)     Franchisee shall proceed to open the said additional business under this Section within three (3) months following payment of said franchise fee;

(d)     In the event that more than one business is involved, Franchisee shall notify Franchisor within thirty (30) days of the opening of the first additional business of his intention to open additional businesses, after which time Franchisee shall proceed again as outlined in this Section;

(e)     The franchise fee and royalty for each additional business shall be as specified in subsection (b), above, or in the Franchise Agreement employed by Franchisor at the time Franchisee exercises his right to open such additional business, which decision shall be solely within the discretion of the Franchisor.

### FRANCHISOR'S ELECTION NOT TO RENEW

Section 9.09.     In the event Franchisor determines that Franchisee would not have the right to exercise the renewal option referred to in Section 9.02, above, pursuant to Section 9.05, above, and Franchisor is unwilling to renew the right, franchise, and option granted by this Agreement, Franchisor shall mail to Franchisee, by certified mail, postage prepaid, not less than nine (9) months prior to expiration, a Notice of Probable Intention Not to Renew ("Notice").     Such Notice shall set forth the acts and/or omissions of Franchisee which constitute the reasons under this Agreement that Franchisor is unwilling to renew.     In the event Franchisor is convinced that Franchisor is incapable of fulfilling its obligations under this Agreement, Franchisor shall then send to Franchisee a Notice of Refusal to Renew by registered or certified mail at least six (6) months prior to the expiration of this Agreement.     The notice shall state the reasons for the refusal to renew and the effective date of the nonrenewal or expiration of this Agreement.     To the extent permitted by Section 20025 of the California Business and Professions Code, such Notice of Refusal to Renew shall be deemed to supersede, revoke, and otherwise withdraw the option of Franchisee to renew.     In the event Franchisor is satisfied that Franchisee is able to and will correct any uncured deficiencies claimed in its Notice of Probable Intention Not to Renew, Franchisee will be so advised and will be allowed to exercise its option to renew referred to

in Section 9.02, above.

### ARTICLE 10.    MISCELLANEOUS PROVISIONS
### GRAMMER

Section 10.01.    The masculine of any pronoun shall include the feminine and/or the neuter thereof, and the singular of any noun or pronoun shall include the plural, or vice versa, wherever the context shall require.

Section 10.02.    Upon any effective assignment of Franchisee's interest in this Agreement, any and all references herein to "Franchisee" shall, unless the context otherwise requires, mean and refer to such assignee.

### SECTION HEADINGS

Section 10.03.    Section headings are for convenience of reference only and shall not be construed as part of this Agreement nor shall they limit or define the meaning of any provision herein.

### COST OF ENFORCEMENT OR DEFENSE

Section 10.04.    In the event Franchisor is required to employ legal counsel or to incur other expense to enforce any obligation of Franchisee hereunder, or to defend against any claim, demand, action or proceeding by reason of Franchisee's failure to perform any obligation imposed upon Franchisee by this Agreement, and provided that legal action is filed by or against Franchisor and such action or the settlement thereof establishes Franchisee's default hereunder, then Franchisor shall be entitled to recover from Franchisee the amount of all reasonable attorney's fees of such counsel and all other expenses incurred in enforcing such obligation or in defending against such claim, demand, action, or proceeding, whether incurred prior to or in preparation for or contemplation of the filing of such action or thereafter.    Nothing contained in this Section shall relate to arbitration proceedings pursuant to this Agreement.

### REMEDIES CUMULATIVE

Section 10.05.    All rights and remedies conferred upon Franchisor by this Agreement and by law shall be cumulative of each other, and neither the exercise nor the failure to exercise any such right or remedy shall preclude the exercise of any other such right or remedy.

### NONWAIVER

Section 10.06.    No failure by Franchisor to take action on account of any default by Franchisee, whether in a

single instance or repeatedly, shall constitute a waiver of any such default or of the performance required of Franchisee.    No express waiver by Franchisor of any provision or performance hereunder or of any default by Franchisee shall be construed as a waiver of any other or future provision, performance, or default.

## INVALIDITY AND SEVERABILITY

Section 10.07.    If any provision of this Agreement shall be invalid or unenforceable, either in its entirety or by virtue of its scope or application to given circumstances, such provision shall be deemed modified to the extent necessary to render the same valid, or as not applicable to given circumstances, or to be excised from this Agreement, as the situation may require, and this Agreement shall be construed and enforced as if such provision had been included herein as so modified in scope or application, or had not been included herein, as the case may be, it being the stated intention of the parties that had they known of such invalidity or unenforceability at the time of entering into this Agreement, they would have nevertheless contracted upon the terms contained herein, either excluding such provisions, or including such provisions only to the maximum scope and application permitted by law, as the case may be. In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section shall operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision.

## NOTICES

Section 10.08.    Any notice or demand given or made pursuant to the terms of this Agreement shall be served in the following manner:

(a)    If given to Franchisor, it shall be sent by certified mail, postage fully prepaid, addressed to California Closet Company at 6409 Independence Avenue, Woodland Hills, California, or at such changed address or addresses as Franchisor may from time to time designate.

(b)    If given to Franchisee, it shall either be delivered personally to the person (or any one of the persons) designated in Section 5.04, above, or shall be sent by certified mail, postage fully prepaid, addressed to Franchisee at the address of Franchisee's business as shown in Section 2.01, above.

(c)    Any such notice or demand shall be deemed to have been given or made and shall be deemed effective when the same has been received, provided that any demand for arbitration or any notice pursuant to Section 2.10, above, shall be deemed to have been made or given and shall be deemed effective when mailed

In accordance with this Section, provided that the same is received by Franchisor within five (5) business days after expiration of the period for making or giving such demand or notice.

## ENTIRE AGREEMENT

Section 10.09.  This Agreement, together with any written lease or sublease of the shop premises described in Section 2.01, above, entered into between Franchisee and Franchisor or any of its subsidiaries or affiliated corporations, constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof and thereof.  There are no representations, undertakings, agreements, terms, or conditions not contained or referred to herein or in any such lease or sublease.  This Agreement supersedes and extinguishes any prior written agreement between the parties or any of them relating to the shop location described in Section 2.01 hereof, provided that it shall not abrogate, impair, release, or extinguish any debt, obligation or liability of Franchisee to Franchisor accrued immediately prior to the execution of this Agreement nor cancel any credit owed by Franchisor to Franchisee at said time, nor shall it abrogate or impair any understandings or approvals relating to plans and specifications for the shop building and premises or the equipment and opening inventory to be installed or placed therein.  Nothing contained herein shall affect or relate to any agreement between the parties or any of them relating to any shop location other than the one described in Section 2.01 of this Agreement, except as expressly stated in Section 5.04 hereof.

## BINDING EFFECT

Section 10.10.  Subject to all the provisions of Article 7 and Section 8.09(c), above, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto (including the parties whose signatures follow those of franchisor and Franchisee) and their respective heirs, executors, administrators, personal representatives, successors, and assigns.

## CONTROLLING LAW

Section 10.11.  This Agreement, including all matters relating to the validity, construction, performance, and enforcement thereof, shall be governed by the laws of the State of California.

COUNTERPARTS

Section 10.12.    This Agreement may be executed in any number of identical counterparts, and each such counterpart shall be deemed a duplicate original hereof.

ACKNOWLEDGEMENT OF UNDERSTANDING

The parties hereto have fully read and understand this Franchise Agreement, its terms, conditions and significance. The parties hereto understand and agree that they either have had legal counsel review this Franchise Agreement or hereby expressly, knowingly and intelligently waive their right to have legal counsel review this Franchise Agreement. Further, the parties hereto while acknowledging their right to have legal counsel review and interpret this Franchise Agreement, voluntarily execute this Franchise Agreement mindful and understanding of its legal significance.

Executed at Encino, California, on the date and year first above written.

FRANCHISOR

CALIFORNIA CLOSET COMPANY, INC.

BY: _____

NEIL BALTER, President

FRANCHISEE

BY _____

_____

44

## GUARANTY

Each of the undersigned, being directly or indirectly beneficially interested in the business to be conducted by Franchisee pursuant to the foregoing Agreement, and in order to induce Franchisor to enter into said Agreement and in consideration of its doing so, hereby joins in and agrees to be personally bound by all the terms and provisions of this Agreement, including those requiring the payment of money by Franchisee, to the same extent and in the same manner as Franchisee is bound. Nothing herein shall be deemed to abrogate or impair any separate instrument of guaranty or subordination which any of the undersigned may have heretofore executed or may contemporaneously herewith or hereafter execute.

_James W. Damran_

_Solveig J. Damran_

45

## NOTE

The  name and address of the Franchisor's agent(s) in this state
authorized to receive service of process (is) are:

C.T. CORPORATION SYSTEM
222 West Washington Avenue
Madison, Wisconsin  53203

THE COMMISSIONER OF SECURITIES
State of Wisconsin
111 W. Wilson Street, Box 1768
Madison, Wisconsin  53701

46

EXHIBIT "A"

TRADEMARKS AND SERVICEMARKS, FEDERAL:

Trademark "California Closet Company" serial No. 580-238 was registered on the Principal Register on October 7, 1986, as Registration number 1,412,380, In Class Numbers 20 and 42.

TRADEMARKS AND SERVICEMARK, FEDERAL

Pending Servicemark "Creative Closet Company" serial No. 73/439981 and slogan "a unique concept in closet design" in connection with mark. Anticipated registration date: January, 1986.

CALIFORNIA:

Trademark Registration No. 72947 described as a stylized clothing hanger encompassing the words "California Closet Company" and the slogan "a unique concept in closet design" used in connection with the mark. Servicemark registration No. 19508. both marks are identical to that pictured below.

<u>PENNSYLVANIA</u>: .

      Servicemark  Registration No.  84551292 described  and
pictured as California servicemark above.


<u>OTHER U.S., CANADIAN & FOREIGN</u>

      Pending  Servicemark  or  Trademark  registration
described as pictured as Federal No. 73/439981, above, "Creative
Closet Company":

| <u>Jurisdiction</u> | <u>Registration No.</u> | <u>Registration Date</u><br>(Ten Years) |
|---|---|---|
| 1. Alabama | Pending | |
| 2. Alaska | Pending | |
| 3. Arizona | Pending | |
| 4. Arkansas | Pending | |
| 5. Colorado | T-27003 | August 31, 1984 |
| 6. Connecticut | 6115 | October 22, 1984 |
| 7. Delaware | Pending | |
| 8. District of Columbia | Pending | |
| 9. Florida | Pending | |
| 10. Georgia | S-5492 | December 11, 1984 |
| 11. Hawaii | Pending | |
| 12. Idaho | Pending | |
| 13. Illinois | 55394 | September 5, 1984 |
| 14. Indiana | 5009-6204 | October 11, 1984 |
| 15. Iowa | Pending | |
| 16. Kansas | (No. Reg. No.) | January 15, 1985 |
| 17. Kentucky | Pending | |
| 18. Louisiana | Book 42 | October 22, 1984 |

OTHER U.S., CANADIAN & FOREIGN (con'd)

| Jurisdiction | Registration No. | Registration Date (10 years) |
|---|---|---|
| 19. Maine | Pending | |
| 20. Maryland | 85 S 1452 | |
| 21. Massachusetts | 36352 | |
| 22. Michigan | Pending | |
| 23. Minnesota | 9522 | September 4, 1984 |
| 24. Mississippi | Pending | |
| 25. Missouri | S8199 | May 9, 1984 |
| 26. Montana | Pending | |
| 27. Nebraska | Pending | |
| 28. Nevada | V-19 P-325 | September 24, 1984 |
| 29. New Hampshire | Pending | |
| 30. New Jersey | (No. Reg. No.) | November 21, 1984 |
| 31. New Mexico | Pending | |
| 32. New York | S-8308 | October 1, 1985 |
| 33. North Carolina | (No. Reg. No.) | June 18, 1985 |
| 34. North Dakota | Pending | |
| 35. Ohio | Pending | |
| 36. Oklahoma | Pending | |
| 37. Oregon | S-19698 | September 4, 1984 |
| 38. Rhode Island | Pending | |
| 39. South Carolina | Pending | |
| 40. South Dakota | Pending | |

OTHER U.S., CANADIAN & FOREIGN (cont'd)

| Jurisdiction | Registration No. (10 years) | Registration Date |
|---|---|---|
| 41. Tennessee | (No. Reg. No.) | December 20, 1984 |
| 42. Texas | 44198 | November 6, 1984 |
| 43. Utah | Pending | |
| 44. Vermont | Pending | |
| 45. Virginia | (No. Reg. No.) | November 27, 1984 |
| 46. Washington | 15335 | September 27, 1984 |
| 47. West Virginia | Pending | |
| 48. Wisconsin | Pending | |
| 49. Wyoming | Pending | |
| 50. Canada | Pending | |

EXHIBIT "A"   (Cont'd)

## SERVICES TO BE RENDERED BY FRANCHISEES

1.  Selling customized closets to the general public;

2.  Constructing and installing customized closets, including but not limited to:

    a.  Measuring;
    b.  Installing and fastening;
    c.  Cutting;
    d.  Painting;
    e.  Cleaning;

3.  Selling related retail accessories from storeroom locations.

## GOODS TO BE SOLD BY FRANCHISE

1.  Long hanging racks;

2.  Low hanging shoe racks;

3.  Medium hanging shelves;

4.  Double hanging shelves;

5.  Drawers;

6.  Front to back hanging;

7.  Tie rack — 24"

8.  Belt rack;

9.  Wood;

    a.  Industrial grade particle board;
    b.  Oak;
    c.  Cedar;

10. Luggage shelf;

11. Extra deep shoe shelf;

12. Mirrored doors;

13. Coat hooks;

51

14. Belt hooks for belt rack — 7/8";

15. 3/8" rod cups;

16. Rod covers;

17. Drawer Knobs;

18. 16" side drawer runners;

19. 13" bottom drawer runners;

GOODS WHICH SHALL BE SOLD TO FRANCHISEE BY FRANCHISOR OR IT'S DESIGNEES:

1. Wood, brass, plastic, multiple and special hangers;
2. Shoe racks;
3. Tie racks;
4. Garment racks;
5. Storage closets;
6. Specialty items and closet rods;
7. Any other closet related accessories and fixtures.

GOODS WHICH FRANCHISEE MAY PURCHASE FROM FRANCHISOR OR FROM OTHERS:

1. Mirrored doors;
2. Lumber and particle board;
3. Rod covers, rod cups, pole covers and hardware.

