1
DLA PIPER US LLP
JEFFREY M. HAMERLING, Bar No. 91532
2
153 Townsend Street, Suite 800
San Francisco, CA 94107-1957
3
jeffrey.hamerling@dlapiper.com
Tel: 415.836.2500
4
Fax: 415.836.2501

5
DLA PIPER US LLP
NORMAN M. LEON *(to be admitted pro hac vice)*
6
JOHN A. HUGHES *(to be admitted pro hac vice)*
203 North LaSalle Street, Suite 1900
7
Chicago, IL 60601
Phone: 312.368.4000
8
Fax: 312.236.7516

9
Attorneys for Plaintiff
CALIFORNIA CLOSET COMPANY, INC.
10

11
## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

12
### SAN FRANCISCO DIVISION

13
CALIFORNIA CLOSET COMPANY,
INC.,

14
                    Plaintiff,

15
        v.

16

17
J. MARK EBBEN, an individual, and
EBBEN ENTERPRISES, INC., a
18
Wisconsin corporation,

19                    Defendant.

| CASE NO. CV 08-0625 SI |
|---|

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER VENUE**

<u>Hearing</u>
Date:        April 18, 2008
Time:        9:00 a.m.
Courtroom:   10
Judge:       Hon. Susan Illston

20
21
22
23
24
25
26
27
28

DLA PIPER US LLP
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................................... 1

II.    STATEMENT OF ISSUES TO BE DECIDED ........................................................... 1

III.   FACTUAL BACKGROUND ...................................................................................... 2

       A.    The Parties And Their Written Franchise Agreement.............................................. 2

       B.    Defendants' Breaches Of The Franchise Agreement And Other Wrongful
             Conduct ............................................................................................................... 4

       C.    CCC's Complaint ................................................................................................. 5

IV.    ARGUMENT ............................................................................................................. 6

       A.    This Court Has Personal Jurisdiction Over Defendants........................................... 6

             1.    Applicable Standards ................................................................................. 6

             2.    This Court's Assertion Of Personal Jurisdiction Over Defendants
                   Satisfies Due Process ............................................................................... 6

                   a.    Purposeful Direction Or Availment ................................................. 7

                   b.    Claims Arising Out of Defendants' Activities................................ 11

                   c.    Reasonableness ......................................................................... 12

       B.    Venue Is Proper In This Court ............................................................................ 15

       C.    Defendants' Motion To Transfer Venue Should Be Denied................................... 16

V.     CONCLUSION ......................................................................................................... 21

DLA PIPER US LLP
SAN FRANCISCO

-i-

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER - CASE NO.  CV 08-0625 SI

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ballard v. Savage,*
   65 F.3d 1495 (9th Cir. 1995).................................................................. 6, 8

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,*
   223 F.3d 1082 (9th Cir. 2000).................................................................. 10

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)............................................................. 7, 8, 9, 11, 12

*Calder v. Jones,*
   465 U.S. 783 (1984)............................................................................ 9, 10

*Caruth v. Int'l Psychoanalytical Ass'n,*
   59 F.3d 126 (9th Cir. 1995)....................................................................... 7

*CFA N. California, Inc. v. CRT Partners LLP,*
   378 F. Supp. 2d 1177 (N.D. Cal. 2005)............................................. 6, 8, 11

*Clipp Designs, Inc. v. Tag Bags, Inc.,*
   996 F. Supp. 766 (N.D. Ill. 1998)................................................ 10, 11, 16

*Commodity Futures Trading Comm'n v. Savage,*
   611 F.2d 270 (9th Cir. 1979).................................................................. 17

*Cooper v. Molko,*
   512 F. Supp. 563 (N.D. Cal. 1981)......................................................... 15

*Core-Vent Corp. v. Nobel Indus. AB,*
   11 F.3d 1482 (9th Cir. 1993)..................................................................... 7

*Corporate Inv. Bus. Brokers v. Melcher,*
   824 F.2d 786 (9th Cir. 1987)......................................................... 8, 9, 12

*Decker Coal Co. v. Commonwealth Edison Co.,*
   805 F.2d 834 (9th Cir. 1986).................................................................. 18

*Dole Food Co. v. Watts,*
   303 F.3d 1104 (9th Cir. 2002)......................................................... 6, 7, 10, 11

*Fields v. Sedgwick Assoc. Risks, Ltd.,*
   796 F.2d 299 (9th Cir. 1986)..................................................................... 6

*Fireman's Fund Ins. Co. v. Nat'l Bank for Cooperatives,*
   1993 WL 341274, at *6 (N.D. Cal. Aug. 27, 1993)......................... 18, 19, 20

*Florens Container v. Cho Yang Shipping,*
   245 F. Supp. 2d 1086 (N.D. Cal. 2002).......................................... 19, 20

DLA PIPER US LLP
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3  *Gelber v. Leonard Wood Memorial,*
      2007 WL 1795746, at *4 n.2 (N.D. Cal. June 21, 2007) .......................................... 19

4
  *Haisten v. Grass Valley Med. Reimbursement Fund,*
5     784 F.2d 1392 (9th Cir. 1986)..................................................................... 10

6  *Hardee's Food Sys., Inc. v. Beardmore,*
      169 F.R.D. 311 (E.D.N.C. 1996) ........................................................... 15, 16
7
  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,*
8     328 F.3d 1122 (9th Cir. 2003)................................................................... 6, 7

9  *Heller Financial, Inc. v. Midwhey Powder Co.,*
      883 F.2d 1286 (7th Cir. 1989)...................................................................... 20
10
  *Indianapolis Colts, Inc. et al. v. Metropolitan Baltimore Football Club Ltd. P'ship, et al.,*
11     34 F.3d 410 (7th Cir. 1994).......................................................... 10, 11, 16

12  *Int'l Shoe Co. v. Washington,*
      326 U.S. 310 (1945)....................................................................................... 6
13
  *Integral Dev. Corp. v. Weissenbach,*
14     99 Cal. App. 4th 576 (2002) ........................................................................ 9

15  *Jonathan Browning, Inc. v. Venetian Casino Resort, LLC,*
      2007 WL 4532214, at *6 (N.D. Cal. Dec. 19, 2007) ........................................ 16, 18
16
  *Jones v. GNC Franchising, Inc.,*
17     211 F.3d 495 (9th Cir. 2000)...................................................................... 17

18  *Keeton v. Hustler Magazine, Inc.,*
      465 U.S. 770 (1984)....................................................................................... 7
19
  *Lockman Foundation v. Evangelical Alliance Mission,*
20     930 F.2d 764 (9th Cir. 1991)....................................................................... 18

21  *Mattel, Inc. v. Greiner and Hausser GmbH,*
      354 F.3d 857 (9th Cir. 2003)......................................................................... 6
22
  *McDonald's Licensee Prototype Welfare Plan, et al. v. Boldt, Inc.,*
23     60 F. Supp. 2d 785 (N.D. Ill. 1999) ........................................................... 15

24  *Omeluk v. Langsten Slip & Batbyggeri A/S,*
      52 F.3d 267 (9th Cir. 1995)........................................................................... 7
25
  *Panavision Int'l, L.P. v. Toeppen,*
26     141 F.3d 1316 (9th Cir. 1998).......................................... 6, 7, 9, 10, 11, 12, 16

27  *Pasulka v. Sykes,*
      131 F. Supp. 2d 988 (N.D. Ill. 2001) ....................................................... 15, 16
28
DLA PIPER US LLP
SAN FRANCISCO

-iii-

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER - CASE NO. CV 08-0625 SI

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3
*Quality Inns. Int'l, Inc. v. Patel,*
    1988 WL 62882, at *1 (D. Md. June 9, 1988) ............................................... 8

4

*Shropshire v. Fred Rappaport Co.,*
5    294 F. Supp. 2d 1085 (N.D. Cal. 2003) ...................................................... 16

6
*Sports Authority Michigan, Inc. v. Justballs, Inc.,*
    97 F. Supp. 2d 806 (E.D. Mich. 2000) ......................................................... 10

7

*Stewart Org. v. Ricoh Corp.,*
8    487 U.S. 22 (1988) ................................................................................. 17

9
*Strigliabotti v. Franklin Resources,*
    2004 WL 2254556, at *2 (N.D. Cal. Oct. 5, 2004) ........................................ 17, 18, 20

10

*Travelers Health Assn. v. Virginia,*
11    339 U.S. 643 (1950) ............................................................................ 8, 9

12
*Van Dusen v. Barrack,*
    376 U.S. 612 (1964) ............................................................................... 17

13

*Wiener King Sys., Inc. v. Brooks,*
14    628 F. Supp. 843 (W.D.N.C. 1986) ............................................................. 9

15
*Williams v. Bowman,*
    157 F. Supp. 2d 1103 (N.D. Cal. 2001) ....................................................... 17

16

*World Wide Volkswagen Corp. v. Woodson,*
17    444 U.S. 286 (1980) ............................................................................... 7

18
*Ziegler v. Indian River County,*
    64 F.3d 470 (9th Cir. 1995) ...................................................................... 9

19

20

## STATUTES

21
Business and Professions Code
    Section 14330 ...................................................................................... 5

22

Business and Professions Code
23    Section 17200 ...................................................................................... 5

24
Code of Civil Procedure
    Section 410.10 ...................................................................................... 6

25

United States Code
26    Title 28, section 1391(b)(2) .................................................................... 15

27
United States Code
    Title 28, section 1404(a) ........................................................................ 16

28

-iv-

1

## TABLE OF AUTHORITIES
**(continued)**

2

Page

3

## RULES

4  Rules of the Court
    Rule 12(b)(2).................................................................................................................. 6

5

## OTHER AUTHORITIES

6

7  15 Wright, Miller and Cooper, *Federal Practice & Procedure*, § 3851, at 424-28
    (2d ed. 1986 & 1992 Supp.)...................................................................................... 19

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN FRANCISCO

-v-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER - CASE NO.  CV 08-0625 SI

1          Plaintiff California Closet Company, Inc. ("CCC") submits the following points and

2    authorities in opposition to the motion to dismiss or, in the alternative, transfer, filed by

3    Defendants J. Mark Ebben ("Ebben") and Ebben Enterprises, Inc. ("EEI").

4    **I.**      **INTRODUCTION**

5          This action arises out of a written franchise agreement between CCC (a California

6    corporation with its principal place in California) and Defendants (franchisees of CCC who are

7    located in Wisconsin).  More particularly, this action arises out of Defendants' breach of that

8    agreement and their misuse of the trademarks they were granted a limited license to use.  CCC

9    seeks, among other things, an order (i) directing Defendants to comply with the express terms of

10   their franchise agreement, including, but not limited to, their obligation to permit a full audit of

11   their financial records, and (ii) enjoining Defendants' wrongful and unlawful use of CCC's

12   federally registered trademarks.  Rather than address this misconduct, Defendants filed a motion to

13   dismiss, claiming that this Court lacked jurisdiction over them, that venue was improper, and, in

14   the alternative, that this action should be transferred to Wisconsin.

15         As set forth more fully below, Defendants' attempt to avoid having to answer for their

16   breaches of contract and their related misconduct in this State is unfounded.  Defendants have had

17   a substantial and ongoing contractual relationship with a California-based franchisor for almost

18   eighteen years.  Their motion to dismiss for lack of personal jurisdiction is, as a result, fatally

19   flawed.  Defendants' assertion that venue is improper is likewise flawed, because a substantial

20   portion of the events on which this lawsuit is premised occurred in this State.  Finally, because

21   Defendants cannot establish that Wisconsin is a clearly more convenient venue than California,

22   Defendants' motion to transfer venue also fails.

23   **II.**      **STATEMENT OF ISSUES TO BE DECIDED**

24         1.      Should Defendants' motion to dismiss for lack of personal jurisdiction be denied

25   given that Defendants, among other things, have had a complex contractual relationship with CCC

26   for almost eighteen years, Defendants committed intentional torts which injured CCC in

27   California, CCC's claims arise out of Defendants' forum-related activities, and Defendants have

28   failed to present a compelling case that this Court's exercise of jurisdiction would be

DLA PIPER US LLP
SAN FRANCISCO

-1-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    unreasonable?

2         2.        Should Defendants' motion to dismiss for improper venue be denied given that a

3    substantial part of the events or omissions giving rise to CCC's claims occurred in this District?

4         3.        Should Defendants' motion to transfer be denied given that Defendants have failed

5    to meet their burden of establishing that the balance of convenience and the interests of justice

6    clearly favor transferring this action from this District to the Eastern District of Wisconsin,

7    especially in light of the great deference given to CCC's choice of forum?

8    **III.    FACTUAL BACKGROUND**

9         **A.      The Parties And Their Written Franchise Agreement**

10        On or about May 13, 1987, CCC, as franchisor, and James Damrau and Sally Damrau, as

11   franchisees, entered into a written franchise agreement (the "Franchise Agreement"), pursuant to

12   which CCC (a California corporation) granted the Damraus a franchise to operate a California

13   Closets business within a specified territory in Appleton, Wisconsin, together with a limited

14   license to use the CCC Marks in connection therewith.  (Complaint, ¶¶2, 15; a true and correct

15   copy of the Franchise Agreement is annexed to CCC's Complaint as Exhibit A.)  On or about

16   April 20, 1990, the Damraus (individually and as officers of their operating entity, Chain O Lakes

17   Express, Inc.) and Ebben, a Wisconsin resident, entered into an Assignment Agreement/Sale of

18   Franchise (the "Assignment Agreement") whereby the Damraus assigned their rights and

19   obligations under the Franchise Agreement to Ebben.  (Complaint, ¶¶3, 16; a true and correct copy

20   of the Assignment Agreement is annexed to CCC's Complaint as Exhibit B.)  In December 1992,

21   Ebben formed EEI (a Wisconsin corporation), which is the operating entity under which Ebben

22   operates his franchised California Closets business in Appleton, Wisconsin.  (Complaint, ¶4.)  The

23   Franchise Agreement was renewed in 2000, and is not set to expire until May 7, 2010.

24   (Complaint, ¶18.)[1]

25

26   [1]  Defendants' Appleton, Wisconsin franchise is not the only California Closets franchise that
     Defendants' own.  Since December 21, 1999, Ebben has also been part-owner of another

27   California Closets franchise located in Davenport, Iowa.  (*See* the March 28, 2008 Declaration of
     William Barton ("Barton Decl."), a true and correct copy of which is attached hereto as Exhibit A,

28   ¶6.)

DLA PIPER US LLP
SAN FRANCISCO

-2-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    The documents CCC and Defendants executed make clear that the parties' relationship is

2    inextricably linked to California.  Similarly, the parties agreed in the Franchise Agreement that

3    any disputes (except those seeking relief in equity) over any notice of default and/or termination

4    notice shall be submitted to arbitration *in California*.[2]  (Franchise Agreement, §§8.03, 8.07)

5    (emphasis added.)  The parties also agreed in the Franchise Agreement that the "Agreement,

6    including all matters relating to the validity, construction, performance, and enforcement thereof,

7    shall be governed by the *laws of the State of California*," and the Franchise Agreement expressly

8    states that it was executed *in California*.  (Franchise Agreement, §10.11, p. 44) (emphasis added.)

9    That California is the epicenter of all dealings between CCC and Defendants – and has

10   been the epicenter for the past eighteen years – is reflected not only in the agreements which CCC

11   and Defendants executed, but in the actions the parties have taken over the past eighteen years

12   pursuant to those agreements.  CCC's principal place of business is in California (Complaint, ¶2),

13   and CCC's California headquarters is therefore the office from which virtually every business

14   decision affecting Defendants' franchise is made, the office to which virtually all communications

15   (phone calls, e-mails, and letters) from Ebben are sent, and the office from which virtually all

16   communications (phone calls, e-mails, and letters) to Ebben are sent.  (Barton Decl. (Ex. A) ¶7.)

17   In particular, (i) the standards and procedures which govern the operation of all CCC's franchises,

18   including Defendants' franchises, are established in California and communicated to franchisees

19   from California (Barton Decl. (Ex. A) ¶7); (ii) CCC supports Defendants' franchise from its

20   headquarters in California (Barton Decl. (Ex. A) ¶7); (iii) all of the payments Defendants are

21   required to make to CCC under the Franchise Agreement are sent by Defendants to CCC in

22   California (Barton Decl. (Ex. A) ¶7); (iv) Defendants place their product orders with CCC by

23   sending product order forms to CCC in California (Barton Decl. (Ex. A) ¶7); and (v) Defendants

24   pay for the products they order from CCC by sending their payments for those products to CCC in

25   _____

26   [2]  The Assignment Agreement states that any disputes over that agreement shall be settled by
     arbitration *in California*.  (Assignment Agreement, §9) (emphasis added.)  Moreover, the
27   Agreement of Purchase and Sale (*see* Exhibit A to Defendants' Memorandum), the Assignment
     Agreement, and the Franchise Agreement all expressly refer to the fact that CCC is a "California
28   corporation."

DLA PIPER US LLP
SAN FRANCISCO

-3-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1  California (Barton Decl. (Ex. A) ¶7).  Not only do Defendants send all of the payments required

2  under the Franchise Agreement and their payments for products to CCC in California, but

3  Defendants write CCC's California address on virtually all of the checks Defendants send to CCC.

4  (Barton Decl. (Ex. A) ¶8.)

5 **B.    Defendants' Breaches Of The Franchise Agreement And Other Wrongful**
6 **Conduct**

7      Defendants agreed in the Franchise Agreement to only use the CCC's trademarks (the

8  "CCC Marks") in connection with the conduct of the franchised business in the manner and only

9  for the purposes specified in the Franchise Agreement.  They also agreed to not use the CCC

10  Marks in connection with the sale of any unauthorized product or service or in any manner not

11  explicitly authorized in writing by CCC.  (Complaint, ¶21.)  Furthermore, Defendants agreed to

12  advertise and promote their business under the designation "California Closet Company," and to

13  not use any mark or name other than the "California Closet Company" name in connection with

14  the conduct of their franchised business, and that they would, at all times, devote their full time

15  and effort to the active management and operation of their franchised California Closets business.

16  (Complaint, ¶¶22-23.)

17      Despite their express obligations under the Franchise Agreement, Defendants are operating

18  a competitive business named "Closet Works" at the very same location as their authorized

19  California Closets franchised business and are using the CCC Marks in connection with the

20  operation of their "Closet Works" business.  (Complaint, ¶¶26-27.)  In particular, Defendants are

21  using the CCC Marks to attract customers to their franchised California Closets business, and are

22  then selling those customers Closet Works' competitive products and services in an attempt to

23  avoid paying royalty fees on the sales of those products and services to CCC.  (Complaint, ¶27.)

24  However, Closet Works' products are not the only competitive products that Defendants are

25  selling.  Defendants are also selling through their "Closet Works" business wire shelving

26  manufactured by Rubbermaid.  (Complaint, ¶28.)

27
28
DLA PIPER US LLP
SAN FRANCISCO

1    Not surprisingly, Defendants are also misusing the CCC Marks.  In addition to displaying

2    the "Closet Works" logo on Defendants' California Closets work vans, Defendants are also

3    displaying the Rubbermaid logo on their California Closets work vans, thereby wrongfully

4    associating the CCC Marks with Rubbermaid, a competitor of CCC.  (Complaint, ¶28.)

5    In November 2007, in an attempt to ascertain how much money was being improperly

6    diverted to these competitive concepts, CCC invoked its express right under the Franchise

7    Agreement to perform a full audit of Defendants' financial books and records.  (Complaint, ¶29.)

8    Notwithstanding their express obligation under the Franchise Agreement to allow CCC to perform

9    such an audit, Defendants have refused to allow CCC to audit the books and records of their

10   Closet Works business.  (Complaint, ¶30.)  Defendants first advised CCC of their refusal to permit

11   the full audit of their books and records by sending an e-mail to CCC's Senior Vice President in

12   San Rafael, California.  (Barton Decl. (Ex. A) ¶9.)

13   **C.      CCC's Complaint**

14   On January 28, 2008, CCC filed its Complaint asserting claims against Defendants for:

15   specific performance (First Claim) based on Defendants' refusal to allow CCC to perform a

16   complete audit of Defendants' financial books and records; breach of contract (Second Claim)

17   based on Defendants' failure to perform their obligations under the Franchise Agreement,

18   including, but not limited to, their obligations to (i) only use the CCC Marks in connection with

19   the operation of their franchised business as specified in the Franchise Agreement, (ii) not use any

20   mark or name other than the CCC Marks in connection with the operation of the franchised

21   business, and (iii) devote their full time and effort to the active management and operation of their

22   franchised California Closets business; trademark infringement under the Lanham Act (Third

23   Claim); unfair competition under the Lanham Act (Fourth Claim); unfair competition under Cal.

24   Bus. & Prof. Code § 17200 (Fifth Claim); trademark infringement and unfair competition under

25   California common law (Sixth Claim); and trademark dilution under Cal. Bus. & Prof. Code

26   § 14330 (Seventh Claim) based on Defendants' misuse of the CCC Marks.  CCC also seeks an

27   accounting (Eighth Claim).

28

DLA PIPER US LLP
SAN FRANCISCO

-5-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    IV.    **ARGUMENT**

2        A.    **This Court Has Personal Jurisdiction Over Defendants**

3            1.    **Applicable Standards**

4            The standards governing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction

5    are well-settled. CCC "need only make a prima facie showing of jurisdiction to survive the

6    motion to dismiss." *Mattel, Inc. v. Greiner and Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003)

7    (citing *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th

8    Cir. 2003)). Therefore, CCC "need only demonstrate facts that if true would support jurisdiction"

9    over Defendants. *CFA N. California, Inc. v. CRT Partners LLP*, 378 F. Supp. 2d 1177, 1182

10   (N.D. Cal. 2005) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1598 (9th Cir. 1995) and *Fields v.*

11   *Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986)). In determining whether CCC has

12   satisfied this standard, the uncontroverted allegations in CCC's Complaint are taken as true, and

13   any conflicts in the evidence are resolved in CCC's favor. *Id.* (citations omitted).

14           2.    **This Court's Assertion Of Personal Jurisdiction Over Defendants**
                   **Satisfies Due Process**

15           "Where, as here, there is no applicable federal statute governing personal jurisdiction, the

16   district court applies the law of the state in which the district court sits." *Dole Food Co. v. Watts*,

17   303 F.3d 1104, 1110 (9th Cir. 2002) (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316,

18   1320 (9th Cir. 1998)). "Because California's long-arm jurisdictional statute is coextensive with

19   federal due process requirements, the jurisdictional analyses under state law and federal due

20   process are the same." *Id*; *see also* Cal. Code Civ. Proc. § 410.10. Therefore, this Court "need

21   only determine whether personal jurisdiction in this case would meet the requirements of due

22   process." *Harris Rutsky*, 328 F.3d at 1129.

23           "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant

24   must have at least 'minimum contacts' with the relevant forum such that the exercise of

25   jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food*

26   *Co.*, 303 F.3d at 1110-11 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The

27   Ninth Circuit applies a three-part test to determine if a district court's exercise of specific

28

DLA PIPER US LLP
SAN FRANCISCO

1 | jurisdiction satisfies due process: "(1) The nonresident defendant must purposefully direct his

2 | activities or consummate some transaction with the forum or resident thereof; *or* perform some act

3 | by which he purposefully avails himself of the privileges of conducting activities in the forum,

4 | thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises

5 | out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction

6 | must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Dole Food Co.*,

7 | 303 F.3d at 1111 (citing *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 127 (9th Cir. 1995))

8 | (emphasis in original); *see also Panavision Int'l*, 141 F.3d at 1320 (citing *Omeluk v. Langsten Slip*

9 | *& Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995)); *Harris Rutsky*, 328 F.3d at 1129 (citing

10 | *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993)); *CRT Partners LLP*, 378

11 | F. Supp. 2d at 1183. As set forth below, each of these conditions is satisfied here. Because

12 | Defendants "received fair notice from the contract documents and the course of dealing" that they

13 | might be subject to suit in California, and have failed to demonstrate how jurisdiction in California

14 | would be fundamentally unfair, their motion to dismiss for lack of personal jurisdiction should be

15 | denied. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 487 (1985).

16 |         a.    **Purposeful Direction Or Availment**

17 |      Defendants' argument that they have not purposefully directed any activity towards

18 | California is contrary to both United States Supreme Court and Ninth Circuit authority. Simply

19 | put, because Defendants entered into a contractual relationship which created continuing

20 | obligations between themselves and a California corporation, and committed torts, the effects of

21 | which were felt in California, this prong is easily satisfied.

22 |      The "'purposeful availment' requirement ensures that a defendant will not be haled into a

23 | jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.'" *Burger King*

24 | *Corp.*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and

25 | *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)). It also "ensures that the

26 | defendant should reasonably anticipate being haled into the forum State court based on its

27 | contacts." *CRT Partners LLP*, 378 F. Supp. 2d at 1183 (citing *World-Wide Volkswagen Corp.*,

28 |

DLA PIPER US LLP
SAN FRANCISCO

-7-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    444 U.S. at 297). In that regard, the United States Supreme Court has emphasized that "with

2    respect to interstate contractual obligations . . . parties who 'reach out beyond one state and create

3    continuing relationships and obligations with citizens of another state' are subject to regulation

4    and sanctions in the other State for the consequence of their activities." *Burger King Corp.*, 471

5    U.S. at 473 (quoting *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950)). In other

6    words, "where the defendant . . . has created 'continuing obligations' between himself and

7    residents of the forum . . . he manifestly has availed himself of the privilege of conducting

8    business there." *Corporate Inv. Bus. Brokers v. Melcher*, 824 F.2d 786, 789 (9th Cir. 1987)

9    (quoting *Burger King Corp.*, 471 U.S. at 475-76); *CRT Partners LLP*, 378 F. Supp. 2d at 1183

10    (quoting *Ballard*, 65 F.3d at 1498) ("The purposeful availment test is met where 'the defendant

11    has taken deliberate action within the forum state or if he has created continuing obligations to

12    forum residents.'").

13        Here, there is "no question" that Defendants, "in forming a long-term franchise

14    relationship with" CCC, "'purposefully directed' commercial activities to" California, thereby

15    purposefully availing themselves of California benefits. *Melcher*, 824 F.2d at 789; *see also*

16    *Quality Inns. Int'l, Inc. v. Patel*, 1988 WL 62882, at *2 (D. Md. June 9, 1988) (noting that the

17    court has "consistently held that a franchisor may subject a franchisee to jurisdiction in the

18    franchisor's state of controlling operation" and finding jurisdiction over out-of-state franchisees

19    "proper in Maryland because of the long-term agreement into which they entered, and the total

20    course of dealings to be pursued and potential benefits to be derived as a result of the contract.").

21    In *Burger King Corp.*, the Supreme Court held that Rudzewicz, a Michigan resident, was subject

22    to personal jurisdiction in Florida, Burger King's home state, by entering into a franchise

23    agreement and agreeing to a variety of continuing obligations which were due to Burger King in

24    Florida. The Supreme Court held that "Rudzewicz deliberately 'reached out beyond' Michigan

25    and negotiated with a Florida corporation for the purchase of a long-term franchise and the

26    manifold benefits that would derive from affiliation with a nationwide organization." *Burger King*

27    *Corp.*, 471 U.S. at 479-80 (quoting *Travelers Health Assn.*, 339 U.S. at 647). "Upon approval, he

28

1    entered into a carefully structured 20-year relationship that envisioned continuing and wide-

2    reaching contacts with Burger King in Florida." *Id.* at 480.

3          "There is no reason to treat the franchise agreement here differently than the one in *Burger*

4    *King.*"[3] *Wiener King Sys., Inc. v. Brooks*, 628 F. Supp. 843, 848 (W.D.N.C. 1986). "Both of the

5    agreements are complex, multi-year contractual obligations." *Id.* Both franchise agreements

6    "indicate that the contracts were made in the franchisor's home state; both recite that the law of

7    the franchisor's home state would apply in the event of any controversy;[4] and both indicated that

8    regulations will be imposed on the business by the home office of the plaintiff." *Id.* As in *Burger*

9    *King Corp.*, in light of Defendants' "voluntary acceptance of the long-term and exacting

10   regulation" of their business from CCC's California headquarters, the "quality and nature" of their

11   relationship to CCC in California "can in no sense be viewed as "random," "fortuitous," or

12   "attenuated." *Burger King Corp.*, 471 U.S. at 480 (citations omitted). They are, as such, subject

13   to this Court's jurisdiction.

14         Not only is the assertion of specific jurisdiction proper because of the long-term

15   contractual relationship between the parties, but it is also proper because Defendants committed

16   intentional torts which had their effects felt in California. *See Integral Dev. Corp. v. Weissenbach*,

17   99 Cal. App. 4th 576, 587 (2002) ("[E]ven without other contacts with the forum state, the

18   commission of an intentional tort that is directed at a California resident may provide sufficient

19   minimum contacts to support the exercise of personal jurisdiction over the non-resident

20   defendant."). "In tort cases, jurisdiction may attach if the defendant's conduct is aimed at or has

21   an effect in the forum state." *Panavision Int'l*, 141 F.3d at 1321 (citing *Calder v. Jones*, 465 U.S.

22   783 (1984) and *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995)). In fact, the

23

24   [3] "In [at least] one respect, the defendant in *Burger King* had more attenuated forum contacts
     than" do Defendants here. *Melcher*, 824 F.2d at 789 n. 4. In *Burger King Corp.*, most of the
25   Michigan franchisee's contacts were with Burger King's Michigan office, not with Burger King's
     Florida headquarters. Here, there is no intermediary between CCC in California and Defendants
26   in Wisconsin. *Id.*
     [4] The California choice-of-law clause in the Franchise Agreement reinforces Defendants'
27   "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation
     there." *Burger King Corp.*, 471 U.S. at 482.
28

1    Ninth Circuit has held that "purposeful availment is satisfied even by a defendant 'whose only

2    contact with the forum state is the purposeful direction of a foreign act having effect in the forum

3    state." *Dole Food Co.*, 303 F.3d at 1111 (citing *Haisten v. Grass Valley Med. Reimbursement*

4    *Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986)). The "effects test" "requires that the defendant

5    allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing

6    harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co.*, 303

7    F.3d at 1111; *see also Panavision Int'l*, 141 F.3d at 1321.

8        Defendants' use of the CCC Marks in connection with the operation of their "Closet

9    Works" business is certainly intentional. *See Calder*, 465 U.S. at 789-90 (distinguishing between

10   intentional and allegedly tortious activity, on the one hand, and "mere untargeted negligence," on

11   the other hand). It is equally clear that those actions were expressly aimed at California because

12   Defendants "engaged in wrongful conduct targeted at a plaintiff whom the defendant[s] know[] to

13   be a resident of the forum state." *Dole Food Co.*, 303 F.3d at 1111 (quoting *Bancroft & Masters,*

14   *Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). Moreover, the effects of

15   Defendants' wrongful use of the CCC Marks and unfair competition is felt in California, CCC's

16   home state. *See Panavision Int'l*, 141 F.3d at 1321 (the effects of defendants' trademark dilution

17   were felt in California, Panavision's home state); *see also Indianapolis Colts, Inc. et al. v.*

18   *Metropolitan Baltimore Football Club Ltd. P'ship, et al.*, 34 F.3d 410, 411 (7th Cir. 1994)

19   (holding that the injury caused by defendants' alleged trademark infringement would be felt by the

20   Indianapolis Colts mainly in Indiana); *Sports Authority Michigan, Inc. v. Justballs, Inc.*, 97 F.

21   Supp. 2d 806, 815 (E.D. Mich. 2000) (injury from trademark infringement occurs where the

22   trademark owner resides); *Clipp Designs, Inc. v. Tag Bags, Inc.*, 996 F. Supp. 766, 768 (N.D. Ill.

23   1998) (The injury from the infringement of Clipp's intellectual property rights was felt in Clipp's

24   home state.). Because CCC was injured in California by Defendants – who knew CCC was

25   located in California – CCC need not go to Wisconsin to seek redress. *See Calder*, 465 U.S. at

26   790 ("An individual injured in California need not go to Florida to seek redress from persons who,

27   though remaining in Florida, knowingly cause the injury in California.").

28

DLA PIPER US LLP
SAN FRANCISCO

-10-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    Defendants purport to argue that they have not purposefully directed any activities towards

2    California because Ebben (1) "runs and operates his business in Wisconsin," (2) Closet Works

3    "does not operate in any State other then [sic] Wisconsin," (3) "any potential harm to CCC's

4    intellectual property is localized to Wisconsin," (4) the violations of the trademark laws are based

5    on conduct that "occurred in Wisconsin," and (5) "[t]he only relationship with Plaintiff is the

6    franchise agreement." (Defendants Memorandum, p. 5.)  Defendants' first two arguments deserve

7    little attention because it is beyond peradventure that personal jurisdiction cannot be avoided

8    "merely because the defendant did not *physically* enter the forum State."[5]  *Burger King Corp.*, 471

9    U.S. at 476 (emphasis in original).  Defendants' third and fourth arguments are just as misguided.

10   As set forth above, CCC felt the harm from Defendants' trademark infringement and unfair

11   competition in California – not in Wisconsin.  *See Panavision Int'l*, 141 F.3d at 1321; *see also*

12   *Indianapolis Colts, Inc.*, 34 F.3d at 411; *Sports Authority Michigan, Inc.*, 97 F. Supp. 2d at 815;

13   *Clipp Designs, Inc.*, 996 F. Supp. at 768.  Moreover, while Defendants' misuse of the CCC Marks

14   might have "occurred in Wisconsin," the effects of Defendants' malfeasance were felt here in

15   California.  *Dole Food Co.*, 303 F.3d at 1111; *see also Panavision Int'l*, 141 F.3d at 1321.

16   Defendants' final argument – that there was no purposeful availment because "the only

17   relationship with Plaintiff is the franchise agreement" – is belied by *Burger King Corp.* and its

18   progeny.

### b.    Claims Arising Out of Defendants' Activities

20   The Ninth Circuit has adopted a "but for" test to determine whether the claims arise out of

21   or result from a defendant's forum-related activities.  *Panavision Int'l*, 141 F.3d at 1322; *CRT*

22   *Partners LLP*, 378 F. Supp. 2d at 1186.  Defendants state in conclusory fashion that because

23   neither of them "have had any activities within California," there "is no harm directed towards

---

[5]  Notably, Ebben only states that he has "not physically visited California, for personal or
business matters, individually or through Ebben Enterprises, Inc., *in approximately ten years*."
(Ebben Declaration, ¶5) (emphasis added.)  He does not state – most likely because he cannot do
so – that he has never visited California over the past eighteen years regarding his California
Closets franchised business.  Of course, this Court's assertion of personal jurisdiction over Ebben
is proper even if he has never visited California regarding his franchised business.  *See Burger*
*King Corp.*, 471 U.S. at 470 (Florida court's assertion of personal jurisdiction over Rudzewicz
was proper even though he never visited Florida).

1   California," and therefore the required "causal connection" is missing. (Defendants'

2   Memorandum, p. 5-6.) The opposite is true here, however. Because CCC's claims directly arise

3   out of the parties' Franchise Agreement as well as the tortious activity that Defendants' directed

4   towards California, this requirement is easily satisfied. *See Panavision Int'l*, 141 F.3d at 1322

5   (tort claims arose out of the actions which had the effect of injuring plaintiff in California);

6   *Melcher*, 824 F.2d at 789-90 (breach of contract claims arose out of franchisee's relationship

7   under the franchise agreement).

8                     c.     **Reasonableness**

9          "Once it has been shown that the defendant purposely availed himself of the forum's

10   benefits, the forum's exercise of jurisdiction over him is presumptively reasonable." *Melcher*, 824

11   F.2d at 790 (citing *Burger King Corp.*, 471 U.S. at 476). "In order to rebut that presumption the

12   defendant 'must present a compelling case' that jurisdiction would, in fact, be unreasonable." *Id.*

13   (quoting *Burger King Corp.*, 471 U.S. at 477). In addressing the question of reasonableness, the

14   following factors may be considered: "(1) [t]he extent of purposeful interjection into the forum

15   state; (2) [t]he burden on the defendant of defending in the forum; (3) [t]he extent of conflict with

16   the sovereignty of defendant's state;[6] (4) [t]he forum state's interest in adjudicating the dispute; (5)

17   [t]he most efficient judicial resolution of the controversy; (6) [t]he importance of the forum to

18   plaintiff's interest in convenient and effective relief; and (7) [t]he existence of an alternative

19   forum."[7] *Id.*; *see also Panavision Int'l*, 141 F.3d at 1323. Defendants have failed to present a

20   "compelling case" that would override the presumption that the assertion of personal jurisdiction

21   in this case is reasonable.

22          The Ninth Circuit gives the first factor – purposeful interjection – no weight once, as in

23   this case, it is shown that the defendant purposefully directed its activities to the forum state.

24   *Melcher*, 824 F.2d at 790. However, if this Court is inclined to consider this factor, Defendants'

25   actions were aimed at CCC in California and the degree of interjection therefore weighs in favor

26

27   [6] Defendants concede that this factor is not an issue in this case. (Defendants' Response, p. 7.)

28   [7] CCC acknowledges that Wisconsin would be an alternative forum.

1    of a finding of reasonableness.  Defendants' arguments that "there is no degree of interjection" and

2    that they "did not direct any activity toward California Closets in California" are belied by the

3    facts.  (Defendants' Memorandum, p. 6.)  Defendants have been operating a California Closets

4    franchised business for the past eighteen years, and have had numerous and substantial contacts

5    with CCC in California over that time period.  Defendants send payments to CCC in California

6    and regularly communicate with CCC in California.  Indeed, Defendants first communicated to

7    CCC that they would not permit a full audit of their business by sending an e-mail to CCC in

8    California.[8]

9        As to the second factor, Defendants acknowledge that "unless the 'inconvenience is so

10   great as to constitute a deprivation of due process, it will not overcome clear justifications for the

11   exercise of jurisdiction.'"  *Panavision Int'l*, 141 F.3d at 1323 (quoting *Caruth*, 59 F.3d at 128-29).

12   Defendants have utterly failed to meet their burden of showing such a deprivation.  Defendants

13   simply state that (1) they will have to transport unidentified witnesses and physical evidence

14   across the country, and (2) Defendants are a "small franchise," and not a "large business operation

15   generating substantial amounts of money."  (Defendants' Memorandum, p. 7.)  Of course, the

16   mere fact that it might be "expensive and inconvenient" for Defendants to defend themselves in

17   California is not dispositive.  *See Dole Food Co.*, 303 F.3d at 1114.  Any claimed inconvenience

18   Defendants "might suffer from travel certainly does not rise to the level of a due process

19   violation."  *Melcher*, 824 F.2d at 791.  In other words, "modern advances in communications and

20   transportation have significantly reduces the burden of litigating in another" state.  *Dole Food Co.*,

21   303 F.3d at 1114.  Defendants' other argument – that their claimed lack of financial wherewithal

22   makes this Court's assertion of jurisdictional unconstitutional – has no basis in either law or fact.

23   "[A] defendant who has purposefully derived commercial benefit from his affiliations in a forum

24

25   [8]  Defendants' additional argument that their infringement of the CCC Marks is "only negligent"
26   (Defendants' Response, p. 6) is entirely disingenuous because it implies that the "Closet Works"
     logo was not intentionally placed on Defendants' California Closets work vans and otherwise
27   associated with the CCC Marks.  There is no doubt that Defendants chose to use the CCC Marks
     in connection with their Closet Works business knowing that CCC would suffer injury in
28   California – its home state.

DLA PIPER US LLP
SAN FRANCISCO

-13-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    may not defeat jurisdiction there simply because of his adversary's greater net wealth." *Burger*

2    *King Corp.*, 471 U.S. at 483 n. 25.  Plus, Defendants' statement that they do not generate

3    substantial amounts of money is simply not true.  To the contrary, Defendants' gross revenues

4    exceeded $564,000 in the 2004-2005 accounting period, and exceeded $525,000 in both the 2005-

5    2006 and 2006-2007 accounting periods. (*See* the March 27, 2008 Declaration of Vincent Grubbs

6    ("Grubbs Decl."), a true and correct copy of which is attached hereto as Exhibit B, ¶5.)

7         Defendants' attempt to satisfy the fourth factor is likewise unfounded.  In stating that

8    "California's interest in litigating this is minimal" (Defendants' Memorandum, p. 7), Defendants

9    ignore the fact that "California maintains a strong interest in providing an effective means of

10   redress for its residents tortiously injured." *Panavision Int'l*, 141 F.3d at 1323.  In addition,

11   "California has a strong interest in assuring that contracts made with its residents are not

12   breached." *CRT Partners LLP*, 378 F. Supp. 2d at 1187.  This factor weighs heavily towards a

13   finding of reasonableness.

14        Moreover, CCC certainly has an "interest in having any litigation over this franchise

15   agreement and similar franchise agreements made with other franchisees being heard in a forum

16   where consistent applications" of California law may be expected. *Wiener King Sys., Inc.*, 628 F.

17   Supp. at 849.  The "importance of the forum to plaintiff" prong (the sixth factor) therefore also

18   favors CCC.

19        The remaining prong (the "efficient resolution" prong) "focuses on the location of the

20   evidence and witnesses." *Panavision Int'l*, 141 F.3d at 1323.  Defendants argue that "all the

21   evidence and witnesses are located in Wisconsin." (Defendants' Memorandum, p. 7.)  Of course,

22   while Defendants' witnesses might reside in Wisconsin, the majority of CCC's witnesses reside in

23   California. (Barton Decl. (Ex. A) ¶11.)  In any event, this factor "is no longer weighed heavily

24   given the modern advances in communication and transportation." *Panavision Int'l*, 141 F.3d at

25   1323; *see also Melcher*, 824 F.2d at 791 ("modern transportation reduced the burden of travel for

26   out-of-forum witnesses.").  In addition, the supposed problems confronting Defendants "are

27   identical to those that face most parties who defend actions outside their home states – they and

28

DLA PIPER US LLP
SAN FRANCISCO

-14-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    their witnesses must travel to a distant fora." *Melcher*, 824 F.2d at 791.  Because Defendants were

2    required to "present *compelling* reasons" in support of their claim that jurisdiction over them in

3    California is unreasonable and they have failed to do so, Defendants' motion to dismiss should be

4    denied.  *Id.* (emphasis in original).

5          **B.    Venue Is Proper In This Court**

6          Venue is proper "in any judicial district in which a substantial part of the events or

7    omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2).  The venue statute, on its

8    face, does not require that there be no other jurisdiction where venue is appropriate.  *See Cooper v.*

9    *Molko*, 512 F. Supp. 563, 566 (N.D. Cal. 1981) (denying motion to dismiss for improper venue

10   even though some of the acts described in the complaint took place outside the Northern District

11   of California); *see also McDonald's Licensee Prototype Welfare Plan, et al. v. Boldt, Inc.*, 60 F.

12   Supp. 2d 785, 787 (N.D. Ill. 1999) (venue found appropriate "notwithstanding the possibility that

13   [defendant's] activities may have been more substantial elsewhere."); *Hardee's Food Sys., Inc. v.*

14   *Beardmore*, 169 F.R.D. 311, 316 (E.D.N.C. 1996) ("there may be several districts that qualify for

15   venue purposes.").  In other words, the test is not whether a majority of the activities pertaining to

16   the case were performed in a particular district, but whether a substantial portion of the activities

17   giving rise to the claim occurred in the particular district.  *See* 28 U.S.C. § 1391(b)(2); *see also*

18   *Pasulka v. Sykes*, 131 F. Supp. 2d 988, 994 (N.D. Ill. 2001).

19         In putative support of their motion, Defendants mistakenly focus exclusively on events

20   which allegedly occurred outside of California. (Defendants Memorandum, p. 9.)  Defendants

21   state that (1) they do not reside in California, (2) the Franchise Agreement was "negotiated,

22   entered into and allegedly breached in Wisconsin, and (3) CCC's "allegations reveal that

23   everything occurred in Wisconsin." (Defendants' Memorandum, p. 9.)  Defendants' arguments

24   are entirely unavailing.  First, the mere fact that Defendants do not reside in California does not

25   mean that a substantial part of the events giving rise to CCC's claims did not occur in California.

26   Second, the Franchise Agreement expressly states that it was executed in California – not

27   Wisconsin. (Franchise Agreement, p. 44.)

28         Finally, Defendants' completely ignore the numerous events or omissions which occurred

DLA PIPER US LLP
SAN FRANCISCO

-15-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    in this District. Regarding CCC's contract claims, Defendants send the payments that become due

2    and owing to CCC under the Franchise Agreement to CCC in California, and therefore "a

3    substantial portion of the performance of the Agreement occurred in this district." *Shropshire v.*

4    *Fred Rappaport Co.*, 294 F. Supp. 2d 1085, 1094 (N.D. Cal. 2003). In addition, Defendants'

5    defaults under the Franchise Agreement – which was executed in California – are also "at the

6    bottom" of many of CCC's claims. *Hardee's Food Sys., Inc.*, 169 F.R.D. at 317 (venue

7    appropriate where the agreement was accepted and executed in North Carolina and default of the

8    agreement was "at the bottom of all of plaintiffs' claims."); *see also Jonathan Browning, Inc. v.*

9    *Venetian Casino Resort, LLC*, 2007 WL 4532214, at *6 (N.D. Cal. Dec. 19, 2007) (venue proper

10   in the Northern District of California where the financial injury from defendant's conduct was felt

11   here). Moreover, the e-mail advising CCC that Defendants would not permit a full audit of their

12   business was sent to CCC in San Rafael, California, and because CCC has asserted a claim against

13   Defendants based upon their failure to permit a full audit, a substantial part of the events or

14   omissions giving rise to that claim occurred in California. *See Pasulka*, 131 F. Supp. 2d at 994

15   (Venue "may be satisfied by a communication to or [from] the district in which the cause of action

16   was filed, given a sufficient relationship between the communication and the cause of action.").

17   Finally, a substantial part of CCC's trademark and unfair competition claims occurred in

18   California – the place where CCC was injured by Defendants' actions. *See Panavision Int'l*, 141

19   F.3d at 1321; *see also Indianapolis Colts, Inc.*, 34 F.3d at 411; *Sports Authority Michigan, Inc.*, 97

20   F. Supp. 2d at 815; *Clipp Designs, Inc.*, 996 F. Supp. at 768. Because a substantial part of the

21   events or omissions giving rise to CCC's claims occurred in California, Defendants' motion to

22   dismiss for improper venue should be denied.

23       **C.    Defendants' Motion To Transfer Venue Should Be Denied**

24           The final prong of Defendants' motion – which seeks to have this action transferred to

25   Wisconsin – is likewise deficient. A transfer of venue is only appropriate under 28 U.S.C.

26   §1404(a) if (1) venue is proper in both the transferor and transferee courts; (2) transfer is for the

27   convenience of the parties and witnesses; and (3) transfer is in the interests of justice.

28

DLA PIPER US LLP
SAN FRANCISCO

-16-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    *Strigliabotti v. Franklin Resources*, 2004 WL 2254556, at *2 (N.D. Cal. Oct. 5, 2004). Courts

2    have "discretion 'to adjudicate motions for transfer according to an individualized, case-by-case

3    consideration of convenience and fairness.'" *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498

4    (9th Cir. 2000) (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). Courts may

5    consider: "(1) the location where the relevant agreements were negotiated and executed, (2) the

6    state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the

7    respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of

8    action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the

9    availability of compulsory process to compel attendance of unwilling non-party witnesses, and

10   (8) the ease of access to sources of proof." *Id.* at 498-99. Administrative considerations such as

11   docket congestion in each forum is also a proper consideration. *Strigliabotti*, 2004 WL 2254556,

12   at *2 (citing *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001)). "The burden is

13   on the party seeking transfer to show that when these factors are applied, the balance of

14   convenience *clearly favors* transfer." *Id.* at *3 (citing *Commodity Futures Trading Comm'n v.*

15   *Savage*, 611 F.2d 270, 279 (9th Cir. 1979)) (emphasis added). "It is not enough for defendant

16   merely to show that he prefers another forum . . . nor will transfer be allowed if the result is

17   merely to shift the inconvenience from one party to another." *Id.* (citing *Van Dusen v. Barrack*,

18   376 U.S. 612, 645-465 (1964)).

19         With respect to the first factor, Ebben contends that transfer is warranted because the

20   "Franchise Agreement that is the subject of this action was negotiated [sic] assigned and executed

21   in Wisconsin." (Ebben Declaration, ¶2.) Ebben is incorrect. While the assignment documents

22   might have been negotiated in Wisconsin, the Franchise Agreement expressly states that it was

23   executed *in California*, (Franchise Agreement, p. 44) (emphasis added), and it is the Franchise

24   Agreement that is at the heart of this action – not the assignment documents. This factor therefore

25   does not favor transfer.

26         The second factor – the governing law – also does not favor transfer. The Franchise

27   Agreement makes clear that California law applies to these disputes. (Franchise Agreement,

28

DLA PIPER US LLP
SAN FRANCISCO

-17-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    §10.11.) Because California law applies, "[t]his factor therefore favors denying the motion to

2    transfer." *Fireman's Fund Ins. Co. v. Nat'l Bank for Cooperatives*, 1993 WL 341274, at *6 (N.D.

3    Cal. Aug. 27, 1993); *see also Jonathan Browning, Inc.*, 2007 WL 4532214, at *6 (denying motion

4    to transfer because, among other reasons, the Northern District of California "is more familiar with

5    the relevant California state laws that govern the state claims."). Not only does California law

6    apply to this action, but California also has a "strong public interest in deciding controversies

7    involving its citizens." *Jonathan Browning, Inc.*, 2007 WL 4532214, at *6 (citing *Lockman*

8    *Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 771 (9th Cir. 1991)).

9            CCC's choice of forum – the third factor – must be given "considerable weight" in

10   determining the proprietary of a motion to transfer. *Strigliabotti,* 2004 WL 2254556, at *3 (citing

11   *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)). In fact,

12   "[t]ypically a court should give a plaintiff's choice of forum *great deference* unless the defendant

13   can show that other factors of convenience *clearly outweigh* the plaintiff's choice of forum."

14   *Jonathan Browning, Inc.*, 2007 WL 4532214, at *6 (emphasis added). Because CCC is located in

15   this District, its "choice of forum is favored." *Id.*

16           The parties' contacts with this District and the contacts with respect to CCC's claims (the

17   fourth and fifth factors) were discussed at length above. Needless to say, based on Defendants'

18   eighteen-year contractual relationship with CCC, Defendants' performance of the Franchise

19   Agreement in California (by, for example, sending payments to CCC in California), the

20   communications Defendants have directed to CCC in California, and the injuries Defendants have

21   caused CCC in California, Defendants' conclusory statement that they "have virtually no contacts

22   with California" (Defendants' Memorandum, p. 9) is simply not true.

23           The sixth factor – the differences in the costs of litigating in the two forums – also does not

24   favor transfer. Defendants provide no support for their peculiar statement that "[i]t would

25   certainly be more expensive for both parties to litigate in California" (Defendants Memorandum,

26   p. 9.) To the contrary, because CCC is located in this District, it will be cheaper for CCC to

27   litigate this action in this District. While it might arguably be cheaper for Defendants to litigate

28

DLA PIPER US LLP
SAN FRANCISCO

-18-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1  this matter in Wisconsin, this factor is, at best, neutral.[9]

2      Because Defendants attempt to rely solely on "vague generalizations," they have also

3  failed to meet their burden of establishing that the availability of compulsory process to compel

4  attendance of unwilling non-party witnesses – the seventh factor – strongly favors transfer.[10]

5  *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1093 (N.D. Cal. 2002).

6  Defendants merely state that unidentified witnesses "related to product confusion" are located in

7  Wisconsin, unidentified witnesses "related to the ownership and financial aspects of 'Closet

8  Works'" are also located in Wisconsin, as are "local accountants and other owners" who will

9  supposedly testify regarding "profitability." (Defendants' Memorandum, p. 9.)  However,

10  Defendants cannot rely on such "conclusory statements" about their expected witnesses, and must

11  instead provide "admissible evidence of who they are, where they currently live, or why their

12  testimony would be material." *Fireman's Fund Ins. Co.*, 1993 WL 341274, at *4.  In other words,

13  "[i]f a party has merely made a general allegation that witnesses will be necessary, without

14  identifying them and indicating what their testimony will be the application for transfer will be

15  denied." *Id.* (citing 15 Wright, Miller and Cooper, *Federal Practice & Procedure*, § 3851, at 424-

16  28 (2d ed. 1986 & 1992 Supp.)).  In short, because Defendants have both failed to identify the

17  witnesses and show why the witnesses' proffered testimony is necessary to their case, their motion

18  to transfer should be denied.  Defendants do not need multiple third-party witnesses to testify

19  regarding whether they breached the Franchise Agreement and misused the CCC Marks.

20

21  [9]  Contrary to Defendants' bald assertion, the mere fact that CCC has engaged two attorneys from
22  DLA Piper US LLP's Chicago office does not mean that it is more convenient for CCC to litigate
   in the Eastern District of Wisconsin (Defendants' Memorandum, pp. 9-10.)  As an initial matter,
   Milwaukee is over 90 miles from downtown Chicago, and is therefore not "a little more than an
23  hour by automobile" as Defendants contend.  Moreover, the Green Bay Division of the Eastern
   District of Wisconsin (the Division in which Appleton, Wisconsin is located) is over 200 miles
24  away from downtown Chicago.  In any event, Defendants ignore the fact that CCC has also
   engaged attorneys from DLA Piper US LLP's San Francisco office and, in any event, the location
25  of counsel is irrelevant and is not a factor to be considered on a motion to transfer.  *See Gelber v.
   Leonard Wood Memorial*, 2007 WL 1795746, at *4 n.2 (N.D. Cal. June 21, 2007).
26  [10]  Almost all of CCC's employee witnesses with knowledge of Defendants' breaches of contract
   and misuse of CCC's trademarks, including William Barton and Lois Erbay (CCC's Director of
27  Franchise Operations), reside in California and work in CCC's San Rafael, California
   headquarters.  (Barton Decl. (Ex. A) ¶11.)
28

1    Defendants have merely attempted to pile on several unidentified and immaterial "witnesses."

2    That is insufficient to support a transfer motion. *See Florens Container*, 245 F. Supp. 2d at 1093

3    ("The moving party is obligated to identify the key witnesses to be called and to present a

4    generalized statement of what their testimony would include.") (citing *Heller Financial, Inc. v.*

5    *Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989)).

6          Defendants' arguments regarding the ease of access to proof – the eighth factor – are

7    similarly flawed. Defendants summarily conclude that because the "physical location of the

8    products is Wisconsin and their differences will need to be demonstrated to a jury," a "substantial

9    part of the physical evidence is located in Wisconsin." (Defendants' Memorandum, p. 9.)

10   However, because the "movant must make more than mere generalized allegations that there are

11   many important documents in his preferred forum" and instead "must, at least, explain what these

12   documents are and why they are necessary to the determination of the issues," Defendants have

13   also failed to carry their burden as to this factor. *Fireman's Fund Ins. Co.*, 1993 WL 341274, at

14   *4. Defendants also ignore the fact that aside from being CCC's principal place of business,

15   California is also where all of CCC's records, including those applicable to this dispute, are

16   maintained. (Barton Decl. (Ex. A) ¶10.)

17         Finally, with respect to the relative speed of getting to trial in the two forums, annexed

18   hereto as Exhibit C are copies of the 2007 Judicial Caseload Profiles for the Northern District of

19   California and the Eastern District of Wisconsin, as compiled by the Administrative Office of the

20   United States Courts. They show that the median time from filing to disposition of civil cases is

21   shorter in this District than in the Eastern District of Wisconsin (6.7 months to 8.2 months,

22   respectively). *See Strigliabotti*, 2004 WL 2254556, at *6 (noting that the better measure of court

23   congestion is the time to disposition).

24         In sum, because CCC's "choice of forum should not be lightly disturbed," and because

25   Defendants have provided no evidence to outweigh this initial presumption, Defendants' motion to

26   transfer should be denied. *Florens Container*, 245 F. Supp. 2d at 1093-94.

27

28

DLA PIPER US LLP
SAN FRANCISCO

-20-
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, DISMISS FOR
IMPROPER VENUE, OR IN THE ALTERNATIVE, TRANSFER – CASE NO. 08-0625 SI

1    V.    **CONCLUSION**

2        For the foregoing reasons, CCC respectfully requests the Court deny Defendants' motion

3    to dismiss for lack of personal jurisdiction, motion to dismiss for improper venue or, alternatively,

4    to transfer venue.

5    Dated:  March 28, 2008

6                        DLA PIPER US LLP

7

8                        By_____/s/_____
                              JEFFREY M. HAMERLING
                              Attorneys for Plaintiff

9                             CALIFORNIA CLOSET COMPANY, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   SANFI\391045.1

# EXHIBIT A

CRG0P30993356.1

1  DLA PIPER US LLP
   JEFFREY HAMERLING (State Bar No. 91532)
2  153 Townsend Street, Suite 800
   San Francisco, CA  94107-1957
3  jeffrey.hamerling@dlapiper.com
   Phone: 415.836.2500
4  Fax: 415.836.2501

5  DLA PIPER US LLP
   NORMAN M. LEON *(to be admitted pro hac vice)*
6  JOHN A. HUGHES *(to be admitted pro hac vice)*
   203 North LaSalle Street, Suite 1900
7  Chicago, IL  60601
   Phone: 312.368.4000
8  Fax: 312.236.7516

9  Attorneys for Plaintiff
   CALIFORNIA CLOSET COMPANY, INC.

10
                IN THE UNITED STATES DISTRICT COURT
11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  CALIFORNIA CLOSET COMPANY,          CASE NO. CV 08-0625 SI
    INC.,
14  a California corporation,

15               Plaintiff,             DECLARATION OF WILLIAM G. BARTON

16         v.

17  J. MARK EBBEN,
    an individual, and
18  EBBEN ENTERPRISES, INC.,
    a Wisconsin corporation,
19
                 Defendant.
20

21

22  1.  My name is William G. Barton.  I am an individual over the age of eighteen (18) years.

23      The facts set forth herein are based upon my personal knowledge as well as my review of

24      certain documents that California Closet Company, Inc. ("CCC") keeps in the ordinary

25      course of its business.  I would be willing and able to testify thereto if and when called

26      upon to do so.

27  2.  I reside in Larkspur, California.

28

3.  I am the Senior Vice President of CCC.  I have held that position since 2006.  As the Senior Vice President, my duties include, among other things, the operations of the California Closets franchise business to include territory development, sales, training, product distribution, information technology, compliance, renewals, expirations, transfers, and new business development.

4.  I work at CCC's headquarters in San Rafael, California.

5.  J. Mark Ebben ("Ebben") and Ebben Enterprises, Inc. ("EEI") are franchisees of CCC who operate a franchised California Closets business in Appleton, Wisconsin.

6.  Since December 21, 1999, Ebben has also been part-owner of another California Closets franchise located in Davenport, Iowa.  A true and correct copy of the Davenport, Iowa franchise agreement is attached to my Declaration as Exhibit 1.

7.  CCC's California headquarters is the office from which virtually every business decision affecting Defendants' franchise is made, the office to which virtually all communications (phone calls, e-mails, letters) from Ebben are sent, and the office from which virtually all communications (phone calls, e-mails, and letters) to Ebben are sent.  In particular, (i) the standards and procedures which govern the operation of all CCC's franchises, including Defendants' franchises, are established in California and communicated to franchisees from California; (ii) CCC supports Defendants' franchise from its headquarters in California; (iii) all of the payments Defendants are required to make to CCC under the Franchise Agreement are sent by Defendants to CCC in California (a true and correct copy of one such payment – a February 13, 2008 payment Defendants sent to CCC in California – is attached to my Declaration as Exhibit 2); (iv) Defendants place their product orders with CCC by sending product order forms to CCC in California (true and correct copies of two such product order forms Defendants sent to CCC in California

1    are attached to my Declaration as Exhibit 3); and (v) Defendants pay for the products they

2    order from CCC by sending their payments for those products to CCC in California (a true

3    and correct copy of one of the checks Defendants sent to CCC in California to pay for

4    products they ordered from CCC is attached to my Declaration as Exhibit 4).

5

6    8.   Defendants write CCC's California address on virtually all of the checks Defendants send

7         to CCC.

8    9.   Defendants first advised CCC of their refusal to permit the full audit of their books and

9         records by sending an e-mail to me in San Rafael, California on November 20, 2007.  A

10        true and correct copy of that e-mail is attached to my Declaration as Exhibit 5.

11   10.  CCC's files regarding its relationship with Defendants and the documents relating to its

12        claims against Defendants are located in San Rafael, California.

13

14   11.  Almost all of CCC's other witnesses with knowledge of Defendants' breaches of contract

15        and misuse of CCC's trademarks, including Lois Erbay (CCC's Director of Franchise

16        Operations), reside in California and work in CCC's San Rafael, California headquarters.

17        I declare under penalty of perjury under the laws of the United States that the foregoing is

18   true and correct.

19        Executed on March 28, 2008.

20

21

22                                    WILLIAM G. BARTON

23

24

25

26

27

28

DLA PIPER US LLP
SAN FRANCISCO

CHGO\31169536.1                          -3-                    DECLARATION OF WILLIAM G. BARTON

# EXHIBIT 1

TABLE OF CONTENTS

1.  GRANT OF FRANCHISE AND LICENSE................................................................1
    1.1   Grant.........................................................................................................1
    1.2   No Right to Sublicense.............................................................................2

2.  LOCATION AND TERRITORY ..........................................................................2
    2.1   Location.....................................................................................................2
    2.2   New Locations...........................................................................................2
    2.3   Lease..........................................................................................................3
    2.4   Territorial Rights With Respect to Storage Space Services..................3
    2.5   Company's Right to Solicit Within the Territory for Storage Space Services ....3
    2.6   Rights Reserved by Company....................................................................4
    2.7   Franchisee's Duties and Activities in the Territory ..............................4
    2.8   Loss of Territorial Rights ........................................................................5

3.  TERM..................................................................................................................5
    3.1   Initial Term................................................................................................5
    3.2   Renewal......................................................................................................5
    3.3   Redefinition of Territory...........................................................................6
    3.4   Form and Manner of Renewal...................................................................6
    3.5   Notice Required by Law ...........................................................................7

4.  PAYMENTS AND REPORTS BY FRANCHISEE .............................................7
    4.1   Initial Franchise Fee..................................................................................7
    4.2   Continuing Royalty ...................................................................................7
    4.3   Late Charge ...............................................................................................7
    4.4   Application of Funds..................................................................................7
    4.5   Reports .......................................................................................................7

5.  TRADEMARKS ..................................................................................................8
    5.1   Use and Display of Trademarks ...............................................................8
    5.2   Defense of Trademarks ..............................................................................8
    5.3   Prosecution of Infringers ..........................................................................9
    5.4   Modification of Trademarks ......................................................................9
    5.5   Assumed Name Registration.....................................................................9

6.  OTHER OBLIGATIONS OF COMPANY.............................................................9
    6.1   Training and Supervision ..........................................................................9
    6.2   Operations Manual ..................................................................................10

7.  FRANCHISEE OPERATIONS ...........................................................................10
    7.1   System Specifications..............................................................................10
    7.2   Contractor's License ...............................................................................11
    7.3   Operations Manual ..................................................................................11
    7.4   General Manager......................................................................................11
    7.5   Appearance and Furnishing of Franchised Business ..........................12
    7.6   Products and Services..............................................................................12

| | | |
|---|---|---|
| 7.7 | Hours of Operation | 13 |
| 7.8 | Customer Service; Employees | 13 |
| 7.9 | Franchisee Advertising | 14 |
| 7.10 | Co-op Advertising | 15 |
| 7.11 | National Advertising Programs | 16 |
| 7.12 | Computer System | 17 |
| 7.13 | Books and Records | 18 |
| 7.14 | Inspections | 18 |
| 7.15 | Confidentiality | 18 |
| 7.16 | Liability and Insurance | 19 |
| 7.17 | Compliance With Law | 20 |
| 7.18 | Franchisee Control of Business | 20 |
| 7.19 | Indemnification | 20 |

| | | |
|---|---|---|
| 8. | ASSIGNMENTS | 21 |
| 8.1 | Assignment by Company | 21 |
| 8.2 | Company's Right of First Refusal | 21 |
| 8.3 | Franchisee May Not Assign Without Approval of Company | 21 |
| 8.4 | Conditions for Approval of Assignment | 22 |
| 8.5 | Assignment By Succession | 24 |
| 8.6 | No Encumbrance | 24 |

| | | |
|---|---|---|
| 9. | DEFAULT AND TERMINATION | 24 |
| 9.1 | Termination by Franchisee | 24 |
| 9.2 | Termination by Company | 24 |
| 9.3 | Immediate Termination | 25 |
| 9.4 | Cross Default | 26 |
| 9.5 | Authority to Sign | 26 |
| 9.6 | Remedies Not Exclusive | 26 |
| 9.7 | Notice Required By Law | 26 |
| 9.8 | Equitable Relief | 26 |

| | | |
|---|---|---|
| 10. | OBLIGATIONS AND RIGHTS UPON expiration or TERMINATION | 27 |
| 10.1 | Orders For Products | 27 |
| 10.2 | Effect of Termination | 27 |

| | | |
|---|---|---|
| 11. | NON-COMPETITION COVENANTS | 28 |
| 11.1 | In-Term Non-Competition | 28 |
| 11.2 | Post-Term Non-Competition | 29 |
| 11.3 | Severability | 29 |

| | | |
|---|---|---|
| 12. | REMEDIES | 29 |
| 12.1 | Submission to Arbitration | 29 |
| 12.2 | Exceptions to Arbitration | 30 |
| 12.3 | Notice of Claim | 30 |
| 12.4 | Limitations on Remedies | 30 |

| | | |
|---|---|---|
| 13. | MISCELLANEOUS | 31 |
| 13.1 | Relationship of the Parties | 31 |

13.2   Notice To Third Parties........................................................................31
13.3   Section Headings................................................................................31
13.4   Attorney's Fees..................................................................................31
13.5   Remedies............................................................................................31
13.6   No Waiver...........................................................................................31
13.7   Severability........................................................................................31
13.8   Notices................................................................................................32
13.9   Entire Agreement..............................................................................32
13.10  Binding Effect...................................................................................32
13.11  Governing Law..................................................................................32
13.12  Counterparts......................................................................................32
14.    SUBMISSION OF AGREEMENT .....................................................33

# CALIFORNIA CLOSET COMPANY, INC.

## FRANCHISE AGREEMENT

This Agreement is entered into as of December 31, 1999, between CALIFORNIA CLOSET COMPANY, INC., a California corporation ("Company"), and Ben-Tel, LLC, a _____ ("Franchisee"), with reference to the following facts:

A.    Company has developed and is continuing to develop certain specialized and confidential training, management and marketing techniques and other procedures and methods of operation (the "System") which are used in connection with the operation of retail businesses ("Franchised Businesses") which offer and sell customized closet, garage, and other storage space design, production, and installation services ("Storage Space Services") and related products ("Storage Space Products") to both residential and commercial customers.

B.    Company is the exclusive owner of all rights and interests in and to the trademark and service mark "CALIFORNIA CLOSET COMPANY," "CALIFORNIA CLOSETS" and other marks which are identified in Exhibit A attached hereto, and all other trademarks, trade names, service marks, logotypes, insignias and designs which Company may from time to time expressly authorize Franchisee to use in connection with the Franchised Business (collectively the "Trademarks").

C.    Franchisee has had the opportunity to review an Offering Circular delivered by Company describing the Franchised Business and to investigate the competitive market in which it would operate. Based thereon, Franchisee wishes to obtain a franchise to use the System and the Trademarks in connection with the operation of a Franchised Business, and Company wishes to grant such franchise to Franchisee, upon the terms and conditions set forth in this Agreement.

D.    Franchisee acknowledges that the storage area customization business is very competitive, that all CALIFORNIA CLOSETS operations are dependent upon each other to maintain and enhance the commercial value of the System, and that it is essential to the maintenance of the System and to the preservation of the value of the Trademarks that each franchisee adhere to Company's standards, procedures, and policies described herein.

In consideration of the representations, covenants, and conditions set forth herein, Company and Franchisee hereby agree as follows:

## 1.    GRANT OF FRANCHISE AND LICENSE

### 1.1    Grant

Company hereby grants to Franchisee, and Franchisee hereby accepts, the right to use the System and a license to use and display the Trademarks in connection with the operation of a Franchised Business at one location within the Territory (hereinafter defined), strictly in accordance with the terms and subject to the conditions of this Agreement.

### 1.2    No Right to Sublicense

Franchisee may not subfranchise or sublicense others to use any of the rights granted to it herein.

## 2.    LOCATION AND TERRITORY

### 2.1    Location

The location of the Franchised Business as of the date hereof (the "Location") is:

_____

_____

### 2.2    New Locations

(a)    Franchisee may at any time during the term hereof move the Franchised Business to, or open, new locations, upon the terms and conditions set forth herein. Any such new location shall be within the Territory (as hereinafter defined) and shall be subject to Company's reasonable prior approval. Prior to such move or opening, Franchisee shall deliver written notice to Company of the proposed new location, the reasons for any relocation, and such additional information relating thereto as Company may reasonably request. The failure by Company to disapprove the proposal in writing within thirty (30) days after receipt shall be deemed an approval thereof. Franchisee acknowledges that Company's review and/or approval of any proposed location hereunder shall in no way constitute a representation or guarantee of any kind as to the future success of the location, and acknowledges that the selection and investigation of any such location is Franchisee's responsibility.

(b)    Except in the cases described in Section 2.2(d), whenever Franchisee moves the Location of its Franchised Business with Company's approval pursuant to this Section, it shall open for business at the new location not later than the business day immediately following the day on which the old location closes

(c)    Any new location opened hereunder may be memorialized by a written notice from Company to Franchisee and shall not require a formal amendment to this Agreement. Any lease for any such new location shall satisfy the provisions of Section 2.3.

(d)    In the event Franchisee loses its right to occupy the Location at any time, for reasons outside of Franchisee's reasonable control, Franchisee shall, within forty-five (45) days after losing such right, enter into a lease for a new location, subject to the following conditions:

(1)    Such lease shall satisfy the conditions set forth in Section 2.3; and

(2)    Such new location shall be subject to Company's approval, in the manner provided in Section 2.2(a).

### 2.3    Lease

(a)    Not later than sixty (60) days after the effective date hereof, Franchisee shall enter into a lease for the Location ("Lease") for a term which is, considering all options to renew the lease, at least equal to the term of this Agreement.

(b)    The Lease shall be subject to Company's approval, which may not be unreasonably withheld.  As a condition of such approval Company may require that the Lease provide in substance that:

(1)    Company has an option, without cost, to assume or have its assignee assume the Lease in the event of termination of this Agreement for any reason other than Company's breach;

(2)    the Lease may not be amended, assigned, or subleased by Franchisee without the prior written consent of Company;

(3)    Company will be given prior written notice of, and have the opportunity to cure, any default of Franchisee under the Lease;

(4)    the layout, sign usage, hours, and other methods of operation of Franchisee's business as required by this Agreement are expressly permitted; and

(5)    the landlord shall not lease premises in the immediate vicinity of the Franchised Business to competing unaffiliated retail establishments.

### 2.4    Territorial Rights With Respect to Storage Space Services

Provided that Franchisee is in substantial compliance with this Agreement, and subject to Sections 2.5 and 2.6, Company will not operate or grant a franchise for the operation of a business which sells to the general public, Storage Space Services in connection with the Trademarks at any location within the geographical area described in Exhibit B attached hereto and incorporated herein (the "Territory").

### 2.5    Company's Right to Solicit Within the Territory for Storage Space Services

Notwithstanding Section 2.4, in an effort to increase market share and/or to service local, regional or national accounts, Company may, and may authorize others to, solicit "Leads" by any means whatsoever, including, but not limited to, displays in home centers, catalog, direct mail or telephone sales and the offering of Storage Space Services through existing businesses within the Territory.  As used herein, a "Lead" shall mean the name, address and telephone number of any prospective residential or commercial customer of Storage Space Services, to be performed at a location in the Territory.

In the event that Company solicits Leads in the Territory, Company shall first refer the Lead to Franchisee.  Franchisee shall be required to pay a reasonable fee designated by Company for such Lead.  Such payment shall be treated as Advertising Credits under Section 7.9.  Franchisee shall further be required to promptly and diligently perform all services requested by the Lead or outlined by Company.  In the event Franchisee fails to pay the designated fee for the Lead or decline or fail to perform such services in a timely manner and to cooperate with Company in servicing such Leads,

Company may, at its option, perform or authorize another entity or individual to perform the Storage Space Services and may retain all revenue generated therefrom.

Such Leads may be the result of a local, regional or national program established by Company. Company shall have the right to negotiate and enter into arrangements for local, regional and national programs upon such terms and conditions as it deems appropriate. If Franchisee chooses to accept the Lead, Franchisee must agree to accept all such terms as negotiated by Company which may include the payment of a commission on sales from the Lead. If at any time, (a) Franchisee refused to service a Lead; (b) a Lead requests that Company or its designee service the Lead; or (c) Franchisee fails to maintain Company's standards in providing services to the Lead, Company shall have the right at any time in its sole discretion to service the Lead directly or to designate another entity to service the Lead.

**2.6    Rights Reserved by Company**

Company retains the right, in its sole discretion, to:

(a)    operate and grant others the right to operate California Closets businesses offering Storage Space Services outside of the Territory on such terms and conditions as Company deems appropriate;

(b)    generate and pursue Leads for the sale of Storage Space Services whether within or outside of the Territory as described in Section 2.5; and

(c)    sell Storage Space Products or license to others the right to sell Storage Space Products or other products bearing the Trademarks or other marks, within and outside of the Territory, by any and all means of distribution including, but not limited to, distributors, retail chains or outlets, mail, telephone orders, catalog sales or otherwise.

**2.7    Franchisee's Duties and Activities in the Territory**

(a)    Franchisee shall exercise its best efforts to promote, market, and conduct the Franchised Business so as to maximize its business potential in the Territory

(b)    Except as otherwise expressly provided herein, Franchisee may market, promote, and advertise its Franchised Business in any channels and media in the Territory, even if such activities reach persons located outside the Territory. However, Franchisee shall not directly solicit customers who are located outside of the Territory without Company's prior written consent. Without limiting the generality of the foregoing, Company may, in its discretion, withhold such consent if such customers are located in the territory of another franchisee. For purposes hereof, "direct solicitation" shall include, without limitation, solicitation by mail or by telephone. Nothing herein shall provide any rights to a franchisee against Company for its enforcement or non-enforcement of this provision.

(c)    Notwithstanding the foregoing, Franchisee may provide Storage Space Services to customers located outside the Territory whom Franchisee did not directly solicit.

### 2.8    Loss of Territorial Rights

In the event Franchisee commits any act or any other event occurs which constitutes grounds for termination of this Agreement by Company under Article 9, including without limitation a material breach of Franchisee's duty under Section 2.5 to exercise its best efforts to promote, market and conduct the Franchised Business, Company, may instead elect to terminate Franchisee's territorial rights set forth in Section 2.4 and/or right to receive Leads set forth in Section 2.5. Such termination shall take effect immediately upon written notice to Franchisee by Company, and Company may thereafter open and operate additional businesses located in the Territory offering Storage Space Services and Products, under the Trademarks or otherwise, and may authorize others to do so.

## 3.    TERM

### 3.1    Initial Term

The initial term of this Agreement ("Initial Term") shall expire on the date which is ten (10) years after the effective date hereof, unless sooner terminated in accordance herewith.

### 3.2    Renewal

(a)    Provided Franchisee in all respects satisfies the conditions set forth in this Section and Section 3.4, Franchisee shall have the right, but not the obligation, to enter into a Renewal Agreement (as defined below) for a period commencing on the day following the last day of the Initial Term and expiring ten (10) years thereafter (the "Renewal Term").

(b)    As a condition of Franchisee's right to renew:

(1)    At the time of Franchisee's exercise of the right and at the commencement of the Renewal Term, Franchisee will have:

(i)    fully performed all of its obligations under this Agreement and under all other agreements then in effect between Company and Franchisee; and

(ii)    received no more than two (2) notices of default during any twelve (12) month period during the Initial Term, whether or not cured.

(2)    At least five (5) days prior to the commencement of the Renewal Term, Franchisee shall pay to Franchisor a fee (the "Renewal Fee") not to exceed fifty percent (50%) of the initial franchise fee then being charged, or last charged, to new franchisees. No part of the Renewal Fee shall be refundable, even if Franchisee fails to satisfy any conditions to its right to renew.

(3)    Franchisee shall effect, in a manner satisfactory to Company, such upgrading of machinery and equipment used in the Franchised Business and such renovation and modernization of the Location, as Company may reasonably require, including, without limitation, renovation of signs, furnishings, fixtures, and decor, to reflect the then-current standards and image of the System.

(4)    Franchisee shall present satisfactory evidence that it has the right to remain in possession of the Location (or any approved new Location) for the entire Renewal Term.

(5)    If Franchisee operates in a jurisdiction which requires that it be a licensed contractor, Franchisee will have obtained such license.

(6)    Franchisee shall execute the form of franchise agreement and any ancillary agreements then customarily used by Company in the granting of new franchises for the operation of California Closets businesses (including all the then-current continuing royalty fees and other terms) and with the appropriate modifications to reflect the fact that (a) the agreement relates to the renewal of the franchise; (b) no further renewal term will be granted; and (c) the franchisee shall not be required to pay an initial fee.

(7)    Franchisee and its owners shall execute general releases, in a form satisfactory to Company, of any and all claims against Company, its affiliates and their respective shareholders, officers, directors, employees, agents, successors and assigns.

### 3.3    Redefinition of Territory

Company shall have the right, but not the obligation, to redefine the Territory, effective as of the commencement of the Renewal Term. Company shall exercise this right in good faith, and shall use the same criteria for determining Franchisee's new Territory as it then uses in redefining the territories of all franchisees similarly situated. If Company elects to exercise this right, it shall deliver to Franchisee a description of the new Territory in the Renewal Agreement which is presented to Franchisee. If Company does not exercise its right to redefine the Territory, the Territory during the Renewal Term shall be the same as the Territory herein defined.

### 3.4    Form and Manner of Renewal

Franchisee shall exercise its right to enter into a Renewal Agreement in the following manner:

(a)    Not less than six (6) months nor more than nine (9) months before the expiration of the Initial Term, Franchisee shall request from Company a copy of its then current Uniform Franchise Offering Circular (including its Renewal Agreement) (the "Offering Circular").

(b)    No sooner than ten (10) business days but no more than thirty (30) business days after Franchisee receives Company's Offering Circular, Franchisee, by written notice, shall notify Company as to whether or not it elects to execute the Renewal Agreement.

(c)    Upon receipt of Franchisee's notice of election to do so, Company shall deliver to Franchisee two (2) copies of the Renewal Agreement. Promptly upon receipt of the Renewal Agreement, Franchisee shall execute said two (2) copies and shall return both copies to Company.

(d)    If Franchisee fails to perform any of the acts, or deliver any of the notices, required hereunder, in a timely fashion, such failure shall be deemed an election by Franchisee not to exercise its right to enter into a Renewal Agreement, and shall cause its right to renew to expire.

(e)    Provided that Franchisee has exercised the right to enter into a Renewal Agreement in the form and manner described above, and if on the date of expiration of the Initial Term Franchisee has complied with all of the conditions set forth in Section 3.2, Company shall execute

the Renewal Agreement and, promptly after expiration of the Initial Term, shall deliver one fully executed copy of it to Franchisee.

### 3.5    Notice Required by Law

If applicable law requires that Company give notice to Franchisee prior to the expiration of the term, this Agreement shall remain in effect on a month to month basis until Company has given the requisite notice.

## 4.    PAYMENTS AND REPORTS BY FRANCHISEE

### 4.1    Initial Franchise Fee

Concurrently herewith, Franchisee shall pay to Company the sum of Twenty-Nine Thousand Six Hundred Twenty-Five Dollars ($29,625) ("Initial Fee"), receipt of which is hereby acknowledged. Except as herein expressly provided, the Initial Fee is not refundable in whole or in part, and shall be deemed fully earned upon payment.

### 4.2    Continuing Royalty

(a)    Franchisee shall pay to Company, within fifteen (15) days after the end of each calendar month or portion thereof during the term of this Agreement, a continuing royalty ("Royalty") in an amount equal to eleven percent (11%) of Franchisee's "Gross Income" for said month or portion thereof. Franchisee shall be entitled to certain Advertising Credits against Royalties pursuant to Section 7.9(d).

(b)    For purposes hereof, "Gross Income" shall mean the total revenue derived from sales of both merchandise and services sold by or performed by or for Franchisee or the Franchised Business, whether for cash or credit, including any payments made under any policy of business interruption insurance relating to the Franchised Business, exclusive only of applicable sales taxes, use taxes, gross receipts taxes, and other similar taxes added to the sales price and collected from the customer, and any bona fide refunds, rebates, and discounts.

### 4.3    Late Charge

Any amount owing from Franchisee to Company hereunder, if not paid when due, shall bear interest, until paid, at the lower of eighteen percent (18%) per annum or the highest permissible interest rate chargeable under applicable law.

### 4.4    Application of Funds

If Franchisee is delinquent in the payment of any obligation to Company under this or any other agreement, Company shall have the right to apply any payments received from Franchisee to any obligation owed, notwithstanding any contrary designation by Franchisee.

### 4.5    Reports

(a)    Concurrently with the payment of each Royalty, Franchisee shall deliver to Company a report showing the Gross Income for the preceding month, in a form prescribed by Company.

(b)    Franchisee shall submit to Company, within sixty (60) days after the end of each of its fiscal years, complete financial statements in a form prescribed by Company, including balance sheets, profit and loss statements, and statements of source and use of funds, and a copy of Franchisee's federal and state tax returns.

(c)    Franchisee shall submit to Company such other reports and financial information as Company may from time to time require, including by way of example and not limitation, sales and cost data and analysis, personal financial statements of any persons having a material financial interest in Franchisee's business and customer data and information.

## 5.    TRADEMARKS

### 5.1    Use and Display of Trademarks

(a)    Franchisee shall display, or upon Company's request not display, the Trademarks on such materials, products, vehicles, and equipment used by Franchisee in connection with the operation of the Franchised Business, and in such manner, as Company may prescribe.

(b)    The Franchised Business shall be named "California Closets" without any suffix or prefix attached thereto, unless otherwise directed by Company. Franchisee shall use and display such signs, advertising and slogans as Company may from time to time designate. Upon expiration or sooner termination of this Agreement, Company may, if Franchisee does not do so, execute in Franchisee's name and on Franchisee's behalf, any and all documents necessary in Company's judgment to terminate Franchisee's use of Company's Trademarks. Company is hereby irrevocably appointed as Franchisee's attorney-in-fact so to do.

(c)    If Franchisee is a corporation, it shall not use the Trademarks or any words or symbols confusingly similar thereto as any part of Franchisee's corporate or other legal name, or as part of any e-mail address, domain name, or other identification in any electronic medium.

(d)    Franchisee shall not display the trademark, service mark, tradename, insignia or logotype of any third party in connection with the Franchised Business without the prior written consent of Company. Franchisee acknowledges that it may use the Trademarks only in connection with the operation of the Franchised Business in conformity herewith and only during the term hereof. Nothing herein shall give Franchisee any right, title or interest in or to any of the Trademarks, except a mere license to use them during the term hereof.

(e)    Franchisee acknowledges that the Trademarks are the exclusive property of Company and Franchisee shall not assert any claim to any goodwill, reputation or ownership thereof by virtue hereof or otherwise. Franchisee will not do or permit any act or thing to be done in derogation of any of the rights of Company in connection with the same, either during the term of this Agreement or thereafter.

### 5.2    Defense of Trademarks

If Franchisee receives notice, or is otherwise informed, of any claim against Franchisee on account of any alleged infringement, unfair competition, or similar matter relating to its use of the Trademarks, Franchisee shall promptly notify Company thereof. Company shall take such action as it deems necessary to protect and defend Franchisee against any such claim and shall indemnify

Franchisee against any loss or expenses incurred in connection therewith. Franchisee shall not compromise any such claim without the prior written consent of Company. Company shall have the sole right to defend or compromise any such claim, in its discretion, at its sole cost, using attorneys of its own choosing. Franchisee shall cooperate fully with Company in such defense. Franchisee may participate at its own expense in such defense, but Company's decisions with regard thereto shall be final.

### 5.3    Prosecution of Infringers

If Franchisee is informed that any third party, which it believes to be unauthorized to do so, is using the Trademarks or any variation thereof, Franchisee shall promptly notify Company of the facts relating to such use. Company shall, in its sole discretion, determine whether or not it wishes to take any action against such third person on account of such alleged infringement. Franchisee shall have no right to make any demand or to prosecute any claim of any kind against such alleged infringer on account of such infringement.

### 5.4    Modification of Trademarks

From time to time Company may add to, delete or modify any or all of the Trademarks. Franchisee shall accept, use, or cease using the Trademarks, including but not limited to any such modified or additional trade names, trademarks, service marks, logotypes and commercial symbols, in strict accordance with the procedures and rules prescribed by Company

### 5.5    Assumed Name Registration

In the event Franchisee is required to do so by applicable law, Franchisee shall promptly file with the appropriate authority a notice of its intent to conduct its business under the name "California Closets". Upon the termination of this Agreement for any reason Franchisee shall promptly execute and file such documents as may be necessary to terminate such assumed name registration. Franchisee hereby irrevocably appoints Company as its attorney-in-fact to do so on behalf of Franchisee.

## 6.    OTHER OBLIGATIONS OF COMPANY

### 6.1    Training and Supervision

(a)    Company shall, prior to the opening of the Franchised Business, train Franchisee, and/or such number of its employees as Company deems appropriate, in the System. Such initial training program shall be without charge to Franchisee and shall be conducted at Company's home office, or at such other places as Company may designate. Company shall pay no compensation for any services performed by such trainee(s). Franchisee shall pay all expenses incurred by Franchisee and such trainee(s) in connection with and during such training, including, but not limited to, transportation costs, meals, lodging and other living expenses. Franchisee, and the General Manager of the Franchised Business, shall pursue and complete such training to Company's satisfaction, unless waived by Company in writing in its sole subjective judgment, exercised in good faith, by reason of such person's prior training or experience.

(b)    In addition to the initial training described above, Company shall, upon Franchisee's request and at no cost to Franchisee, provide a member of its staff to assist Franchisee for such

period of time as Company, in its sole discretion, deems advisable, at the time Franchisee commences its Franchised Business. In the event that all members of Company's training staff are unavailable at the time Franchisee first commences the Franchised Business, Company shall furnish a member of such training staff as soon as one becomes available. After the Franchised Business is opened and operating, Company shall provide such operational assistance to Franchisee as Franchisee requests and as Company deems necessary and appropriate to the Franchised Business, subject to staff availability and at Company's then-current rates for such assistance.

(c)    In the event of an assignment by Franchisee pursuant to Article 8, Company shall train the assignee and no more than one (1) other person designated by him in the same manner described in subsection (a) above, at such time and place as Company may determine in its reasonable judgment. The assignee shall be required to pay Company's then-current fees for such training

(d)    Company may, from time to time, at its discretion, make available to Franchisee additional training courses or programs during the term of this Agreement. Company shall have the right in its reasonable judgment to make attendance by Franchisee or its General Manager mandatory or optional, and to charge its then-current rates for such additional training. Franchisee shall pay all costs it incurs in attending such courses.

(e)    Company may, from time to time, at its discretion, cause its field representatives and/or headquarters staff to visit the Franchised Business for the purpose of rendering advice and consultation with respect to such Business, its operation and performance, and Franchisee's compliance with the Operations Manual. Franchisee shall have the right to inquire of Company's headquarters staff, its field representatives and training staff with respect to problems relating to the operation of the Franchised Business by telephone or correspondence, and Company shall use its best efforts to diligently respond to such inquiries, in order to assist Franchisee in the operation of its Franchised Business.

6.2    **Operations Manual**

Upon the effective date hereof, Company shall furnish to Franchisee one copy of the Operations Manual    Franchisee shall comply with and safeguard the Operations Manual in accordance with Section 7.3.

7.    **FRANCHISEE OPERATIONS**

7.1    **System Specifications**

Franchisee acknowledges and agrees that strict compliance with the System, including the standards, specifications, systems, procedures, requirements and instructions contained in this Agreement and in the Operations Manual, is vitally important to the collective success of all of Company's franchisees, and that Company and all of its franchisees will derive benefits from consistency in products, identity, quality, appearance, facilities and service among all Franchised Businesses which are part of the "California Closets" system.

**7.2    Contractor's License**

Before Franchisee operates its Franchised Business, it shall obtain and shall thereafter maintain in good standing a contractor's license, if and as required by applicable law.

**7.3    Operations Manual**

(a)    Franchisee shall operate the Franchised Business in strict compliance with the standard procedures, policies, rules and regulations established by Company and incorporated in Company's Operations Manual as the same may be amended from time to time. However, nothing set forth in the Operations Manual may impair any of Franchisee's fundamental rights granted by this Agreement. The Operations Manual shall include all memoranda, bulletins, and other written communications sent by Company to Franchisee from time to time relating to the operation of the Franchised Business. Modifications in the Operations Manual shall become effective upon delivery of written notice thereof to Franchisee unless a longer period is specified in such notice. The Operations Manual, as modified from time to time, shall be an integral part of this Agreement and any reference made in this Agreement, or in any amendments, exhibits or schedules hereto, to the Operations Manual shall include the Operations Manual and all amendments, bulletins, and directives issued by Company from time to time. In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Company at Company's headquarters shall be controlling absent manifest error.

(b)    The Operations Manual, written directives, other manuals and any other confidential communications provided or approved by Company shall at all times remain the sole property of Company, shall at all times be kept in a secure place at the Franchised Business, and shall be returned to Company immediately upon request or upon termination of this Agreement. Franchisee shall not make, or cause or allow to be made, any copies of all or any portion of the Operations Manual without Company's prior written consent.

**7.4    General Manager**

(a)    Franchisee shall appoint a general manager of the Franchised Business (which may be Franchisee), who is identified in Exhibit C attached hereto ("General Manager"). The General Manager shall devote his full business time and effort to the active management and operation of the Franchised Business, shall reserve and exercise ultimate authority and responsibility with respect to the management and operation of such Business, and shall represent Franchisee in all dealings with Company.

(b)    If Franchisee operates or hereafter commences to operate one or more additional "California Closets" Franchised Businesses, the General Manager hereunder may serve as the General Manager of such other Businesses as well.

(c)    In the event of the termination, disability, or death of the General Manager, Franchisee shall promptly replace him with another individual, who shall thereupon satisfy and comply with all the duties of a General Manager, and shall promptly notify Company thereof. For purposes of this Agreement, such new General Manager may be identified by a written notice from Company to Franchisee and shall not require a formal amendment hereof.

**7.5    Appearance and Furnishing of Franchised Business**

(a)    Franchisee acknowledges that the design and appearance of both the exterior and interior of the Franchised Business are part of Company's trade dress, and that it is essential to the integrity thereof that consistency in appearance be maintained among the premises of Company's franchisees.

(b)    Franchisee shall purchase or lease and install, at its expense, such fixtures, furnishings, equipment, machinery and signs as Company may reasonably require from time to time and shall refrain from installing or permitting to be installed on or about the Franchised Business premises, without Company's prior written consent, any fixtures, furnishings, equipment, machinery and signs, or other items not previously approved or not meeting Company's standards and specifications.

(c)    Franchisee shall at its sole expense maintain interior and exterior appearance and decor in such manner and form as may be reasonably prescribed from time to time by Company. Franchisee shall follow the reasonable instructions of Company with respect to floor layout and character of interior furnishings.

(d)    At Company's request, but not more often than once every five (5) years, Franchisee shall refurbish the premises at Franchisee's expense to conform to the design, trade dress, color schemes and presentation of the Trademarks consistent with the image then in effect for new franchisees, including without limitation, such body work, repainting and interior remodeling and redecoration and such modifications to existing improvements as may be necessary.

(e)    Franchisee shall at all times maintain its business premises in a clean, attractive, and safe condition, and in good maintenance and repair.

**7.6    Products and Services**

(a)    Franchisee shall offer and sell to the general public all products and services which Company may from time to time require, shall not offer or sell any products or services not authorized by Company, and shall not use the Location for any purpose other than the operation of the Franchised Business.

(b)    All products, equipment, tools, furnishings, and supplies (collectively "Products") offered, sold, or used by Franchisee shall conform to standards established by Company from time to time and shall be purchased only from Company or suppliers approved in writing by Company. If Franchisee proposes to offer or sell any such Product, and/or acquire any Product from a supplier, not theretofore approved by Company, it shall first notify Company thereof and supply such samples, specifications, photographs and other information as Company may reasonably request to determine whether such Product and/or supplier meets Company's standards. Company may as a condition of approval inspect such supplier's facilities. Franchisee shall reimburse Company for all reasonable costs incurred by Company in connection with any such examination, testing or inspection, including but not limited to travel and lodging expenses incurred where Company reasonably deems it necessary to visit a supplier's facilities.

(c)    Company may base or condition its approval of any such proposed Product or supplier on considerations relating not only directly to the Product or supplier itself but also

indirectly to the uniformity, efficiency, and quality of operation it deems necessary or desirable in its franchise system as a whole.

     (d)    Company reserves the right, at its option, to re-inspect the facilities and Products of any approved supplier and to revoke any approval previously given, upon the supplier's failure to continue to meet Company's specifications.

     (e)    Nothing herein shall require Company to approve an unreasonable number of suppliers for a given Product, which approval might, in Company's reasonable judgment, result in higher costs or prevent the effective and economical supervision of approved suppliers.

     (f)    Franchisee shall at all times maintain an inventory of required Products which is adequate, in terms of both range of Products covered and their quantities, to fulfill anticipated demand therefor.

     (g)    To ensure the dedication of Franchisee's best efforts to the operation of its Franchised Business and the service of its end-user customers, Franchisee shall not sell any Products or other merchandise to any other franchisee or to any competitor of Company.

     (h)    Franchisee shall have sole discretion as to the prices and payment terms it charges its customers on all products and services offered by it.

     (i)    The prices, delivery terms, terms of payment, and other terms relating to the sale of products by Company to Franchisee shall be as prescribed by Company from time to time, and shall be subject to change by Company without prior notice at any time, provided however that purchase orders received prior to the effective date of any such change shall be honored at the prior rates and terms. Nothing herein obligates Company to continue selling products to Franchisee which it previously offered. Company shall not be responsible for shortages, delays, or failures to ship caused by matters outside of its reasonable control.

### 7.7    Hours of Operation

     Franchisee shall keep the Franchised Business open to the public during all normal business days and hours throughout the year (at least 9:00 a.m. to 5:00 p.m.) except recognized holidays.

### 7.8    Customer Service; Employees

     (a)    Franchisee shall at all times give prompt, courteous, and efficient service to the public, shall perform work competently and in a workmanlike manner, and in all business dealings with members of the public shall observe the highest standards of honesty, integrity, fair dealing, and ethical conduct. Franchisee shall do nothing which would tend to discredit, dishonor, or in any manner injure the reputation of Company, Franchisee, or any other franchisee of Company.

     (b)    Franchisee shall use the highest degree of care in the hiring of employees, so that its employees meet competency requirements for their particular positions, and demonstrate conscientiousness, ability, and integrity toward Company and the Franchised Business, its customers, vendors, and suppliers.

### 7.9    Franchisee Advertising

(a)    In order to protect the Trademarks, Franchisee shall not use, display, publish, broadcast, or in any manner disseminate any advertising or promotional material for the Franchised Business, whether or not using the Trademarks, unless the same has first been approved in writing by Company. Franchisee shall comply with all requirements and programs prescribed by Company with regard to advertising content, media selection, and local and national advertising programs.

(b)    In the event Franchisee wishes to use an advertising medium or content not previously approved, it shall submit a description thereof to Company. Failure by Company to disapprove such use within seven (7) business days of Franchisee's request shall be deemed an approval.

(c)    Franchisee specifically acknowledges and agrees that any Website (as defined in paragraph (5) below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) the provisions of this Section 7.9. In connection with any Website, Franchisee agrees to the following:

(1)    Before establishing the Website, Franchisee shall submit to Company a sample of the Website format and information in the form and manner Company may reasonably require.

(2)    Franchise will not establish the Website without Company's prior written approval.

(3)    In addition to any other applicable requirements, Franchisee shall comply with Company's standards and specifications for Websites prescribed by Company from time to time in the Operations Manual or otherwise in writing. If required by Company, Franchisee shall establish its Website as part of Company's Website and/or establish electronic links to Company's Website. Franchisee shall sign such additional license agreement or other documentation as Company may require in connection with the creation of a Website.

(4)    If Franchisee proposes any material revision to the Website or any of the information contained in the Website, Franchisee shall submit each such revision to Company for Company's prior written approval.

(5)    "Website" means an interactive electronic document, contained in a network of computers linked by communications software, that Franchisee operates or authorizes others to operate and that refers to the Franchised Business, Trademarks, Company, and/or the System. The term Website includes, but is not limited to, Internet and World Wide Web home pages.

(d)    In no event shall Franchisee's advertising contain any statement or material which is misleading or false, in bad taste or offensive to the public or to any group of persons, defamatory of any person, or inconsistent with the public image of Company or the System.

(e)    Subject to subsection (f), as an incentive for Franchisee to advertise, Franchisee shall be entitled to a credit ("Advertising Credit") against the Royalty payments it owes Company for any particular month equal to one-half of the total of: (i) Franchisee's monthly contribution to the Marketing Fund in accordance with Section 7.11 hereof; plus (ii) the qualifying advertising

expenses Franchisee actually pays during such month, up to a maximum total Advertising Credit of five percent (5%) each month.

By way of example, assume that in a particular month, Franchisee's Gross Income is $100,000, Franchisee spends $7,000 on its own local advertising and contributes 3% or $3,000 to the Marketing Fund. Franchisee's Royalty obligation of $11,000 (11% of $100,000) would be reduced by (1) one-half of the local advertising expenditure of $7,000 ($3,500), plus (2) one-half of the Marketing Fund contribution ($1,500 of $3,000). Thus, Franchisee would owe Company $6,000 ($11,000 - ($3,500 + $1,500)). Company shall have the right, but not the obligation, to use monthly averages of Franchisee's advertising expenses over periods of more than one month in determining the amount of the Advertising Credits during such period. Company may also, in its discretion, designate the qualifying sources from which Advertising Credits will be granted and limit the Credit allowed for some sources to ensure a reasonable marketing mix.

(f)     To obtain the Advertising Credit with respect to local advertising expenditures, Franchisee must do the following:

(1)     provide Company with a copy of all proposed layouts a reasonable time prior to their anticipated publication dates and obtain Company's written approval thereof, unless previously approved; and obtain Company's written approval thereof.

(2)     provide Company, on request, with actual tear sheets and copies of invoices of advertising expenses actually incurred and paid

**7.10    Co-op Advertising**

(a)     Company shall have the right at any time and from time to time to establish, and thereafter modify, cooperative advertising programs ("Co-op Programs") for California Closets businesses in the region in which Franchisee is located. Franchisee shall participate in each such Co-op Program and shall be bound by and comply with its determinations, provided it is established and operates in accordance with this Section.

(b)     Each such Co-op Program shall require the participation of each California Closets franchisee and each similar Company-operated business (collectively "Participants") which are located within the region established by Company for the Program. Company may define the size and extent of the region in its discretion. Company may provide, in its discretion, that the voting interest of each Participant in making decisions for purposes of the Co-op Program ("Voting Interests") may be based on any of the following: (1) one vote per Participant; (2) the population or other market characteristics of the territory of each Participant; (3) the number of stores of each Participant; (4) the revenues of each Participant; or (5) any other reasonable basis. Company shall have the right to establish reasonable procedures for the calling and conduct of meetings, notices to Participants, and other procedural matters.

(c)     Each Co-op Program shall be organized and operated solely to create, develop, and implement advertising, promotional, and other marketing programs and materials for the principal benefit of the Participants in the particular region, in such media and by such other means as the Participants may determine.

(d)    Participants may be required to expend amounts for advertising or promotion within the region, provided however that (1) such decisions must be approved by at least a majority of the Voting Interests of the Participants, by a vote taken at a duly constituted and noticed meeting, and (2) Franchisee shall be allowed to apply such expenditures as Advertising Credits in accordance with Section 7.9(d). Company may administer or designate a third party to administer each Co-op Program. The general administration shall be under the direction of Company in all respects not otherwise expressly provided for in this Section, according to its reasonable judgment.

(e)    Nothing set forth herein shall prohibit Franchisee and other franchisees of Company located within a particular region from establishing their own cooperative advertising programs, provided such activities are subject to Company's reasonable approval and comply in all respects with this Agreement.

### 7.11    National Advertising Programs

Recognizing the value of advertising to the goodwill and public image of California Closets businesses, Company has instituted an advertising fund (the "Marketing Fund") for such advertising and public relations programs as Company, in its sole discretion, may deem necessary or appropriate to promote California Closets businesses. As part of its advertising expenses under this Agreement, Franchisee shall pay an amount (the "Marketing Fee") equal to three percent (3%) of its Gross Income for each month to the Marketing Fund. Franchisee shall pay the Marketing Fee concurrently with each royalty payment to Company. Franchisee may include the Marketing Fee in its advertising expenses which operate as a partial credit against royalties under the Advertising Credit provision described in Section 7.9 of this Agreement. California Closets businesses owned by Company and its affiliates shall contribute to the Marketing Fund on the same basis as Franchisee.

Company shall spend the Marketing Fund on the marketing and advertising of the "California Closets" system and its Products and Trademarks, in its best reasonable judgment. Company may determine in its sole discretion, from time to time, creative concepts, materials, content and endorsements used in such marketing and advertising, and the geographic market and media placement and allocation thereof. Without limiting the foregoing, the Marketing Fund may be applied to any or all of the following: market surveys and research; public relations; video, audio and written marketing materials; national, regional or multi-regional programs; direct mail; purchases of television, radio, magazine, billboard, newspaper and other media advertising; and employing consultants and marketing agencies. If less than sixty percent (60%) of the Marketing Fund shall be spent on media during any calendar year, Company shall consult with a committee of franchisees to be formed by Company (the "Franchise Marketing Committee"), on the reasons and advisability of such expenditures.

The Marketing Fund shall be accounted for separately from the other funds of Company and shall not be used to defray any of Company's general operating expenses, except for salaries, administrative costs, overhead and other costs that Company may incur in activities reasonably related to the administration of the Marketing Fund and its marketing programs (including, without limitation, travel associated with implementing and maintaining the Marketing Fund, conducting marketing research, preparing advertising and marketing materials and collecting and accounting for contributions to the Marketing Fund). Company may spend in any fiscal year an amount greater or less than the aggregate contribution of all California Closets businesses to the Marketing Fund in that year and the Marketing Fund may borrow from Company or other lenders to cover deficits of

the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. Franchisee authorizes Company to collect for remission to the Marketing Fund, any advertising or promotional monies or credits offered by any supplier based upon purchases by Franchisee. All interest on monies contributed to the Marketing Fund shall be used to pay advertising costs of the Marketing Fund before other assets of the Marketing Fund are expended. A statement of monies collected and costs incurred by the Marketing Fund shall be prepared annually, on a calendar basis, by Company and furnished to Franchisee. Company shall have the right to cause the Marketing Fund to be incorporated or operated through any entity separate from Company at such time as Company deems appropriate, and such successor entity shall have all rights and duties of Company pursuant to this Section.

Franchisee understands and acknowledges that the Marketing Fund is intended to maximize recognition of the Trademarks and patrons of California Closets businesses. Although Company shall endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising, that will benefit all California Closets businesses, Company undertakes no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Marketing Fund by California Closets businesses operating in that geographic area or that any California Closets businesses will benefit directly or in proportion to its contribution to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Section, Company assumes no direct or indirect liability or obligation to Franchisee with respect to the maintenance, direction or administration of the Marketing Fund. Where appropriate, in Company's reasonable judgment, Company shall identify Franchisee as a "participating franchisee" in certain advertising materials. Company may withhold such identification if Franchisee fails to pay its Marketing Fee as herein required.

The Marketing Fund may be terminated upon thirty (30) days' notice by Company and may further be terminated under the terms and conditions as set forth in Company's policies which may be revised from time to time.

### 7.12    Computer System

Franchisee agrees to use in operating the Franchised Business the computer equipment and operating software (collectively, the "Computer System") that Company may, but is not required to, specify from time to time. Company may require Franchisee to obtain specified computer hardware and/or software and may periodically modify specifications for and components of the Computer System. Company's modification of specifications for the Computer System may require Franchisee to purchase, lease and/or license new or modified computer hardware and/or software and to obtain service and support for the Computer System. Within sixty (60) days after Franchisee receives notice from Company, Franchisee agrees to obtain the components of the Computer System that Company designates and ensure that Franchisee's Computer System, as modified, is functioning properly.

Company may charge Franchisee a reasonable fee if Company develops or has developed (and, once developed, for modifying and enhancing) proprietary software that Company licenses to Franchisee and for other Computer System maintenance and support services that Company or its affiliates gives Franchisee. If Company or its affiliates licenses proprietary software to Franchisee, Franchisee agrees to sign any software license agreement or similar document that

Company or its affiliates prescribe to regulate Franchisee's use of, and Franchisee's and Company's respective rights and responsibilities with respect to, the software.

Notwithstanding the fact that Franchisee must buy, use and maintain the Computer System under Company's standards and specifications, Franchisee will have sole and complete responsibility for: (1) the acquisition, operation, maintenance and upgrading of the Computer System, including the Year 2000 readiness of the system; (2) the manner in which Franchisee's Computer System interfaces with Company's computer system and those of other third parties; and (3) any and all consequences that may arise if the system is not properly operated, maintained and upgraded.

### 7.13    Books and Records

Franchisee shall maintain its books and records in such manner as to clearly and accurately reflect Gross Income. All such books and records shall be preserved for a period of not less than five (5) years after the close of the fiscal year to which they relate and shall be open at all reasonable times to inspection and verification by Company or any of its representatives. Company shall be entitled at any time to have Franchisee's books and records examined or audited at Company's expense, and Franchisee shall cooperate fully with the persons making such examination or audit. Franchisee shall promptly pay to Company or Company shall credit to Franchisee's account, as the case may be, any underpayment or overpayment of Royalties disclosed by such examination or audit. If any examination or audit is necessitated by Franchisee's failure to submit statements of Gross Income or to maintain books and records as required by this Section or if the Gross Income reported by Franchisee for any period is more than five percent (5%) less than the actual Gross Income of Franchisee for such period, then Franchisee shall pay to Company the cost of such examination or audit (including reasonable compensation for any time necessarily expended by Company's own employees and reimbursement for expenses necessarily incurred by them), as well as any additional amount of Royalties shown to be due plus applicable interest. Such payments shall be without prejudice to any right of Company to terminate this Agreement on account of such defaults by Franchisee, as herein permitted.

### 7.14    Inspections

Company, through its authorized representatives, shall have the right at all reasonable times, to visit Franchisee's business for the purpose of inspecting its merchandise and equipment, inspecting the nature and quality of goods sold and services rendered, and observing the manner and method of operating the business. If any of Franchisee's books, records, or inventory are located outside the premises, Company shall have similar rights with regard to the same.

### 7.15    Confidentiality

(a)    Franchisee acknowledges that Company is the sole owner of all proprietary rights in and to the System and all information relating to the System now or hereafter revealed to Franchisee by Company or by others on Company's behalf, including without limitation all information set forth in the Operations Manual. Franchisee further acknowledges that except for such matters which are generally known by the trade, the System, in its entirety, constitutes trade secrets of Company revealed to Franchisee in confidence, solely for the purpose of enabling Franchisee to establish and operate the Franchised Business in accordance with the terms hereof. Such

confidential information includes but is not limited to methods of site selection, production and installation techniques, marketing methods, customized computer software, customer and supplier lists, product analysis and selection, and service methods and skills relating to the development and operation of the Franchised Business. Franchisee acknowledges that the customer and supplier lists are the confidential property of Company and are held in trust for Company by Franchisee and must be returned to Company upon termination or expiration of this Agreement.

(b)     Franchisee shall not, during or after the term of this Agreement, reveal any of such trade secrets to any other person or entity except to its employees during the term hereof to the extent necessary to perform hereunder. Franchisee shall not use any such trade secrets other than in connection with the operation of the Franchised Business licensed herein.

(c)     At Company's request, Franchisee shall require and obtain execution of covenants concerning the confidentiality of such information from its employees who have received it in connection with their employment, in a form satisfactory to Company. Franchisee shall cause such persons to comply with such covenants.

(d)     If Franchisee or Franchisee's employees develop any new concepts, processes, or improvements in the Franchised Business, Franchisee shall promptly notify Company and provide Company with all necessary information concerning same. Franchisee acknowledges that any such concept, process or improvement shall become the property of Company, and Company may utilize or disclose such information to its Franchisees and other parties as it deems appropriate.

### 7.16    Liability and Insurance

(a)     Except as otherwise expressly provided, Franchisee alone shall be responsible for all loss or damage arising out of or relating to the operation of the Franchised Business or arising out of the acts or omissions of Franchisee or any of Franchisee's agents, servants, employees or contractors in connection with the sale of products or rendering of services, and for all claims for damage or injury or death of any persons directly or indirectly resulting therefrom. Franchisee shall defend, indemnify, and hold Company and its affiliates and their respective shareholders, officers, directors, employees, agents, successors and assigns, harmless against and from any and all such claims, losses and damages, including reasonable attorney's fees.

(b)     Franchisee shall obtain and at all times maintain in force and pay the premiums for public liability insurance, in either case with complete operations coverage, from companies acceptable to Company, with limits of liability for bodily injury of not less than $1,000,000.00 for each injury and $1,000,000.00 for property damage in each occurrence. Franchisee shall maintain "all risk coverage" insurance for fire, business interruptions, and similar risks up to the replacement value of Franchisee's inventory. Franchisee shall maintain workers compensation insurance for all of Franchisee's employees.

(c)     Such limits of liability may be increased, and modified or additional types of coverage shall be obtained at the direction of Company, as and when changed circumstances reasonably so require. Said policies shall expressly protect both Franchisee and Company and its affiliates and their respective shareholders, officers, directors, employees, agents, successors and assigns (as an additional insured) and shall require the insurer to defend Franchisee and Company in such action. Franchisee shall furnish to Company a certified copy or certificate of each such policy, providing that such policy shall not be cancelled or modified except upon ten (10) days prior written

notice to Company. Maintenance of the insurance required under this Section shall not relieve Franchisee of its obligations of indemnification. If Franchisee fails to procure or maintain in force any insurance as required by this Section or to furnish the certified copies or certificates thereof required hereunder, Company may, in addition to all other remedies it may have, procure such insurance and/or certified copies or certificates, and Franchisee shall promptly reimburse Company for all premiums and other costs incurred in connection therewith.

### 7.17    Compliance With Law

(a)    Franchisee shall comply with all applicable law in operating the Franchised Business. Nothing herein shall preclude Franchisee from contesting the validity or applicability thereof in any manner permitted by law.

(b)    Franchisee acknowledges that some state and local laws require or may hereafter require the registration of "Home Improvement Salespersons". If so required, Franchisee shall register such salespersons, pay any and all required fees, submit all necessary documentation, comply with such requirements, and hold Company and its affiliates and their respective shareholders, officers, directors, employees, agents, successors and assigns harmless therefrom.

### 7.18    Franchisee Control of Business

Except as otherwise expressly provided in this Agreement, including without limitation in the Operations Manual, Company shall have no right whatsoever to control or dictate any aspect of Franchisee's business or the manner in which Franchisee performs it, all of which shall remain within Franchisee's sole control, discretion, and responsibility.

### 7.19    Indemnification

Franchisee agrees to indemnify, defend and hold Company, its affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees harmless against and to reimburse them for all claims, obligations and damages, including any and all taxes and claims and liabilities directly or indirectly arising out of the operation of the Franchised Business, the use of the Trademarks, or the transfer of any interest in this Agreement, the franchise, the Franchised Business or Franchisee, in any manner not in accordance with this Agreement, to the extent that such claims, obligations, damages, taxes, losses or liabilities do not arise from the negligence or wrongful conduct of Company. For purposes of this indemnification, "claims" shall mean and include all obligations, actual and consequential damages and costs reasonably incurred in the defense of attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Company  Company shall have the right to defend any such claim against it in such manner as Company deems appropriate or desirable in its sole discretion  This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

8.    **ASSIGNMENTS**

8.1    **Assignment by Company**

Company shall have the right to assign this Agreement, and all of its rights and privileges, to any other person or entity; provided that, with respect to any assignment resulting in the subsequent performance by the assignee of the functions of the Company, (1) the assignee shall, at the time of such assignment, be financially responsible and capable of performing the obligations of Company; and (2) the assignee shall expressly assume and agree to perform such obligations.

8.2    **Company's Right of First Refusal**

If Franchisee or its owners shall at any time determine to sell an interest in this Agreement, the franchise, the Franchised Business or an ownership interest in Franchisee, or if Franchisee or its owners shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser, a true and complete copy of the offer (and any proposed "side" or ancillary agreements) shall immediately be submitted to Company by Franchisee, its owners or both. The offer must apply only to an interest in this Agreement, the franchise, the Franchised Business or Franchisee. It must not include the purchase price of any other property or rights of Franchisee (or its owners); but if the offeror proposes to buy any other property or rights from Franchisee (or its owners) under a separate, contemporaneous offer, the price and terms of purchase offered to Franchisee (or its owners) for the interest in this Agreement, the franchise, the Franchised Business or Franchisee shall reflect the bona fide price offered therefor and shall not reflect any value for any other property or rights. Company shall have the right, exercisable by written notice delivered to Franchisee or its owners within thirty (30) days from the date of delivery of any exact copy of such offer to Company, to purchase such interest for the price and on the terms and conditions contained in such order, provided that Company may substitute cash for any form of payment proposed in such offer, Company's credit shall be deemed equal to the credit of any proposed purchaser, and Company shall have not less than sixty (60) days to prepare for closing. Company shall be entitled to purchase such interest subject to all customary representations and warranties given by the seller of the assets of a business or voting stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to ownership, condition and title to stock and/or assets, liens and encumbrances relating to the stock and/or assets, validity of contracts and liabilities of the corporation whose stock is purchased and affecting the assets, contingent or otherwise. If Company does not exercise its right of first refusal, Franchisee or its owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to Company's approval of the transfer, as provided in Section 8.3, provided that if the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such offer to Company, or if there is a material change in the terms of the sale, Company shall have an additional right of first refusal for thirty (30) days on the same terms and conditions as are applicable to the initial right of first refusal. The right of first refusal hereinabove provided shall not apply to any inter-family transfer. For purposes of this Agreement, an "inter-family" transfer shall include a transfer to Franchisee's spouse or any ancestor, lineal descendant, brother, sister, spouse of a brother or sister, lineal descendant of a brother or sister, or trust for the benefit of one or more of such persons.

8.3    **Franchisee May Not Assign Without Approval of Company**

Franchisee understands and acknowledges that the rights and duties created by this Agreement are personal to Franchisee (or its owners) and that Company has granted the Franchise to

Franchisee (or its owners) in reliance upon the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of Franchisee (or its owners). Accordingly, neither this Agreement nor the franchise (or any interest therein), nor any part or all of the ownership of Franchisee or the Franchised Business (or any interest therein), may be assigned without the prior written approval of Company, and any such assignment without such approval shall constitute a breach hereof and convey no rights to or interests in this Agreement, the franchise, Franchisee, or the Franchised Business. As used in this Agreement, the term "assignment" shall mean and include the voluntary, involuntary, direct or indirect assignment, sale, gift or other transfer by Franchisee (or any of its owners) of any interest in: (1) this Agreement; (2) the franchise; (3) the ownership of Franchisee; or (4) the Franchised Business. An assignment, sale or other transfer shall include the following events: (1) transfer of ownership of capital stock or partnership interest; (2) merger or consolidation or issuance of additional securities representing an ownership interest in Franchisee; (3) any sale of voting stock of Franchisee or any security convertible to voting stock of Franchisee; (4) transfer of an interest in Franchisee, this Agreement, the franchise or the Franchised Business in a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; or (5) transfer of an interest in this Agreement, the franchise, Franchisee, or the Franchised Business in the event of the death of Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession.

### 8.4    Conditions for Approval of Assignment

If Franchisee and its owners are in full compliance with this Agreement, Company will not unreasonably withhold its approval of an assignment that meets all of the applicable requirements of this Paragraph. The proposed assignee and its owners must be individuals of good moral character and otherwise meet Company's then applicable standards for California Closets franchisees. An assignment of ownership in the Franchised Business may only be made in conjunction with an assignment of the franchise. If the assignment is of the franchise or a controlling interest in Franchisee, or is one of a series of assignments which in the aggregate constitute the assignment of the franchise or a controlling interest in Franchisee, all of the following conditions must be met prior to, or concurrently with, the effective date of the assignment:

(1)    the assignee (or the principal officers, shareholders or directors of the assignee in the case of a corporate assignee) has the skills, qualifications and economic resources necessary, in Company's reasonable judgment, to conduct the business contemplated by this Agreement, and to fulfill the assignee's obligations to Franchisee;

(2)    as of the date of such assignment, Franchisee shall have fully complied with all of its obligations to Company, whether under this Franchise Agreement or any other agreement with Company;

(3)    the assignee shall assume all of the obligations of Franchisee under the Lease, if any, for the Franchised Business and Franchisee shall not be in default with respect to any of its obligations under such Lease;

(4)    the assignee shall execute a new agreement in the form then being offered or last offered by Company to prospective franchisees similarly situated (except that the assignee shall not be obligated to again pay the initial franchise fee and the term of the new franchise agreement shall expire on the date provided herein for the expiration of this Agreement.) The execution of the

new franchise agreement shall, except for Franchisee's post-term obligations hereunder, be deemed to terminate this Agreement;

(5)    the assignee, or a manager designated by the assignee, shall satisfactorily complete the initial training program then required of all new franchisees of Company;

(6)    Franchisee shall pay to Company a transfer fee of Eight Thousand Dollars ($8,000) on or before the consummation of the Assignment or the close of escrow. Such transfer fee is an estimate by Company of Company's administrative costs to be incurred as a result of such transfer. This Agreement shall constitute Franchisee's irrevocable notice to any escrow holder in such transfer to pay such transfer fee directly to Company out of seller's proceeds at the close of escrow. Any approval for transfer given by Company, as provided herein, is conditional pending receipt by Company of such transfer fee;

(7)    shareholders of a corporate assignee, and any persons who are to acquire, directly or indirectly, the controlling interest in Franchisee, shall execute and deliver to Company its then standard forms of personal guaranty and subordination agreement;

(8)    Franchisee and each of its shareholders, directors, and officers shall have executed and delivered to Company a general release of any and all claims against Company, its affiliated corporations, and their respective officers, agents, and employees;

(9)    The assignee, at its expense, shall upgrade the Franchised Business to conform to the then-current standards and specifications of the System, within the time specified by Company;

(10)    Franchisee shall execute a covenant not to compete with the assignee, of which Company shall be a beneficiary, in such form and on such terms as Company may reasonably prescribe;

(11)    The assignee, at its expense, shall deliver to Company evidence of compliance with the requirements for insurance coverage as provided in Section 7.17;

(12)    The terms of purchase are not so burdensome to the assignee as to impair or materially threaten its future operation of the Franchised Business and performance under its franchise agreement; and

(13)    Franchisee shall remain liable for all of the obligations to Company in connection with the Franchised Business prior to the effective date of the Assignment and shall execute any and all instruments reasonably requested by Company to evidence such liability.

(b)    Within thirty (30) days after Company's receipt of the Notice (as defined in Section 8.2) or, if Company shall reasonably request additional information, within thirty (30) days after receipt of such additional information, Company shall have the right to object to the proposed Assignment or to impose conditions precedent to its consent, by delivering a written notice to Franchisee setting forth such objection or conditions. Failure by Company to deliver such notice within said time period shall constitute its consent to the proposed Assignment

(c)    Franchisee may not subfranchise or otherwise attempt to assign or transfer a portion (i.e., less than all) of its rights under this Agreement.

(d)    Company shall have the right to disclose to any prospective assignee such revenue reports and other financial information concerning Franchisee as Franchisee supplies it hereunder.

### 8.5    Assignment By Succession

The assignment of Franchisee's interest to Franchisee's heirs, personal representatives or conservators, as applicable, in the event of the death or legal incapacity of Franchisee (or a partner or principal shareholder of a partnership or corporate Franchisee) shall not constitute an Assignment requiring Company's consent or giving rise to Company's rights of first refusal. However, such heirs, personal representatives or conservators, as applicable, shall comply with the terms and conditions of this Agreement (including, without limitation, the provisions relating to assignments) and shall, within six (6) months after the death of Franchisee (or of a partner or shareholder of a partnership or corporate Franchisee), satisfy Company's standards for new franchisees or effect an Assignment (subject to Company's rights of first refusal and approval) to a new franchisee who satisfies such standards.

### 8.6    No Encumbrance

Franchisee shall have no right to pledge, encumber, hypothecate or otherwise give any third party a security interest in its rights under this Agreement without the prior written permission of Company, which permission may be withheld for any reason whatsoever in Company's sole subjective judgment.

## 9.    DEFAULT AND TERMINATION

### 9.1    Termination by Franchisee

Franchisee shall have the right to terminate this Agreement only on account of a material breach by Company, which Company fails to cure within thirty (30) days after written notice by Franchisee specifying such breach. However, if, because of the nature of such breach, Company is unable to cure it within such thirty (30) day period, Company shall be given such additional time as is reasonably necessary to do so, provided that upon receipt of such notice Company shall have immediately commenced to cure such breach and shall continue to use diligence and best efforts to do so.

### 9.2    Termination by Company

Company may terminate this Agreement upon any of the following grounds and conditions:

(a)    In the event Franchisee fails to make any payment of money owed to Company when due, or fails to submit to Company when due any report required hereunder, and such default is not totally cured within ten (10) days after Company gives written notice thereof to Franchisee, then Company may terminate this Agreement upon written notice to Franchisee.

(b)    In the event Franchisee fails to perform any material obligation hereunder, other than those referred to in subsections (a) or (c) of this Section, and such default is not totally cured within

thirty (30) days after Company has given written notice of such default to Franchisee, then Company may terminate this Agreement upon written notice to Franchisee. However, if, because of the nature of such breach, Franchisee is unable to cure it within such thirty (30) day period, Franchisee shall be given such additional time as is reasonably necessary to do so, provide that upon receipt of such notice Franchisee shall have immediately commenced to cure such breach and shall continue to use diligence and best efforts to do so.

(c)     Company may terminate this Agreement effective immediately, without Franchisee's having an opportunity to cure, by giving written notice to Franchisee, on any of the following grounds:

(1)     If Franchisee commits any willful and material falsification of any report, statement, or other written data furnished to Company; any report which understates Gross Income by more than five percent (5%) shall conclusively be deemed to be willfully and materially false;

(2)     If Franchisee commits any willful and repeated deception of customers relating to the source, nature, terms, or quality of goods sold or services rendered;

(3)     If Franchisee purports to assign this Agreement other than in compliance with Article 8, provided that any failure by Company to exercise its right to terminate pursuant hereto shall not constitute a consent to such assignment nor confer any rights upon the purported assignee;

(4)     If Franchisee fails, at any time, to keep its Franchised Business open and operating for business for a period of five (5) consecutive days, unless (i) such failure is caused by force majeure, (ii) Company consents in writing to such closure, or (iii) Franchisee closes the Business in connection with a relocation thereof effected in accordance with the provisions of this Agreement;

(5)     If Franchisee has been given written notice of default by Company three (3) times within any period of twelve (12) consecutive months pursuant to subsections (a) and/or (b) above, whether or not Franchisee cures such defaults;

(6)     If Franchisee or any of its owners is convicted of an offense directly related to the Franchised Business, or of any felony, whether or not so related;

(7)     If Franchisee fails to cure a default under this Agreement which materially impairs or threatens to impair the goodwill associated with any of Company's Trademarks after Franchisee has received prior written notice to cure of at least twenty-four (24) hours;

(8)     If Franchisee knowingly breaches the confidentiality provisions of Section 7.15 hereof.

### 9.3     Immediate Termination

This Agreement shall terminate immediately upon the occurrence of any of the following events, without notice:

(a)    Subject to applicable law, the adjudication of Franchisee a bankrupt, or the filing of any petition by or against Franchisee, under the federal bankruptcy laws or the laws of any state relating to relief of debtors, for reorganization, arrangement, or other similar relief provided therein, unless such petition filed against Franchisee is dismissed within thirty (30) days, or the making by Franchisee of a general assignment for the benefit of creditors;

(b)    The appointment of any receiver, trustee, or similar officer to take charge of Franchisee's business, or any attachment, execution, levy, seizure, or appropriation by any legal process of Franchisee's interest in this Agreement, unless the appointment of such officer is vacated or discharged or the effect of such legal process is otherwise released within thirty (30) days; and

(c)    If Franchisee is a corporation, partnership, or other business association, the occurrence of any act of a type described in subsection (a) or (b), above, which relates to, involves, or affects the interest of any person owning a controlling interest in Franchisee.

### 9.4    Cross Default

Any default by Franchisee of any other agreement between Company and Franchisee or of any lease agreement pursuant to which Franchisee occupies any Location, shall be deemed a default under this Agreement. If such default is not cured by Franchisee in accordance with the terms of the applicable agreement, Company shall have the right to terminate this Agreement and all of the other agreements between Company and Franchisee immediately upon notice.

### 9.5    Authority to Sign

No notice of default or notice of termination purporting to be given by Company hereunder shall be of any force or effect unless signed by a corporate officer of Company. Regional directors, district managers, and other agents of Company having authority with respect to a specific geographic area shall in no event be deemed corporate officers for purposes of this Section.

### 9.6    Remedies Not Exclusive

The right of Company and Franchisee to terminate this Agreement pursuant to this Section, whether or not exercised, shall not be exclusive of any other remedies under this Agreement or applicable law.

### 9.7    Notice Required By Law

If any valid applicable law or regulation of a competent governmental authority having jurisdiction over the parties limits Company's right of termination or requires longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to such minimum notice periods or restrictions. Company shall not, however, be precluded from contesting the validity or application of such laws in any action, arbitration, hearing or dispute relating to this Agreement or its termination.

### 9.8    Equitable Relief

Franchisee acknowledges that neither termination of this Agreement nor an action at law would be an adequate remedy for a breach by Franchisee relating to Company's Trademarks or trade

secrets, or the obligations of Franchisee arising upon and after termination of this Agreement. In the event of such breach Company shall be entitled to relief in equity to restrain the continuation of any such breach or to compel compliance with this Agreement.

10.    **OBLIGATIONS AND RIGHTS UPON EXPIRATION OR TERMINATION**

10.1    **Orders For Products**

Company shall not be obligated, after the expiration or termination hereof, to fill or ship any orders for merchandise received from Franchisee prior to or after such termination.

10.2    **Effect of Termination**

Upon expiration or termination of this Agreement for any reason, Franchisee shall cease to be an authorized CALIFORNIA CLOSETS franchisee as to any products or services whatsoever, and Franchisee shall do the following:

(a)    promptly pay Company all sums owing to Company, without set-off or other diminution on account of unliquidated claims;

(b)    immediately and permanently discontinue the use of any of Company's Trademarks or System, or any marks, names, or indicia which are confusingly similar thereto, or any other materials which may in any way imply or tend to imply to third parties that Franchisee is an authorized franchisee of Company or is in any way associated with Company;

(c)    immediately and permanently remove, destroy, or obliterate, at Franchisee's expense, all signs containing any of the trademarks or other things the use of which is prohibited by subsection (b) above;

(d)    promptly destroy or surrender to Company all stationery, letterheads, forms, printed matter, promotional displays, and advertising containing any of Company's Trademarks, or other things the use of which is prohibited by subsection (b) above;

(e)    immediately and permanently discontinue all advertising placed while Franchisee was an authorized franchisee of Company or which contains or makes reference to any of the Trademarks or other things the use of which is prohibited by subsection (b) above, and cancel all such advertising already placed or contracted for which would otherwise be published, broadcast, displayed, or disseminated after the date of termination;

(f)    immediately cease using or claiming any right to use any telephone number which Company, as the subscriber therefor, has allowed Franchisee to use during the term hereof, and pay all bills incurred for the period during which Franchisee used such number or numbers. As to each telephone number for which Franchisee may be the subscriber and which will have been listed or advertised by Franchisee for the Franchised Business at any time within the twenty-four (24) month period prior to termination, Franchisee shall immediately transfer and assign any such number to Company or to such person or firm as Company may designate, and shall immediately execute such instruments and take such steps as in the reasonable opinion of Company may be necessary or appropriate to transfer and assign each such telephone number; Franchisee hereby irrevocably

appoints Company as Franchisee's duly authorized agent and attorney-in-fact to execute all such instruments and take all such steps to transfer and assign each such telephone number;

(g)     immediately and permanently discontinue any use of the name "CALIFORNIA CLOSETS" or any name confusingly similar thereto in Franchisee's fictitious business name or trade name, and take such steps as may be necessary or appropriate in the reasonable opinion of Company to make such change;

(h)     immediately return to Company all confidential information, including but not limited to all copies of the Operations Manual, customer lists, customer data and other information identified by Company;

(i)     at Company's option, sell to Company, f.o.b. Franchisee's Location, such of its signs as Company may request, at a price equal to the original installed cost thereof to Franchisee minus a reasonable allowance for depreciation, wear, and obsolescence;

(j)     at Company's option, sell to Company, f.o.b. Franchisee's Location, all or such part of inventories of genuine products bearing Company's Trademarks on hand as of the termination as Company may request in writing prior to or within thirty (30) days after the date of termination, at the current published prices then being charged by Company to its franchisees, not including any costs of storage or transportation paid by Franchisee to bring the goods initially to the Location, and less any costs incurred or to be incurred by Company to restore such goods or packaging thereof to a salable condition, and minus a reasonable allowance for physical deterioration, obsolescence, or damage to the extent not restored. Company shall have the right to set-off any amounts due to Franchisee pursuant to this Subsection against any and all other amounts which may be due from Franchisee to Company;

(k)     all copies and versions and written documentation for such software or other programs as Company provides directly or indirectly to Franchisee shall be sold to Company and Franchisee shall permit a representative of Company to access any equipment to de-install any software or designated programs embedded in such hardware or otherwise comply with section 7.12.

## 11.     NON-COMPETITION COVENANTS

### 11.1     In-Term Non-Competition

During the term hereof, and except as expressly authorized herein, Franchisee shall not, either directly or indirectly, engage in any business offering Storage Space Services or Storage Space Products, either as a proprietor, partner, investor, shareholder, director, officer, lender, employee, principal, agent, advisor or consultant. Franchisee shall cause its shareholders, directors, officers, and employees (if any) to promise to refrain from such activities, and shall enforce such promises in the event of any violation thereof. Not only is direct competition hereby forbidden but also all forms of indirect competition, such as consultation for competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever that would be of any material assistance to a competitor.

### 11.2 Post-Term Non-Competition

For a period of one (1) year immediately following the expiration or termination of this Agreement or its approved transfer to a new franchisee, Franchisee shall not, either directly or indirectly, engage in any business offering Storage Space Services or Storage Space Products, either as a proprietor, a partner, shareholder, director, officer, employee, principal, agent, advisor or consultant, at a location within the territory of any California Closets franchisee or within twenty (20) miles of any Company-owned store. Franchisee shall cause its shareholders, directors, officers, and employees (if any) to refrain from such activities, and shall enforce such promises in the event of any violation thereof. Not only is direct competition hereby forbidden but also all forms of indirect competition, such as consultation for competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever that would be of any material assistance to a competitor.

### 11.3 Severability

The parties agree and acknowledge that the covenants set forth in this Article 11, as to the extent of the restricted territories and time and as to each separate manner of doing business, are separate and severable from such covenants as to each other territory, time, or manner of doing business. In the event any court or other tribunal of competent jurisdiction determines that such covenant is not enforceable as to the full extent of such territories and time, or any such manner of doing business, then the foregoing provisions shall be deemed modified to the extent necessary to make them valid and enforceable as between the parties in light of any such determination.

## 12.  REMEDIES

### 12.1 Submission to Arbitration

Except as otherwise provided in Section 12.2, any controversy or claim arising between Franchisee and Company (including, any claim against Company's shareholders, officers, directors, agents, employees, licensors, licensees, independent contractors or consultants in their capacity as such, or against the owners and guarantors of Franchisee, if applicable) in connection with, arising from, or with respect to: (1) any provision of this Agreement or any other agreement between the parties related to this Agreement; (2) the relationship of the parties hereto; (3) the validity of this Agreement or any other agreement between the parties related to this Agreement or any provision thereof; or (4) any specification, standard or operating procedure relating to the establishment or operation of the Franchised Business be submitted to final and binding arbitration before, and in accordance with, the Commercial Rules of the American Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction of it. Except as otherwise provided, the substantive law of the State of California, except its law relating to conflicts of laws, shall be applied in such arbitration, and this requirement shall be deemed jurisdictional. This arbitration provision shall be deemed self-executing, and if either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party notwithstanding such failure to appear. If Company makes demand for arbitration, such arbitration shall be conducted by the American Arbitration Association at its offices in San Francisco, California, or in a place mutually agreed upon by Company and Franchisee. If Franchisee makes demand for arbitration, such arbitration shall be conducted by the American Arbitration Association either at its offices in San Francisco, California, or (at Franchisee's election) at its offices in the city nearest to the Franchised Business in which such Association maintains facilities for arbitration.

**12.2    Exceptions to Arbitration**

(a)    Any claim or dispute involving or contesting the validity of any of the Trademarks shall not be submitted to arbitration.

(b)    Section 12.1 shall not limit the right of either party to apply to any court of competent jurisdiction for an injunction, attachment, eviction by unlawful detainer or similar proceedings, or other provisional or equitable relief.

**12.3    Notice of Claim**

In the event Franchisee discovers any fact, event, occurrence, transaction, or other matter which, in Franchisee's opinion, either constitutes a breach of, or gives rise to a claim under, this Agreement, or constitutes misrepresentation or fraud regarding any part of any offering circular or other disclosure document delivered to Franchisee in connection with its purchase of the California Closets franchise, then Franchisee shall notify Company, in writing, of such matter no later than ninety (90) days after Franchisee's discovery thereof, to enable Company to adequately and timely investigate, substantiate, or dispute same. In the event Franchisee fails to so notify Company of such matter within such period, Franchisee shall be prohibited from alleging or asserting such matter in any arbitration, judicial, or other adjudicatory proceeding, whether as a claim, cause of action, defense, cross-complaint, counterclaim, cross-claim, or similar claim.

**12.4    Limitations on Remedies**

(a)    Both Company and Franchisee hereby waive the right, if any, to obtain any award for exemplary or punitive damages from the other in any arbitration, judicial, or other adjudicatory proceeding arising out of or with respect to this Agreement, except for willful and malicious conduct of one party which is in fact intended in bad faith to harm the other.

(b)    Franchisee hereby waives the right to obtain any remedy based on the alleged fraud, misrepresentation, or deceit of Company, including without limitation, rescission of this Agreement, in any arbitration, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

(c)    No action shall be maintained, whether in arbitration or otherwise, by Franchisee to enforce any liability of Company with respect to this Agreement, or the sale of the franchise, unless such action is brought before the expiration of one year after the act, event, occurrence or transaction which constituted or gave rise to the alleged liability.

<u>NOTE</u>: By its signature immediately below, Franchisee acknowledges that it has read, understood and consented to this Article 12.

Dated: _12/31/99_

13. **MISCELLANEOUS**

### 13.1   Relationship of the Parties

This Agreement does not in any way create the relationship of principal and agent, joint venture, or partnership between Company and Franchisee.  Franchisee shall not act or attempt to act, or represent himself to others, as an agent of Company or in any manner assume or create any obligation on behalf of or in the name of Company.  Neither party shall be liable for the debts or obligations of the other unless expressly assumed in writing.

### 13.2   Notice To Third Parties

Franchisee shall display prominently on a sign at its place of business, on all correspondence with third parties, and in any printed materials bearing its name or business location, in such manner as Company shall reasonably direct, a statement that the Franchised Business is an independently owned and operated franchise of CALIFORNIA CLOSET COMPANY, INC.

### 13.3   Section Headings

Section headings are for convenience of reference only and shall not be construed as part of this Agreement nor shall they limit or define the meaning of any provision herein.

### 13.4   Attorney's Fees

In the event of any arbitration or litigation hereunder, the prevailing party shall be entitled to recover, in addition to any other relief to which it is entitled, reasonable attorneys' fees and other costs of suit.

### 13.5   Remedies

All rights and remedies conferred upon Company by this Agreement and by law shall be cumulative of each other, and neither the exercise nor the failure to exercise any such right or remedy shall preclude the exercise of any other such right or remedy.

### 13.6   No Waiver

No failure by Company to take action on account of any default by Franchisee, whether in a single instance or repeatedly, shall constitute a waiver of any such default or of the performance required of Franchisee. No express waiver of a default by Franchisee shall be construed as a waiver of any other or future provision, performance, or default.

### 13.7   Severability

Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law.  Whenever there is any conflict between any provision of this Agreement and any present or future law to which the parties have no legal right to contract, the latter shall prevail, but in such event the provision of this Agreement thus affected shall be curtailed and limited only to the extent necessary to conform to the requirement of the law.  If any provision of this Agreement is held to be invalid or otherwise unenforceable, the entire Agreement shall not fail on account of such holding, and the balance of this Agreement shall continue in full force and effect; provided however

that if the provision so held to be invalid or unenforceable granted to either party a material and fundamental right, then such party may elect to terminate this Agreement immediately.

### 13.8    Notices

Any notice or demand given or made pursuant to this Agreement shall be served in the following manner:

(a)      If given to Company, it shall be sent by certified mail, postage fully prepaid, addressed to CALIFORNIA CLOSET COMPANY, Inc. at 1000 4th Street, Suite 800, San Rafael, California, 94901 or at such changed address or addresses as Company may from time to time designate;

(b)      If given to Franchisee, it shall be either delivered personally to the General Manager, or sent by certified mail, postage fully prepaid, addressed to Franchisee at the address of the Franchised Business; and

(c)      Any such notice or demand shall be deemed to have been given or made and shall be deemed effective when the same has been received, or five (5) business days after mailing in accordance herewith, whichever is first.

### 13.9    Entire Agreement

This Agreement, together with any written lease or sublease of the location entered into between Franchisee and Company or any of its subsidiaries or affiliated corporations, constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof, superseding all prior or contemporaneous written or oral agreements.   There are no representations, undertakings, agreements, terms, or conditions not contained or referred to herein or in any such lease or sublease.  However, this Agreement shall not abrogate or impair any understandings or approvals relating to plans and specifications for Franchisee's buildings and premises or the equipment and opening inventory to be installed or placed therein.

### 13.10   Binding Effect

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and permitted assigns.

### 13.11   Governing Law

This Agreement, including all matters relating to the validity, construction, performance, and enforcement thereof, shall be governed by the laws of the State of California.

### 13.12   Counterparts

This Agreement may be executed in any number of identical counterparts, and each such counterpart shall be deemed a duplicate original hereof.

14.    **SUBMISSION OF AGREEMENT**

The submission of this Agreement does not constitute an offer and this Agreement shall become binding upon Company only upon the execution of it by an authorized officer of Company. Acknowledgment of deposit herein by a sales representative of Company shall not be deemed as an acceptance hereof. No such sales representatives have any authority whatsoever to modify any of the terms or provisions of the Agreement or any of the agreements and/or documents herein described, or to execute any of the same on behalf of Company, except as expressly agreed by Company in writing.

THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNLESS AND UNTIL FRANCHISEE HAS BEEN FURNISHED BY COMPANY SUCH DISCLOSURE, IN WRITTEN FORM, AS MAY BE REQUIRED PURSUANT TO APPLICABLE LAW.

THE PARTIES HERETO HAVE FULLY READ AND UNDERSTAND THIS FRANCHISE AGREEMENT, ITS TERMS, CONDITIONS AND SIGNIFICANCE. THE PARTIES HERETO UNDERSTAND AND AGREE THAT THEY EITHER HAVE HAD LEGAL COUNSEL REVIEW THIS FRANCHISE AGREEMENT OR HEREBY KNOWINGLY WAIVE THEIR RIGHT TO HAVE LEGAL COUNSEL REVIEW THIS FRANCHISE AGREEMENT. WHILE ACKNOWLEDGING THEIR RIGHT TO HAVE LEGAL COUNSEL REVIEW THIS FRANCHISE AGREEMENT, THE PARTIES VOLUNTARILY EXECUTE IT MINDFUL OF ITS LEGAL SIGNIFICANCE.

**CALIFORNIA CLOSET COMPANY, INC.**

BY: _____

ITS: _____ PRESIDENT

**FRANCHISEE**

BY: _____

ITS: Managing Partner

EXHIBIT A

TRADEMARKS (FEDERAL)

"CALIFORNIA CLOSETS" - trade name registered on the principal register on September 11, 1990, as Registration Number 1,613,365, in class 42.

"CALIFORNIA CLOSETS" - composite mark consisting of a stylized hanger and the words "CALIFORNIA CLOSETS," registered on the principal register on February 24, 1998, as Registration Number 2,138,333, in international classes 20, 37 and 42.

"SIMPLIFY YOUR LIFE" - service mark registered on the principal register on August 29, 1995, as Registration Number 1,915,339 in classes 35, 37 and 42.

Stylized hanger service mark registered on the principal register on October 28, 1986 as registration number 1,415,023 in classes 20 and 42.

"ROOM2WORK" – application for service mark was submitted for registration on the principal register. The application was assigned a serial number in international classes.

# EXHIBIT B

## TERRITORY

The territory is comprised of the following counties:

| In the state of Illinois: | In the state of Iowa: |
|---|---|
| Jo Daviess | Delaware |
| Carroll | Dubuque |
| Whiteside | Linn |
| Henry | Jones |
| Rock Island | Jackson |
| Mercer | Clinton |
| Henderson | Cedar |
| Warren | Johnson |
| Knox | Muscatine |
| | Scott |

December 31, 1999

Please see highlighted portion of
map on following page for graphic
representation of the territory.

Franchisee

Franchisor

12   ILLINOIS

See index pgs. C30—C34.



IOWA

See index pgs. C38 —C40.



EXHIBIT C

GENERAL MANAGER

Deb Van Boxtel

## OWNER'S GUARANTY AND ASSUMPTION OF

## FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution of the Franchise Agreement (the "Agreement") by CALIFORNIA CLOSET COMPANY, INC. ("Company"), each of the undersigned ("Guarantors") hereby personally and unconditionally (1) guarantees to Company and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that ___Ben-Tel, LLC___ ("Franchisee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

Each Guarantor hereby waives:

(1)    acceptance and notice of acceptance by Company of the foregoing undertakings;

(2)    notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

(3)    protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

(4)    any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5)    any and all other notices and legal or equitable defenses to which he may be entitled.

Each Guarantor consents and agrees that:

(1)    his direct and immediate liability under this guaranty shall be joint and several;

(2)    he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so;

(3)    such liability shall not be conditioned upon pursuit by Company of any remedies against Franchisee or any other person; and

(4)    such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Company may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement.

Franchisee

Franchisee

## RIDER TO THE CALIFORNIA CLOSET COMPANY, INC.
### FRANCHISE AGREEMENT
### REQUIRED BY THE STATE OF ILLINOIS

This Rider is entered into this 31ˢᵗ day of December 1999, by and between California Closet Company, Inc., a California corporation ("Company," "we," "us," or "our") and __Ben-Tel LLC__ ("Franchisee," "you," or "your").

1.     **Background.** We and you are parties to that certain Franchise Agreement dated December 31, 1999 that has been signed concurrently with the signing of this Rider. This Rider is annexed to and forms part of the Franchise Agreement. This Rider is being signed because (a) the offer or sale of the franchise for the Franchised Business that you will operate under the Franchise Agreement was made in the State of Illinois and you will operate the Franchised Business in the State of Illinois; and/or (b) you are a resident of the State of Illinois.

2.     Section 12.1 (Submission to Arbitration) shall be revised by adding the following as the last sentence thereof:

> This provision will not affect any claim or liability arising under the Illinois Franchise Disclosure Act and Illinois law shall govern any such claim or liability.

3.     Section 12.3 shall be revised by adding the following as the last sentence thereof:

> This foregoing provision shall not operate to shorten any statute of limitations for claims arising under the Illinois Franchise Disclosure Act.

4.     Section 14 shall be revised by adding the following as the last sentence thereof:

> Although the submission of this Agreement to you does not constitute a binding offer to enter into this Agreement, it may constitute an "offer" for purposes of applying the Illinois Franchise Disclosure Act.

    IN WITNESS WHEREOF, each of the undersigned hereby acknowledges having read this Rider, understands and consents to be bound by all of its terms, and have caused this Rider to be executed on the dates written below.

FRANCHISEE: Ben-Tel L.L.C.

By: _____
Title: Managing Partner
Dated: 12/31/99

CALIFORNIA CLOSET COMPANY, INC.

By: _____
Title: PRESIDENT
Dated: 1/5/00

# EXHIBIT 2

**EBBEN ENTERPRISES, INC.**
**DBA CALIFORNIA CLOSET COMPANY**
2350 W. PERSHING ST.   PH: (920) 738-7411
APPLETON, WI 54914

FOX COMMUNITIES CREDIT UNION
APPLETON, WI 54914

79-7725-2759

2/13/2008

| | | |
|---|---|---|
| PAY TO THE ORDER OF: | California Closet Co | $ **3,407.65 |

Three Thousand Four Hundred Seven and 65/100************************************************************ DOLLARS

California Closet Co
1000  Fourth Street #800
San Rafael, CA 94901

*[signature]*
AUTHORIZED SIGNATURE

MEMO

⑈014615⑈  ⑆275977256⑆900000302430⑈

**EBBEN ENTERPRISES, INC.**
**DBA CALIFORNIA CLOSET COMPANY**
2350 W. PERSHING ST.   PH: (920) 738-7411
APPLETON, WI 54914

FOX COMMUNITIES CREDIT UNION
APPLETON, WI 54914

79-7725-2759

2/13/2008

PAY TO THE
ORDER OF:     California Closet Co Marketing Fund                                    $   **1,703.82

One Thousand Seven Hundred Three and 82/100************************************************************************   DOLLARS

California Closet Co Marketing Fund
1000  Fourth Street #800
San Rafael, CA 94901

*Mark Ebben*
AUTHORIZED SIGNATURE

MEMO

⑈014616⑈ ⑆275977256⑆ 900000302430⑈

# EXHIBIT 3

JUL-16-2007 08:28  FROM:CLOSETS 9207380127          TO:14152568520          P:1/1

# CALIFORNIA CLOSETS

## STEVENS DROP SHIP
## CLOSET COMPONENTS ORDER FORM

*Effective May 15, 2006*

**RECEIVED**

STORE NUMBER: 85

SHIP TO ADDRESS: 2350 W Pershing St

1pg  7/16  EW

DATE: 7/16/2007

PO #: 2007-0716-3

CITY, STATE, ZIP: Appleton, WI 54914

ORDERED BY: J Mark Ebben

RUSH - 24/48/72 HRS

LTL

TRUCKLOAD    UPS

TOTAL PAGES FAXED: _____

S 8058-2
(non-stock)

## *SEE IMPORTANT NOTE AT BOTTOM

| PART CODE | QTY. PALLET | DESCRIPTION | PALLET WEIGHT | 25 | 46 | 80 | 86 | 90 | TOTAL LBS. |
|---|---|---|---|---|---|---|---|---|---|
| | | | | COLORS | | | | | |
| **PARTITIONS** | | | | | | | | | |
| SCVH02 | 20 | Hutch Partition | 780 | | | | | | |
| SCVT02 | 100 | Long Par -- Square Bottom | 2,200 | | | | | | |
| SCVT02 | 50 | Long Par -- Square Bottom | 1,185 | | | | | | |
| SCVS04 | 100 | Short Par -- Rounded Bottom | 1,390 | | | | | | |
| SCVS04 | 50 | Short Par -- Rounded Bottom | 750 | | | | | | |
| SCVT04 | 100 | Long Par -- Rounded Bottom | 2,240 | | | | | | |
| SCVT04 | 50 | Long Par -- Rounded Bottom | 1,195 | | | | | | |
| SCVT05N | 20 | Extra Long Par -- Blank, Rounded Bottom | 695 | | | | | | |
| SCVSB04 | 60 | Short Blank Par --Rounded Bottom | 340 | | | | | | |
| SCVSB04 | 20 | Short Blank Par --Rounded Bottom | 136 | | | | | | |
| SCVTB04 | 50 | Long Blank Par -- Rounded Bottom | 1,185 | | | | | | |
| SCVTB04 | 20 | Long Blank Par -- Rounded Bottom | 474 | | | | | | |
| **SQUARE EDGE SHELVING** | | | | | | | | | |
| SCSC14 | 50 | Corner Shelf | 800 | | | | | | |
| SCSC14 | 20 | Corner Shelf | 380 | | | | | | |
| SCSL14 | 75 | Shelf Stick -- 14" x 97" | 2,280 | | | | | | |
| SCSL14 | 50 | Shelf Stick -- 14" x 97" | 1,480 | | | | | | |
| SCSL14 | 20 | Shelf Stick -- 14" x 97" | 740 | | | | | | |
| SCSL18 | 50 | Shelf Stick -- 18" x 97" | 1,790 | | | | | | |
| SCSL24 | 50 | Shelf Stick -- 24" x 97" | 2,360 | | | | | | |
| SCSL24 | 20 | Shelf Stick -- 24" x 97" | 952 | | | | | | |
| **SHEETSTOCK** | | | | | | | | | |
| SPAL55 | 20 | 5' X 8' Sheetstock | 2,700 | | | | | | |
| **MINI-BINS AND MAXI-BINS** | | | | | | | | | |
| SMN8V | 18 | Bins Verticals | 84 | | | | | | |
| SMNBS18 | 18 | 18" Mini-bin Shelf | 40 | | | | | | |
| SMNBS24 | 18 | 24" Mini-bin Shelf | 51 | | | | | | |
| SMNBS30 | 18 | White 30" Mini-bin Shelf | 66 | | | | | | |
| SMXBS24 | 18 | White 24" Maxi-bin Shelf | 51 | 1 | 1 | | 1 | 1 | 102 |
| | | | | | | | | TOTAL WEIGHT | |

| COLOR CODE KEY | |
|---|---|
| 25 | *Cognac |
| 46 | Almond |
| 80 | Black |
| 86 | White |
| 90 | Hardrock Maple |

Non Stock Item (may be a custom order)
Allow 3-4 Weeks Lead Time

* All highlighted Items are on S 8058 (stock)

**Important Note:** *Cognac has 1mm Edgebanding (all other colors have 1/2mm)

APR-13-2007 08:00  FROM:CLOSETS 9207380127          TO:14152568520          P:1/1

## STEVENS DROP SHIP
## CLOSET COMPONENTS ORDER FORM
*Effective May 15, 2006*

# CALIFORNIA CLOSETS

STORE NUMBER: 85

SHIP TO ADDRESS: 2350 W Pershing Street          RECEIVED

CITY, STATE, ZIP: Appleotn, WI 54914

ORDERED BY: J Mark Ebben

TOTAL PAGES FAXED: _____

| | | |
|---|---|---|
| DATE | 4/12/2007 | |
| PO # | 2007-0412-1 | |
| RUSH - 24/48/72 HRS | | UPS |
| LTL | | |
| TRUCKLOAD | | |

S7576

## *SEE IMPORTANT NOTE AT BOTTOM

| PART CODE | QTY. PALLET | DESCRIPTION | PALLET WEIGHT | COLORS 25 | 45 | 80 | 86 | 90 | TOTAL LBS. |
|---|---|---|---|---|---|---|---|---|---|
| | | **PARTITIONS** | | | | | | | |
| SCVH02 | 20 | Hutch Partition | 780 | | | | | | |
| SCVT02 | 100 | Long Par -- Square Bottom | 2,200 | | | | | | |
| SCVT02 | 50 | Long Par -- Square Bottom | 1,185 | | | | | | |
| SCVS04 | 100 | Short Par -- Rounded Bottom | 1,390 | | | | | | |
| SCVS04 | 50 | Short Par -- Rounded Bottom | 750 | | | | | | |
| SCVT04 | 100 | Long Par -- Rounded Bottom | 2,240 | | | | | | |
| SCVT04 | 50 | Long Par -- Rounded Bottom | 1,195 | | | | | | |
| SCVT05N | 20 | Extra Long Par -- Blank, Rounded Bottom | 695 | | | | | | |
| SCVSB04 | 50 | Short Blank Par --Rounded Bottom | 340 | | | | | | |
| SCVSB04 | 20 | Short Blank Par --Rounded Bottom | 135 | | | | | | |
| SCVTB04 | 50 | Long Blank Par -- Rounded Bottom | 1,185 | | | | | | |
| SCVTB04 | 20 | Long Blank Par -- Rounded Bottom | 474 | | | | | | |
| | | **SQUARE EDGE SHELVING** | | | | | | | |
| SCSC14 | 50 | Corner Shelf | 800 | | | | | | |
| SCSC14 | 20 | Corner Shelf | 380 | | | | | | |
| SCSL14 | 75 | Shelf Stick -- 14" x 97" | 2,260 | | | | | | |
| SCSL14 | 50 | Shelf Stick -- 14" x 97" | 1,480 | | | | | | |
| SCSL14 | 20 | Shelf Stick -- 14" x 97" | 740 | | | | | | |
| SCSL18 | 50 | Shelf Stick -- 18" x 97" | 1,790 | | | | | | |
| SCSL24 | 50 | Shelf Stick -- 24" x 97" | 2,380 | | | | | | |
| SCSL24 | 20 | Shelf Stick -- 24" x 97" | 962 | | | | | | |
| | | **SHEETSTOCK** | | | | | | | |
| SPAL58 | 20 | 5' X 8' Sheetstock | 2,700 | | | | | | |
| | | **MINI-BINS AND MAXI-BINS** | | | | | | | |
| SMNBV | 18 | Bins Verticals | 84 | | | | | | |
| SMNBS18 | 18 | 18" Mini-bin Shelf | 40 | | | | | | |
| SMNBS24 | 18 | 24" Mini-bin Shelf | 51 | | | 2 | | | 102 |
| SMNBS30 | 18 | White 30" Mini-bin Shelf | 66 | | | | | | |
| SMXBS24 | 18 | White 24" Maxi-bin Shelf | 51 | | | | | | |
| | | | | | | | TOTAL WEIGHT | 102 |

| COLOR CODE KEY | |
|---|---|
| 25 | *Cognac |
| 45 | Almond |
| 80 | Black |
| 86 | White |
| 90 | Hardrock Maple |

☐ Non Stock Item (may be a custom order)
Allow 3-4 Weeks Lead Time

**Important Note:**  *Cognac has 1mm Edgebanding (all other colors have 1/2mm)

California Closets Corporate Distribution Services - Phone (800) 873-4264  Fax (415) 256-8520

# EXHIBIT 4

14543

**EBBEN ENTERPRISES, INC.**
**DBA CALIFORNIA CLOSET COMPANY**
2350 W. PERSHING ST.    PH: (920) 738-7411
APPLETON, WI 54914

FOX COMMUNITIES CREDIT UNION
APPLETON, WI 54914

79-7725-2759

1/25/2008

PAY TO THE
ORDER OF: California Closet Co                                    $  **2,724.47

Two Thousand Seven Hundred Twenty-Four and 47/100********************************************************** DOLLARS

California Closet Co
1000  Fourth Street #800
San Rafael, CA 94901

AUTHORIZED SIGNATURE

MEMO

⑈014543⑈ ⑆275977256⑈900000302430⑈

---

EBBEN ENTERPRISES, INC. • DBA CALIFORNIA CLOSET COMPANY                    14543

| California Closet Co | | 1/25/2008 | |
|---|---|---|---|
| Inventory:Inventory CCC | 0156649-IN | | 1,953.64 |
| Inventory:Inventory CCC | 0156692-IN | | 520.02 |
| Inventory:Inventory CCC | 0156876-IN | | 250.81 |

Fox Communities Cre                                              2,724.47

# EXHIBIT 5

## Hughes, John

| | |
|---|---|
| **From:** | Mark Ebben [mebben@tds.net] |
| **Sent:** | Tuesday, November 20, 2007 5:20 PM |
| **To:** | Bill Barton |
| **Subject:** | RE: Audit Scheduling |

Bill the dates available at my accountants office are 11/27 thru 11/30. I have made complete copies of Fed Tax returns

for 2002;2003;2004;2005;2006 and could FedEx them out Wed if this would be of help.

You do not have the right to audit any other business records than California Closets, so they will be the only ones

available. Please contact Atty Andrew Wegner at 920-731-5201 regarding any requests other than California Closets.

My accountants office is located at 1121 West Valley Road, Appleton, WI. I will be attending the audit.

Thanks, Mark

-----Original Message-----
**From:** Bill Barton [mailto:bbarton@calclosets.com]
**Sent:** Monday, November 19, 2007 5:49 PM
**To:** Mark Ebben
**Subject:** Audit Scheduling
**Importance:** High

Mark – I haven't seen an email back. I have the auditors ready to go. Can you confirm that you have spoken with your accountant and that the financial records for both companies can be made available to us NLT Nov 30? Thanks, Bill

**BILL BARTON**
Senior Vice President

**CALIFORNIA CLOSET COMPANY, INC.**
1000 Fourth Street, Suite 800
San Rafael, CA 94901

T 415.482.6449
F 415.256.8501
The information contained in the e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please email the sender at bbarton@calclosets.com

# EXHIBIT B

CHGO1\30993356.1

1   DLA PIPER US LLP
    JEFFREY HAMERLING (State Bar No. 91532)
2   153 Townsend Street, Suite 800
    San Francisco, CA  94107-1957
3   jeffrey.hamerling@dlapiper.com
    Phone: 415.836.2500
4   Fax: 415.836.2501

5   DLA PIPER US LLP
    NORMAN M. LEON *(to be admitted pro hac vice)*
6   JOHN A. HUGHES *(to be admitted pro hac vice)*
    203 North LaSalle Street, Suite 1900
7   Chicago, IL  60601
    Phone: 312.368.4000
8   Fax: 312.236.7516

9   Attorneys for Plaintiff
    CALIFORNIA CLOSET COMPANY, INC.
10

11                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13   CALIFORNIA CLOSET COMPANY,          CASE NO. CV 08-0625 SI
     INC.,
14   a California corporation,

15            Plaintiff,                 DECLARATION OF VINCENT GRUBBS

16       v.

17   J. MARK EBBEN,
     an individual, and
18   EBBEN ENTERPRISES, INC.,
     a Wisconsin corporation,
19
              Defendant.
20

21

22   1.  My name is Vincent Grubbs.  I am an individual over the age of eighteen (18) years.  The

23       facts set forth herein are based upon my personal knowledge as well as my review of

24       certain documents that California Closet Company, Inc. ("CCC") keeps in the ordinary

25       course of its business.  I would be willing and able to testify thereto if and when called

26       upon to do so.

27   2.  I reside in San Francisco, California.

28

DLA PIPER US LLP
SAN FRANCISCO

3.  I am the Chief Financial Officer of CCC.  I have held that position since 1993.  As the Chief Financial Officer, my duties include, among other things, overseeing the accounts of CCC's franchisees, including the California Closets franchise operated by Ebben Enterprises, Inc. and J. Mark Ebben.

4.  I work at CCC's headquarters in San Rafael, California.

5.  The annual accounting periods for CCC's franchisees run from December through the following November.  Based on the sales Defendants reported to CCC, Defendants' gross revenues exceeded $564,000 in the 2004-2005 accounting period, and exceeded $525,000 in both the 2005-2006 and 2006-2007 accounting periods.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 27, 2008.

VINCENT GRUBBS

# EXHIBIT C

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA NORTHERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 7,970 | 8,683 | 6,362 | 6,727 | 6,919 | 7,887 | | |
| | Terminations | | 6,777 | 6,983 | 6,966 | 6,471 | 7,094 | 6,675 | | |
| | Pending | | 9,005 | 8,157 | 6,557 | 7,267 | 7,567 | 7,958 | | |
| | % Change in Total Filings | Over Last Year | | -8.2 | | | | | 79 | 15 |
| | | Over Earlier Years | | | 25.3 | 18.5 | 15.2 | 1.1 | 35 | 5 |
| | Number of Judgeships | | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | 3.1 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 569 | 620 | 455 | 480 | 494 | 563 | 15 | 4 |
| | | Civil | 505 | 558 | 390 | 413 | 424 | 510 | 8 | 2 |
| | | Criminal Felony | 33 | 37 | 39 | 44 | 47 | 42 | 86 | 14 |
| | | Supervised Release Hearings** | 31 | 25 | 26 | 23 | 23 | 11 | 28 | 10 |
| | Pending Cases | | 643 | 583 | 468 | 519 | 541 | 568 | 12 | 2 |
| | Weighted Filings** | | 624 | 621 | 543 | 581 | 631 | 598 | 8 | 2 |
| | Terminations | | 484 | 499 | 498 | 462 | 507 | 477 | 30 | 7 |
| | Trials Completed | | 8 | 8 | 10 | 10 | 11 | 11 | 92 | 14 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 12.4 | 11.2 | 12.6 | 11.1 | 11.7 | 11.8 | 82 | 14 |
| | | Civil** | 6.7 | 7.4 | 9.8 | 8.2 | 10.6 | 9.5 | 11 | 2 |
| | From Filing to Trial** (Civil Only) | | 24.9 | 25.0 | 28.0 | 22.5 | 30.3 | 23.5 | 46 | 7 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 393 | 528 | 530 | 430 | 377 | 475 | | |
| | | Percentage | 4.7 | 7.3 | 9.5 | 6.9 | 5.7 | 6.7 | 51 | 5 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 53.81 | 59.09 | 55.21 | 61.19 | 65.00 | 66.42 | | |
| | | Percent Not Selected or Challenged | 41.9 | 43.2 | 31.0 | 48.9 | 40.9 | 47.2 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7074 | 122 | 975 | 1610 | 94 | 44 | 534 | 527 | 243 | 533 | 732 | 422 | 1238 |
| Criminal* | 455 | 6 | 72 | 162 | 40 | 64 | 11 | 38 | 5 | 6 | 16 | 15 | 20 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **WISCONSIN EASTERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 1,665 | 1,740 | 1,744 | 1,906 | 1,639 | 1,658 | | |
| | Terminations | | 1,777 | 1,719 | 1,740 | 1,738 | 1,548 | 1,634 | | |
| | Pending | | 1,483 | 1,664 | 1,637 | 1,621 | 1,446 | 1,293 | | |
| | % Change in Total Filings | Over Last Year | | -4.3 | | | | | 61 | 4 |
| | | Over Earlier Years | | | -4.5 | -12.7 | 1.6 | .4 | 37 | 2 |
| | Number of Judgeships | | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | .0 | 7.5 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 333 | 347 | 349 | 381 | 328 | 332 | 71 | 7 |
| | | Civil | 246 | 279 | 279 | 310 | 265 | 269 | 66 | 7 |
| | | Criminal Felony | 67 | 56 | 54 | 56 | 46 | 48 | 51 | 4 |
| | | Supervised Release Hearings** | 20 | 12 | 16 | 15 | 17 | 15 | 56 | 4 |
| | Pending Cases | | 297 | 333 | 327 | 324 | 289 | 259 | 72 | 6 |
| | Weighted Filings** | | 387 | 423 | 397 | 437 | 363 | 387 | 57 | 5 |
| | Terminations | | 355 | 344 | 348 | 348 | 310 | 327 | 69 | 7 |
| | Trials Completed | | 6 | 8 | 11 | 7 | 9 | 8 | 94 | 7 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 8.8 | 8.9 | 9.5 | 8.1 | 7.8 | 7.1 | 52 | 3 |
| | | Civil** | 8.2 | 8.8 | 9.1 | 7.8 | 8.4 | 8.3 | 33 | 3 |
| | From Filing to Trial** (Civil Only) | | - | 28.0 | 20.3 | 22.0 | 18.0 | 15.0 | - | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 46 | 116 | 131 | 48 | 14 | 20 | | |
| | | Percentage | 4.1 | 8.6 | 9.6 | 3.5 | 1.1 | 1.8 | 40 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.8 | 1.7 | 1.6 | 1.5 | 1.4 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 52.75 | 41.45 | 38.52 | 41.23 | 38.56 | 41.93 | | |
| | | Percent Not Selected or Challenged | 42.9 | 33.7 | 28.9 | 27.5 | 28.8 | 28.2 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1231 | 79 | 26 | 328 | 46 | 5 | 137 | 144 | 54 | 57 | 199 | 3 | 153 |
| Criminal* | 330 | 4 | 106 | 19 | 85 | 56 | 7 | 20 | 3 | 2 | 5 | 11 | 12 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."